**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| rue21, inc., *et al.*,[1] | ) | Case No. 17-22045 (GLT) |
| | ) | |
| Debtors. | ) | Chapter 11 |
| | ) | (Joint Administration Requested) |
| rue21, inc., *et al.*, | ) | |
| | ) | |
| Movants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| No Respondent. | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**DECLARATION OF TODD M. LENHART,
ACTING CHIEF FINANCIAL OFFICER AND SENIOR VICE
PRESIDENT OF ACCOUNTING OF RUE21, INC., IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

| | | |
|---|---|---|
| STATE OF PENNSYLVANIA | ) | |
| | ) | ss. |
| COUNTY OF ALLEGHENY | ) | |

I, Todd M. Lenhart, declare under penalty of perjury to the best of my knowledge,

information, and belief:

1.  I am the Acting Chief Financial Officer and Senior Vice President of Accounting

of rue21, inc. ("rue21"), one of the above-captioned debtors and debtors in possession

(the "Debtors" or the "Company"). I joined rue21 in April 2005 as Controller and was promoted

to Vice President of Accounting in 2010. In October 2016, my role expanded to include the title

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, include: rue21, inc. (1645); Rhodes Holdco, Inc. (6922); r services llc (9425); and rue services
corporation (0396). The location of the Debtors' service address is: 800 Commonwealth Drive, Warrendale,
Pennsylvania 15086.

of Acting Chief Financial Officer.  I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration (this "Declaration") to assist the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court") and other parties in interest in understanding the circumstances leading to the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and certain motions and applications filed in these cases contemporaneously therewith.

2.    Except as otherwise indicated, all facts in this Declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, including Kirkland & Ellis LLP ("K&E"), Rothschild Inc. ("Rothschild"), and Berkeley Research Group LLC ("BRG"), my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and/or my opinions based upon my experience and knowledge.  I am over the age of 18 years and duly authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

3.    The Debtors have requested a variety of relief in their "first day" motions and applications (the "First Day Motions") to minimize any potential adverse effect of the filing of these chapter 11 cases on the Debtors' business and estates.  I am familiar with the contents of each First Day Motion, and I believe that the relief sought therein is necessary to permit an effective transition of the Debtors' operations into chapter 11.  I also believe that the relief requested in the First Day Motions will aid in the implementation of efficient chapter 11 cases that will preserve and maximize the value of the Debtors' estates for the benefit of all parties in interest.

4.      To familiarize the Bankruptcy Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief that they are seeking in their First Day Motions, I have organized this Declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;

- **Part II** provides an overview of the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases;

- **Part IV** describes the Debtors' proposed debtor-in-possession financing and restructuring support agreement; and

- **Part V** sets forth the evidentiary basis for the relief requested in each of the first day pleadings.

**I.      General Background**

**A.      The Debtors' Business Operations**

5.      rue21 is a specialty fashion retailer of girls' and guys' apparel and accessories. For over 37 years, rue21 has been famous for offering the latest trends at an affordable price point that does not require the Company's customers to sacrifice style for savings.   The Company is headquartered in Warrendale, Pennsylvania and it has one distribution center located in Weirton, West Virginia (the "Distribution Center").   The Debtors sell their merchandise to customers in the contiguous 48 states through their online store and their 1,179 brick-and-mortar stores located in various strip centers, regional malls, and outlet centers.



6.     The Debtors have several core rue21 brands in girls' apparel (*rue21*), intimate apparel (*true*), girls' accessories (*etc!*), girls' cosmetics (*ruebeauté!*), guys' apparel and accessories (*Carbon*), girls' plus-size apparel (*rue+*), and girls' swimwear (*ruebleu*).  These core rue21 brands each focus on the Debtors' guiding principle of "Fashion Meets Value," in order to provide quality, yet affordable, young adult clothing to the Company's target demographic of teenagers and young adults in small and mid-size markets.

7.     The Debtors offer a variety of products such as tops, bottoms, dresses, rompers, shoes, accessories, cosmetics, fragrances, lingerie/intimates, outerwear, and swimwear, which can each be found in any of the Company's stores.



8.      The Company maintains control over its proprietary brands by designing, sourcing, marketing, and selling its own merchandise; it does not license the rue21 brand to any third parties.  The Company is able to offer its budget-conscious customers outstanding value on fast-fashion clothing and accessories through an extensive nationwide footprint (limited to the continental United States), localized assortment, a low-cost business model, and a growing online presence.  Through its unique product development strategy, which ensures popular,

quality, and fashion-forward merchandise in stores for the right price, rue21 retains its customers' loyalty.

9.    Like many clothing retailers, rue21 has a strong seasonal cadence, as evidenced by its peak selling periods, including Easter, back-to-school, and Christmas.  Given that these seasons fall relatively evenly throughout the course of the year, the Company's peak selling periods create a relatively even flow of revenues throughout the year.  These peak seasons, including the critical back-to-school season which will occur while the Debtors are operating in chapter 11, are very important to the Debtors' business and ability to continue as a going concern.

10.    Historically, rue21 experienced strong growth, with sales growing from $296.9 million in fiscal year 2007 to $901.9 million in fiscal year 2012.  More recently, the Company's gross sales totaled $1.130 billion in fiscal year 2015 with approximately $105 million in adjusted EBITDA.[2]  Although sales slightly increased in 2016 to $1.137 billion, the Company's adjusted EBITDA decreased by almost half, to $54 million.

---

[2]    EBITDA has been adjusted for non-recurring items such as stock compensation and store improvement.



11.    After years of success and growth, the Debtors' business performance has come under significant pressure in recent years.  While the *Carbon*, *etc!*, and *rue+* brands continue to perform, the results of the Company's girls' division have declined, stemming in large part from an evolution of customer tastes.  For example, the girls' division accounted for 54% of the Company's total gross sales in 2015, while in 2016, it accounted for only 50.2% (with divisional gross sales of $608 million and $568 million, respectively), a material year-over-year drop.

12.    At the same time, the retail industry in general has experienced significant headwinds, requiring traditional brick-and-mortar retailers to adapt to an increasingly digital-focused consumer.  In recent years, the Company has experienced a decline in in-store transactions due to online shopping.  While the Company's online presence is expanding and improving, the Company's historic online platform was not as robust as that of certain of its competitors.

13.    Notwithstanding its current financial difficulties, rue21 remains a valuable and iconic brand with a large and loyal customer base.  In an effort to ensure its longevity, rue21,

through its senior management, has already undertaken a variety of initiatives to reinvigorate the

business.  In particular, the Company hired Nina Barjesteh as Chief Merchandising Officer on or

about October 1, 2016.  Ms. Barjesteh was formerly the Vice President and General Merchandise

Manager of the Women's Apparel Division at Target Corporation and was employed by Target

in various other positions for approximately 20 years.  The Company hired Ms. Barjesteh to

transform and reinvigorate the girls' segment by streamlining the Company's supply chain and

elevating the style and quality of the Debtors' female-focused lines.  These efforts are currently

well underway.

14.     In recent months, the Company has also been focused on revamping its e-

commerce strategy and increasing the number of customers who engage with rue21 on its digital

platform.    Likewise, senior management has recently focused on improving the in-store

experience for customers who visit rue21 stores.  Senior management has also been focused on

right-sizing the Company's existing store footprint, lease portfolio, and capital structure.  Just

last month, the Company began liquidating inventory and/or exiting approximately 400 of its

underperforming stores, which will reduce its retail footprint from 1,179 to approximately 800

stores.  In order to assist the Company in that process, the Company hired K&E, Rothschild,

BRG, A&G Realty Partners, LLC ("A&G") and Gordon Brothers Retail Partners, LLC ("Gordon

Brothers").

15.     These chapter 11 cases are a critical step in the Debtors' efforts to create a

uniformly profitable business and sustainable capital structure.  Among other things, the Debtors

are hopeful that these chapter 11 cases will allow them to:  (a) effect a significant deleveraging

of their existing capital structure, resulting in a sustainable debt and interest burden, or effect a

going concern sale of their business; (b) right-size the Company's store footprint and provide an

opportunity to renegotiate off-market leases; and (c) provide the Debtors with the breathing room necessary to finalize and begin to execute a long-term business plan with input from their relatively new management team, their advisors, and their key constituents in these cases.

### B.    Merchandising Strategy

16.     An important aspect of the Debtors' business strategy is to maintain and leverage the customer loyalty generated by their core demographic — teenage girls.  To maintain and grow this loyal customer base, the Company's merchandising strategy necessitates a wide selection of core products developed in accordance with the latest fashion trends at prices significantly below that of most of its competitors.  Competitive pricing is important to rue21 customers, who, on average, earn less than $35,000 of gross annual income.  The Company's business model is dependent on identifying "on-trend" merchandise through its branding and merchandising partners.  rue21 is able to keep its products on-trend by using its internal design methods and through its third-party consultants, each of whom monitor marketplace trends and provide input on styles of clothing and accessories.

### C.    Supply Chain

17.     Also key to serving the Debtors' customer base well is the Debtors' established global supply chain.  The Debtors maintain an integrated supply chain comprised of more than 90 vendors that is designed to ensure the uninterrupted flow of new merchandise to their brick-and-mortar locations and to their e-commerce customers.  The Debtors shop styles and designs offered by a variety of vendors and contract with the vendors to source and manufacture their final products (the "Merchandise").  The Debtors do not manufacture the Merchandise, and they rely entirely upon their vendors, shippers, and warehousemen to ensure a continuous supply of goods to their customers.

18.    The overwhelming majority of finalized Merchandise that the Debtors order from their vendors is shipped by the vendors to a third-party logistics company, Pacific Logistics Corp. ("PLC").   All Merchandise that will be sold in rue21 stores is shipped by PLC to the Debtors' Distribution Center in West Virginia.   From the Distribution Center, the Debtors ship Merchandise directly to their stores using FedEx.   All Merchandise sold online through the Company's e-commerce platform is currently shipped by PLC to an Ohio warehouse operated by TradeGlobal LLC ("TradeGlobal").[3]   TradeGlobal currently fulfills the Debtors' online orders and ships directly to rue21's online customers using United Parcel Service, Inc.

19.    The flow of Merchandise from the Debtors' vendors to these various facilities depends upon the services provided by, among others, freight forwarders, common carriers, and customs brokers.   The brick-and-mortar and e-commerce supply chain costs totaled $16.8 million in 2016, with monthly costs ranging from $1.1 million to $2.0 million.

**D.    Employee Compensation and Benefits**

20.    The Debtors employ approximately 15,800 employees, including approximately 3,500 full-time employees[4] and approximately 12,300 part-time employees (collectively, the "Employees").  The Employees serve in many capacities supporting the Debtors' operations at the corporate office, the Debtors' distribution center, or at the retail store level.  In addition to the Employees, the Debtors also retain, from time-to-time, independent contractors (the "Independent Contractors") to complete discrete projects, as well as temporary workers (the "Temporary Staff") to fulfill certain duties, including additional store-level staffing during peak sales seasons.  The Debtors currently retain approximately 35 Independent Contractors and

---

[3]    The Debtors have entered into a contract to transition e-commerce fulfillment services from TradeGlobal to Radial Inc. ("Radial").  The Debtors currently intend to assume that contract and, beginning in July 2017, it is expected that online order fulfillment will take place in Radial's Walton, Kentucky warehouse.

[4]    Full-time employees are generally scheduled to work 40 hours per week.

Temporary Staff, although this number fluctuates based on the Debtors' specific needs at any given time.

21.     Prior to May 15, 2017 (the "<u>Petition Date</u>"), the Debtors instituted a "reduction in force" program that will continue to be rolled out following the Petition Date.  This program is designed to reduce the Debtors' total employee headcount (and related costs) to account for the Debtors' decreasing number of stores.  In order to ensure that employees that will be affected by the ongoing reduction in force continue to provide services to the Debtors during this critical period, the Debtors have offered certain employees non-insider severance packages that are consistent with historical practice and are payable at the completion of each employee's agreed employment period.  The Debtors have requested authority to continue and pay these non-insider severance payments in the ordinary course, in order to ensure that employees affected by the reduction in force provide services for a period of time necessary to support the Debtors' ongoing store liquidation sales at certain locations and to maintain employee morale and expectations at this critical juncture.  I believe that this program is critical to ensure that the Debtors' current employees continue to provide services that are necessary to maximize value on account of the current store closing process.

### E.     Real Estate Obligations

22.     The Debtors have a national store footprint of 1,179 stores in all of the 48 contiguous United States with strong concentrations in Texas, Georgia, Ohio, North Carolina, Florida, and California.  The Debtors are leasehold tenants at all of their store locations. The aggregate occupancy cost for the Debtors' stores in fiscal year 2016 was approximately $118 million and in fiscal year 2017 it is anticipated to be approximately $119 million (before the store closings).  In addition, the Debtors lease approximately 84,000 square feet in Warrendale, Pennsylvania, as their corporate headquarters to house certain of the Debtors'

personnel, as well as a photo studio.  The Debtors also lease approximately 375,000 square feet in Weirton, West Virginia to house their Distribution Center for distribution of merchandise to brick-and-mortar stores.  The Debtors also lease a 6,124 square foot office in New York City for limited business purposes.  Finally, the Debtors lease an apartment in Mars, Pennsylvania, where the former Chief Executive Officer, Robert N. Fisch, used to live.



### F.    The October 2013 Privatization and Financing

23.    rue21 is a successor entity to Pennsylvania Fashions Inc., a company that exited chapter 11 proceedings in 2003.  Saunders Karp & Megrue ("SKM") was the majority shareholder of rue21 at the time of its previous exit from chapter 11.  In 2005, Apax Partners, Inc. merged with SKM and thereby became the majority owner of rue21.  Shortly thereafter, rue21 moved into its current Warrendale, Pennsylvania headquarters.  rue21 became a publicly traded company in 2009 with an initial public offering on the NASDAQ Global Select Market under the ticker symbol RUE.  In 2013, however, certain funds and other entities managed or affiliated with Apax Partners, L.P. ("Apax") took rue21 private again through a transaction that involved its merger into Rhodes Merger Sub, Inc. and the buyback of shares from rue21's public shareholders, creating the current corporate structure depicted in **Section II**.

24.    The take-private transaction was completed on October 10, 2013, at which time rue21 obtained certain new senior secured credit facilities consisting of:  (a) a $150 million, five-year asset-based revolving credit facility, of which $10 million was drawn at closing (the "ABL Facility"); and (b) a $538.5 million, seven-year senior secured term loan facility (the "Term Loan Facility"), which was fully drawn at closing.  At the same time, the company issued $250 million in aggregate principal amount of 9.0% senior unsecured notes due 2021 (the "Notes"), and Apax and certain members of management made an equity investment of $270 million.

## II.    The Debtors' Prepetition Corporate and Capital Structure

### Structure Chart



25. The chart above depicts the Debtors' current corporate structure, which was created in connection with the 2013 privatization of the Company. rue21, inc. is the borrower under the ABL Facility and the Term Loan Facility, as well as the issuer of the Notes.

26. As of the Petition Date, the Debtors' capital structure consisted of outstanding funded-debt obligations in the aggregate principal amount of approximately $832 million arising under the ABL Facility, the Term Loan Facility, and the Notes. The following table summarizes the Debtors' outstanding prepetition funded-debt obligations. The subsidiaries of rue21, inc. (*i.e.*, r services llc and rue services corporation) are guarantors of the ABL Facility, the Term Loan Facility, and the Notes. Rhodes Holdco, Inc. is a guarantor under the ABL Facility and the Term Loan Facility only.

|  | Facility Size | Maturity | Outstanding Principal Amount |
|---|---|---|---|
| ABL Facility | $150 million | October 2018 | $72 million |
| Term Loan Facility | $538.5 million | October 2020 | $521 million |
| Unsecured Notes | $250 million | October 2021 | $239 million |
|  |  | Total: | $832 million |

## A. ABL Revolving Credit Facility

27. rue21, inc., Bank of America, N.A. as administrative agent (the "ABL Agent"), and the lenders from time to time party thereto (the "ABL Lenders"), are parties to that certain ABL Credit Agreement, dated as of October 10, 2013 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "ABL Credit Agreement"), a copy of which is attached hereto as **Exhibit A**. The ABL Credit Agreement provides for a senior secured revolving credit facility in an initial aggregate principal amount of up to $150 million, subject to borrowing base availability, maturing October 2018. Amounts borrowed by rue21, inc. under the ABL Credit Agreement are

guaranteed by Rhodes Holdco, Inc., r services llc, and rue services corporation, all of which are

Debtors in these chapter 11 cases.

28.     Obligations under the ABL Facility are secured by:  (a) a properly perfected first

priority security interest in substantially all personal property of the Debtors, including, but not

limited to, accounts receivable, credit card receivables, inventory, cash, deposit accounts,

securities and commodity accounts, documents and supporting obligations (but excluding

intellectual property) (collectively, the "ABL Priority Collateral"); and (b) a properly perfected

second priority security interest in the Term Loan Collateral (as defined below), including

intellectual property (together with the ABL Priority Collateral, the "ABL Collateral").   As of

the Petition Date, approximately $72,201,079.01 was outstanding under the ABL Facility.

29.     Pursuant to the ABL Credit Agreement, substantially all of the cash held in the

Debtors' bank accounts is subject to a properly perfected security interest in favor of the ABL

Agent.  Prior to the Petition Date, in connection with the ongoing negotiations with their lenders,

the Debtors voluntarily entered into the ABL Forbearance Agreement (described below),

pursuant to which the ABL Lenders instituted cash dominion over their cash collateral.  As a

result, each day, all of the Debtors' cash receipts are swept to an account maintained by the ABL

Agent and used to pay down obligations under the ABL Facility.  Each day, the Debtors also

borrow additional funds under the ABL Facility (by means of a borrowing request to the ABL

Agent) to help fund their anticipated operating costs for that day.

**B.     Term Loan Credit Facility**

30.     rue21, inc., Wilmington Savings Fund Society, FSB, as successor to JPMorgan

Chase Bank, N.A., as administrative and collateral agent (the "Term Loan Agent"), and the

lenders from time to time party thereto (the "Term Loan Lenders"), are parties to that certain

Credit Agreement, dated as of October 10, 2013 (as amended, amended and restated,

supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the

Petition Date, the "Term Loan Credit Agreement") a copy of which is attached hereto as

**Exhibit B**.  The Term Loan Credit Agreement evidences a senior secured term loan facility in

the original aggregate principal amount of $538.5 million, which matures in October 2020.

Outstanding amounts due under the Term Loan Credit Agreement are guaranteed by Rhodes

Holdco, Inc., r services llc, and rue services corporation, all of which are Debtors in these

chapter 11 cases.

31.     Obligations under the Term Loan Facility are secured by:  (a) a properly perfected

first priority pledge of all the equity interests of rue21 and its subsidiaries; (b) properly perfected

first priority security interests in liens on substantially all tangible and intangible real and

personal property property of rue21 and its subsidiaries (excluding the ABL Priority Collateral)

(collectively, the "Term Loan Priority Collateral"); and (c) a properly perfected second priority

security interest in the ABL Collateral (together with the Term Loan Priority Collateral, the

"Term Loan Collateral").   As of the Petition Date, approximately $520,998,750 remained

outstanding under the Term Loan Facility.

## C.      The Swap Agreement

32.     Presently, rue21, inc. and Bank of America, N.A. are parties to that certain ISDA

Master Agreement, dated as of October 23, 2014, and a Confirmation, dated as of October 28,

2014, which provides for an interest rate swap on the Term Loan Facility with a notional value of

$364.9 million as of the Petition Date, fixing the rate at 2.216% (the "Term Loan Swap").  The

Term Loan Swap is currently scheduled to terminate on September 30, 2019, but may be

terminated postpetition.

### D.  Intercreditor Agreement

33.   The Debtors' prepetition indebtedness is subject to an intercreditor agreement between the ABL Agent and the Term Loan Agent, dated as of October 10, 2013 (the "Intercreditor Agreement") a copy of which is attached hereto as **Exhibit C**.   The Intercreditor Agreement governs the respective rights, interests, obligations, priority, and positions of the agents and lenders under the ABL Facility and the Term Loan Facility.

### E.  Senior Unsecured Notes

34.   rue 21, inc., as a successor in interest to Rhodes Merger Sub, Inc. (the entity that merged into rue21, inc. in connection with the 2013 go-private transaction), and Wells Fargo Bank, N.A. as Indenture Trustee (the "Indenture Trustee") are parties to that certain Indenture, dated as of October 10, 2013 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Indenture") a copy of which is attached hereto as **Exhibit D**.   Pursuant to the Indenture, rue21 issued $250 million of 9.0% senior unsecured notes due October 2021 (the "Notes").   The Notes are guaranteed by Debtors r services llc and rue services corporation.   As of the Petition Date, approximately $239,200,000 of Notes remain issued and outstanding.

### F.  Trade Credit

35.   In the ordinary course of business, the Debtors incur obligations payable to vendors, shippers, utility providers, landlords, and others.   In the months leading up to the Petition Date, certain suppliers and other trade creditors began to pull their ordinary trade terms, placing a significant strain on the Debtors' liquidity.   In order to manage their liquidity as they explored strategic options, the Debtors began to stretch payments owing to certain vendors, their factoring partners, and landlords.   The Debtors believe that these chapter 11 cases and the liquidity to be provided under their postpetition debtor-in-possession financing facilities will

permit them to return to normalized trade terms with the vendor community and to negotiate rent concessions with certain landlords.

### G.    Common Equity Interests

36.    As of the Petition Date, Apax owns approximately 98.3% of the issued and outstanding common equity interests of Rhodes Holdings LP, a non-debtor limited partnership affiliated with Apax that owns (directly or indirectly) the intermediate holding companies and the operating companies illustrated in **Section II**.    Certain current and former members of management own the remaining 1.7% of Rhodes Holdings LP.

## III.    Events Leading to these Chapter 11 Cases

37.    A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases.  These include the general downturn in the retail industry, decreased sales and increased operating costs, the shift away from brick-and-mortar retail sales to online channels, and the tightening of trade credit in the months prior to the Petition Date.  Other factors include the Debtors' merchandising strategy and issues with e-commerce fulfillment by the Debtors' outgoing third-party outsourcing services provider.  All of these factors have impaired the Debtors' liquidity, their ability to continue as a going concern without instituting a comprehensive balance sheet restructuring, and their ability to maintain their existing capital structure.

### A.    Challenging Retail Environment and Operational Right-Sizing

38.    The Debtors, like many other apparel and retail companies, have faced a challenging commercial environment over the past several years.  This environment has been exacerbated by increased competition and a shift of customer preferences away from physical retail stores.  Given the Debtors' substantial brick-and-mortar presence, their business has been heavily dependent on physical in-store traffic, which has declined in recent years.  In addition to

the challenging retail environment, the Debtors were historically slow to adapt to consumer trends. The Debtors' core demographics' interests in fashion are constantly evolving. By hiring a new Chief Merchandising Officer and other new executives to the management team, the Company has set into motion a key part of its plan to revitalize its approach to merchandising to focus on higher quality on-trend products and a more appealing in-store customer experience. The Debtors are also taking steps to execute a digitally-focused, fashionable marketing campaign that better appeals to their target audiences.

39.     The Debtors also rely on their online presence and e-commerce platform for sales, which has historically underperformed. The Debtors have a contract for e-commerce services with TradeGlobal, whereby online orders are fulfilled from a warehouse in Cincinnati, Ohio. The Debtors and TradeGlobal have mutually agreed to terminate that relationship. Beginning in July 2017, Radial will provide the Debtors with e-commerce fulfillment services from its Walton, Kentucky warehouse. The Debtors believe that Radial will significantly improve the Debtors' e-commerce fulfillment services and satisfy its customers.

**B.     Supply Chain Challenges**

40.     Many of the vendors that the Debtors rely on to manufacture Merchandise use factoring companies to maintain their own liquidity while extending trade terms to customers including the Debtors. In exchange these factors take an assignment of the vendors' future claims against the Debtors at a discount. As the Debtors' liquidity tightened and rumors of a potential restructuring leaked prior to the Petition Date, certain vendors and the factoring community decreased their willingness to extend customary trade credit to the Debtors (or, in the case of factors, to the Debtors' vendors). This reduction in credit has required the Company to pay for the Merchandise on shorter payment terms, including cash in advance and cash on delivery, which has significantly diminished the Debtors' liquidity.

41.     In some cases, vendors have refused to ship inventory until the Debtors pay for

the Merchandise.  In addition to tightened trade terms, an inability to obtain inventory negatively

impacts the Debtors' liquidity, including by reducing the borrowing base under the ABL Facility,

and reducing Merchandise available to sell in stores.   The flow of inventory is the lifeline of any

retail business and ensuring the flow of inventory to the Debtors' customers during these

chapter 11 cases will maximize the value of the Debtors' estates.  The Debtors believe that these

chapter 11 cases will afford them an opportunity to re-establish customary trade terms with the

vendor and factoring communities and ensure that critical inventory continues to reach points of

sale.

### C.     Exploration of Strategic Alternatives

42.     In anticipation of a liquidity crunch and recognizing the need to explore a debt

exchange and other strategic alternatives, the Company's board of directors (the "Board")

authorized the Company to retain Rothschild as investment banker in mid-November 2016, K&E

as legal advisor in mid-February 2017, and BRG as financial advisor in mid-February 2017.  In

recent months, the Company, with the approval of the Board, has explored various refinancing

options with its restructuring advisors, including a potential raise of new liquidity outside of a

court process.[5]   Based on those efforts, it became clear to the Board and management that the

Debtors would be unable to obtain long-term capital without a formal restructuring process.

43.     As a result, and as set forth in the Brownstein Declaration, the Debtors and their

advisors commenced discussions with members of their existing capital structure as well as

---

[5]   More details of this financing process can be found in the *Declaration of of Jonathan Brownstein in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Brownstein Declaration").

certain third party strategic and financial investors regarding the terms of potential postpetition financing and plans of reorganization and/or going-concern sales.

### D.      Real Estate Right-Sizing Initiatives

44.      Prior to the Petition Date, the Debtors and their advisors engaged in an intense review of their store footprint to identify profitable stores that the Debtors would like to continue leasing, unprofitable stores that the Debtors would like to exit, and stores that the Debtors may wish to exit but will consider continuing to lease if certain rent concessions are agreed to by applicable landlords.[6]  Thereafter, the Board authorized the Debtors to commence store closing sales in certain stores, and the Debtors entered into that certain Consulting Agreement, dated as of April 7, 2017, between rue21, inc. and Gordon Brothers, LLC (the "Gordon Brothers Consulting Agreement").  Pursuant to the Gordon Brothers Consulting Agreement, Gordon Brothers began assisting the Debtors with store closing sales in 396 stores in time for the April 14 Easter weekend.  The terms of the Gordon Brothers Consulting Agreement allow the Debtors to identify additional stores to hold liquidation themed sales with the assistance of Gordon Brothers.  Contemporaneously herewith, the Debtors filed a motion to assume the Gordon Brothers Consulting Agreement, which is a key piece of their strategy to right-size their store footprint and operational costs and the performance of which is already well-underway.

45.      As of the Petition Date, Gordon Brothers has assisted the Debtors with the store closing process in 396 brick-and-mortar locations,[7] and this number may increase during the course of these cases, subject to the results of negotiations with certain landlords to be led by the

---

[6]    More details can be found in the *Declaration of Stephen Coulombe in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement, (II) Approving Procedures for Store Closing Sales and (III) Granting Related Relief* (the "Coulombe Declaration").

[7]    The Company also closed seven stores on or about April 15, 2017 without using the services of Gordon Brothers.

Debtors with the assistance of A&G.  On March 15, 2017, the Debtors entered into that certain

Real Estate Services Agreement with A&G to assist the Debtors with, among other things, the

renegotiation of certain unfavorable lease terms.  The Debtors expect that those negotiations will

lead to the assumption of certain modified leases that they would otherwise reject.  The Debtors

are seeking to assume the Gordon Brothers Consulting Agreement and to retain A&G as a

professional in these cases.

### E.    The Forbearance Agreements

46.    As a result of deteriorating liquidity, on March 31, 2017 the Debtors failed to

make a required payment of principal and interest under the Term Loan Credit Agreement.

On the same day, the Debtors, the Term Loan Agent, and certain lenders under the Term Loan

Credit Agreement entered into a Forbearance Agreement (the "Term Loan Forbearance

Agreement"), and on April 4, 2017, the Debtors, the ABL Agent and certain of the lenders under

the ABL Credit Agreement also entered into a Forbearance Agreement (the "ABL Forbearance

Agreement" and together with the Term Loan Forbearance Agreement, the "Forbearance

Agreements").

47.    Under the terms of the Forbearance Agreements, the Term Loan Lenders and the

ABL Lenders agreed, among other things, to forbear from exercising any rights or remedies

arising under the Term Loan Credit Agreement or the ABL Credit Agreement, as applicable,

arising as a result of the Debtors' March 31 payment default.  The Forbearance Agreements

contained certain milestones and other forbearance termination events that required the Debtors

generally to prepare for these chapter 11 cases in an expeditious manner.  On April 10, 2017,

April 12, 2017, April, 30, 2017, and May 8, 2017, the ABL Forbearance Forbearance Agreement

and the Term Loan Forbearance Agreement, respectively, were amended to extend certain of

those milestones to afford the Debtors the time that they required to finalize their business plan,

negotiate postpetition financing, and prepare for a smooth transition in the bankruptcy.   In addition to missing payments owed under the Term Loan Credit Agreement, the Debtors also elected to enter into the 30-day grace period provided under the Notes indenture and forego a coupon payment that was due on April 17, 2017.

**IV.     The DIP Financing and Chapter 11 Plan**

48.     As described in detail in the Brownstein Declaration, to fund the administration of these chapter 11 cases, the ABL Lenders and a subset of the Term Loan Lenders have each agreed to provide the Debtors with debtor-in-possession financing, consisting of a postpetition ABL facility and a postpetition term loan facility, respectively (collectively, "DIP Financings"). Specifically, the ABL Lenders have agreed to continue to provide a $125 million postpetition DIP ABL Credit Facility on terms similar to those provided under the Debtors' existing asset-based lending facility (the "DIP ABL Credit Facility").   Pursuant to the terms of the ABL DIP Documents (as defined in the Brownstein Declaration), the Debtors intend to use the proceeds from the sale of their inventory to pay down the ABL Facility, and to then draw on the DIP ABL Credit Facility to fund their working capital needs during the pendency of these chapter 11 cases. This process is substantially similar to the Debtors' prepetition cash management process.   As a result, it is anticipated that (subject to approval by the Court), the ABL Lenders' $80 million in outstanding prepetition loans will be converted to postpetition debtor-in-possession loans on a rolling basis.   In addition, and only upon entry of a interim order approving the Debtors' proposed postpetition financings, it is anticipated that the ABL Facility will be refinanced in full by loans provided under the DIP ABL Credit Facility.

49.     In early May 2017, a subset of Term Loan Lenders committed to backstop a $150 million financing, required to support the Debtors' estates during these cases (the "DIP Term Loan Facility") on the basis of a financing and restructuring term sheet (the

"Restructuring Term Sheet") agreed upon by the Debtors and such lenders, which provided for a commitment for up to $50 million in new money loans and the conversion of up to $100 million of Prepetition Term Loans, owing to the Term Loan DIP Lenders into postpetition DIP Term Loans (each as defined in the Brownstein Declaration) (the "Roll-Up Loans") upon entry of the interim order approving the Debtors' entry into the DIP Term Loan Facility.

50.     Both the DIP Term Loan Facility and the DIP ABL Facility are critical to the Debtors' ability to operate postpetition, including by providing sufficient liquidity to fund the administrative costs of these chapter 11 cases and, importantly, payments to vendors and other participants in the Debtors' supply chain to ensure the free flow of inventory to the Debtors' stores and customers.   Based on my personal knowledge and extensive discussions with the Debtors' management team and advisors, I believe that the DIP Financings give the Debtors sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases as the Debtors seek to implement the going-concern restructuring of the business, pursuant to a chapter 11 plan to be proposed in the near term, as contemplated by the Restructuring Support Agreement (as described more fully below).   Finally, based on extensive discussions with the Debtors' advisors and my own participation in the DIP financing process, I believe that the DIP Financings are on the most favorable terms available in light of the circumstances of these chapter 11 cases, present the only reasonable path to the Debtors' going-concern reorganization, were negotiated in good faith and at arms' length, and will allow the Debtors to maximize the value of their estates for the benefit of all parties in interest.

51.     The milestones under the DIP Financing agreements include the following:

- on or before 15 days after the Petition Date, the Debtors shall have filed a chapter 11 plan and disclosure statement;

- on or before 50 days after the Petition Date, the Debtors will secure entry of an order approving their disclosure statement and voting and solicitation procedures;

- on or before 105 days after the Petition Date, the Debtors will secure entry of an order confirming their chapter 11 plan; and

- on or before 115 days after the Petition Date, the effective date of the chapter 11 plan shall have occurred and the Debtors shall have emerged.

52.    The Debtors have arrived in chapter 11 with a transaction structure and process that they believe will preserve and capitalize on the value inherent in their business and brand. That transaction structure, as set forth in that certain Restructuring Support Agreement, dated as of May 15, 2017 and attached hereto as **Exhibit E** (the "Restructuring Support Agreement") provides for the following distributions pursuant to the Debtors' anticipated chapter 11 plan of reorganization:  (a) the $50 million new-money DIP Term Loan Facility will be converted into a $50 million exit facility on the effective date of a chapter 11 plan; (b) the $100 million "roll-up" DIP Term Loan Facility will be converted into 77% of the equity interests in reorganized rue21, inc.; (c) the Term Loan Lenders' prepetition claims will be converted into 19% of the equity interests in reorganized rue21, inc.; and (d) to the extent unsecured creditors accept such plan, they will receive 4% of the equity interests in reorganized rue21, inc. and its interests in the proceeds of specified avoidance actions.  If general unsecured creditors vote to reject the plan, then they will not receive a distribution, and the Term Loan Lenders' prepetition claims will be converted into 80% of the equity interests in reorganized rue21, inc. and the Term Loan Lenders' prepetition claims will be converted into 20% of the equity interests in reorganized rue21, inc.

53.    The DIP ABL Credit Facility, the DIP Term Loan Facility, the Restructuring Support Agreement, and the transactions contemplated thereby will allow the Debtors to emerge from chapter 11 as expeditiously as possible, and are the only reasonable path forward that

25

avoids a liquidation of the Debtors' business.  Preserving value for the benefit of the Debtors'

estates and avoiding a liquidation depends in large part on the Debtors proceeding swiftly to

confirmation of a plan and minimizing the effects of the Debtors' chapter 11 cases on the value

of the Debtors' brand—a critical component of the value of the Debtors' business—and the

Debtors' ongoing liquidity position.  Due to the fact that customer sentiment in the Debtors'

business shifts rapidly and stakeholders often turn swiftly against apparel and retail debtors, such

debtors often do not fare well in bankruptcy—in many instances electing to liquidate as opposed

to reorganize.  The Debtors intend to proceed with a fair and efficient process to preserve and

maximize value for enterprise-wide stakeholders, which ultimately will inure to the substantial

benefit of all parties in interest, including vendors, landlords, and over 10,000 employees.

## V.    Evidentiary Support for First Day Motions[8]

54.     The Debtors have filed the First Day Motions seeking relief that the Debtors

believe is necessary to enable them to efficiently administer their estates with minimal disruption

and loss of value.  The Debtors respectfully request that the proposed relief described in each of

the First Day Motions be granted as critical to maximizing the value of their estates.  I have

reviewed each of the First Day Motions discussed below and the facts set forth in each of the

First Day Motions are true and correct to the best of my knowledge and belief based on

appropriate reliance on the Debtors' corporate officers and advisors.

55.     Furthermore, I believe that with respect to the First Day Motions requesting the

authority, but not direction, to pay discrete prepetition claims or to continue selected prepetition

programs, the relief requested is essential to the Debtors' reorganization and that granting the

interim relief described herein is necessary to avoid immediate and irreparable harm to the

---

[8]   Capitalized terms used in this section, but not defined have the meaning ascribed in the respective First Day
      Motions.

Debtors and their Employees, customers, vendors, creditors, and other stakeholders.   The

Debtors have an immediate need to continue the orderly operation of their business by securing

goods and paying Employees in the ordinary course of business.   The Debtors' continued

operations will enable them to preserve the going concern value of their estates and maintain

vendor and customer confidence.   A description of the relief requested in and the facts

supporting each of the First Day Motions is set forth below.

### A.   Emergency Motion to Direct Joint Administration of the Debtors' Chapter 11 Cases

56.    The Debtors have filed several purely administrative or procedural First Day

Motions, including a motion to jointly administer the Debtors' bankruptcy cases.   As in many

large chapter 11 cases that are jointly administered, the Debtors do not maintain lists of the

names and addresses of their respective creditors on a debtor-by-debtor basis.   Given the

integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will

provide significant administrative convenience without harming the substantive rights of any

party in interest.

### B.   Ex Parte Motion to Schedule Expedited Hearings on Certain First Day Motions and Approve Form and Manner of Notice Thereof

57.    The Debtors have also filed another purely administrative or procedural First Day

Motion to:  (a) schedule an expedited hearing to consider certain "first day" pleadings filed by

the Debtors; and (b) approve the form and manner of notice of such expedited hearing.   The

relief requested in the First Day Motions is required in order to ensure the continuity of the

Debtors' business and to provide for a smooth transition by the Debtors into their chapter 11

cases.   Absent the relief requested in the First Day Motions, the Debtors will be forced to

immediately cease their operations and suffer substantial and irreparable harm.

**C.      Ex Parte Emergency Motion to Designate these Chapter 11 Bankruptcy Cases as Complex Chapter 11 Bankruptcy Cases, Establish Omnibus Hearing Dates and Times, and Authorize an Official Service List**

58.      The Debtors have also filed another purely administrative or procedural First Day Motion to:  (a) designate these cases as complex chapter 11 cases pursuant to the local rules of the Bankruptcy Court; (b) establish omnibus hearing dates and times for considering all motions and other matters in these cases; and (c) authorize an official service list to be established for these chapter 11 cases.   The Debtors have filed 15 First Day Motions, requesting expedited relief.  In addition, the Debtors have approximately $832 million in funded debt and over 50,000 parties in interest.  Designating these cases as complex will streamline these chapter 11 cases.  In addition, establishing omnibus hearings and authorizing an official service list will loosen any administrative burdens on these complex chapter 11 cases.

**D.      Emergency Motion to Extend the Time to File Schedules and Statements, Authorize Consolidated Creditors' Lists, Authorize Redaction of Certain Personal Identification Information, and Approve the Form and Manner of Notifying Creditors of Commencement of these Chapter 11 Cases.**

59.      The Debtors have also filed another purely administrative or procedural First Day Motion to:  (a) extend the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by 30 days, for a total of 44 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions; (b) authorize the Debtors to file a consolidated creditor matrix and list of the 50 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor, (c) authorize the Debtors to redact certain personal identification information for individual

creditors; and (d) authorize the Debtors to mail initial notices through their proposed claims and noticing agent.

60.     *First*, given the size and complexity of the Debtors' businesses and financial affairs, and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these chapter 11 cases, the Debtors were not in a position to complete the Schedules and Statements as of the Petition Date.  *Second*, the preparation of separate lists of creditors for each debtor would be expensive, time consuming and, therefore, the Debtors request to file a consolidated creditor matrix.  Moreover, filing a top 50 list will help alleviate administrative burdens, costs, and the possibility of duplicative service.  *Third*, the list of creditors may include information of individual creditors with personal information; such information can be used to perpetrate identity theft.  *Fourth*, mailing initial notices of bankruptcy through the Debtors' agent, Kurtzman Carson Consultants LLC ("KCC"), to parties in interest will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Bankruptcy Court and the U.S. Trustee.

**E.     Emergency Application to Approve the Appointment and Retention of KCC as the Claims and Noticing Agent to the Debtors, Effective Nunc Pro Tunc to the Petition Date**

61.     The Debtors have also requested the approval of a services agreement between the Debtors and KCC,[9] and the Debtors' retention and employment of KCC as claims and noticing agent for the Debtors in lieu of the Clerk of the United States Bankruptcy Court for the Western District of Pennsylvania, effective *nunc pro tunc* to the Petition Date.  The Debtors anticipate that there will be more than 20,000 entities to be noticed in these cases.  In view of the number of anticipated claimants and the complexity of the Debtors' business, the Debtors submit that the

---

[9]     The KCC application is supported by a separate declaration of Evan J. Gershbein of KCC.

appointment of the Claims and Noticing Agent is both necessary and in the best interests of the Debtors' estates and their creditors because the Debtors will be relieved of the burdens associated with the Claims and Noticing Services. Accordingly, the Debtors will be able to devote their full attention and resources to maximize value for their stakeholders and facilitate the orderly administration of these chapter 11 cases.

**F.     Emergency Motion to Authorize the Debtors to Continue to Operate Their Cash Management System, Honor Certain Prepetition Obligations Related Thereto, Maintain Existing Business Forms, and Authorize the Debtors to Continue Intercompany Transactions**

62.     The Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to: (i) continue to operate their cash management system (the "Cash Management System"); (ii) honor certain prepetition obligations related thereto; and (iii) maintain existing business forms; (b) authorizing the Debtors to continue intercompany transactions in the ordinary course and granting superpriority administrative expense status to postpetition intercompany balances.

63.     The Debtors operate a well-structured cash management system that is typical of a multi-store retail operation and comparable to the centralized cash management systems used by other similarly sized retail companies to manage the cash flow of operating units in a cost-effective, efficient manner.  The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds to various operating accounts and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management control protocols for entering, processing, and releasing funds, including in connection with intercompany transactions.  Additionally, the Debtors' treasury department reconciles, on a daily basis, the Debtors' books and records to ensure that all transfers are accounted for properly.

64.     The Debtors' Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtors' business.  The Debtors estimate that average cash collections range between $65 million and $110 million per month, including store cash receipts, credit card receipts, and e-commerce sales.  In addition, the Debtors estimate that total disbursements will range between $70 million and $120 million per month during these chapter 11 cases.  Because of the nature of the Debtors' business and the disruption to the business that would result if they were forced to close their existing bank accounts, it is critical that the existing Cash Management System remain in place.

65.     The Cash Management System is comprised of approximately 674 bank accounts (the "Bank Accounts") which are predominantly held at approximately 150 institutional banks (collectively, the "Cash Management Banks").[10]  The Cash Management System is based on a centralized concentration account (the "Concentration Account") and a disbursement account (the "Disbursement Account"), both at Bank of America and both maintained by rue21.  The Cash Management System is organized to facilitate the seamless collection and disbursement of cash under the Debtors' ABL Facility.

66.     Pursuant to the ABL Credit Agreement between the Debtors and Bank of America, in such capacity as ABL Agent, substantially all of the cash held in the Bank Accounts is subject to a properly perfected security interest in favor of the ABL Agent.  Prior to the Petition Date, in connection with ongoing negotiations with their lenders, the Debtors voluntarily entered into a forbearance agreement with respect to the ABL Facility, pursuant to which the ABL Lenders instituted cash dominion over their cash collateral.  As a result, each day, all of the

---

[10]   Although the Cash Management System includes approximately 674 bank accounts as of the Petition Date, the Debtors may close existing accounts or open new accounts in the ordinary course and in connection with the ongoing store closing process.

Debtors' cash receipts are swept to an account maintained by the ABL Agent and used to pay down obligations under the ABL Facility. Each day the Debtors draw down on the ABL Facility (by means of a borrowing request to the ABL Agent) to meet their daily operating obligations. The money drawn from the ABL Facility flows into the Disbursement Account and is subsequently disbursed through the Cash Management System.

### 1.    Collection Process

67.    ***Cash Collections***  Cash collections from sales at the rue21 brick and mortar store locations are deposited into one of 668 individual store level deposit accounts maintained by rue21, inc. These store level accounts consist of the following:

> a.    360 store level deposit accounts held at Wells Fargo Bank, N.A., JPMorgan Chase Bank, N.A., PNC Bank, N.A., and Regions Bank (collectively, these store level deposit accounts are defined as the "ABL Paydown Accounts")[11] and
>
> b.    308 store level deposit accounts held at approximately 146 institutional banks (collectively, these store level deposit accounts are defined as the "Store Level Accounts").

68.    The ABL Facility is paid down daily in one of two ways. First, the ABL Facility is paid down on a daily basis directly from the funds in the ABL Paydown Accounts. Second, the ABL Facility is paid down on a daily basis by the transfer of funds from the Store Level Accounts to the Concentration Account, which are then used to pay down the ABL Facility.

69.    ***Credit Card Collections***  All cash receipts on account of credit card sales whether at the Debtors' brick and mortar locations or through the company's e-commerce platform are automatically transferred to a master depository account maintained by rue21, inc. at Bank of America (the "Master Depository Account"). Similar to the Store Level Accounts, all funds

---

[11]    The breakdown of the ABL Paydown Accounts are as follows: (i) 357 store level accounts held at Wells Fargo Bank, N.A.; (ii) one store level account held at JPMorgan Chase Bank, N.A.; (iii) one store level account held at PNC Bank N.A.; and (iv) one store level account held at Regions Bank.

from the Master Depository Account are transferred to the Concentration Account daily, and are then used to pay down the ABL Facility.

70.     ***Intercompany Collections***   All cash receipts on account of credit card sales whether at the Debtors' brick and mortar locations or through the company's e-commerce platform are automatically transferred to a master depository account maintained by rue21, inc. at Bank of America (the "Master Depository Account").  Similar to the Store Level Accounts, all funds from the Master Depository Account are transferred to the Concentration Account daily, and are then used to pay down the ABL Facility.

## 2.     Disbursement Process

71.     Each day, the Debtors make a request to the ABL Agent to transfer available funds under the ABL Facility—determined by reference to the then-applicable borrowing base— into the Disbursement Account, which are then used by the Debtors to satisfy obligations owing to landlords, vendors, Employees,[12] various taxing authorities, swap counterparties, and other creditors.  All disbursements, except those made on account of merchandise purchasing and non-ADP payroll payments, are disbursed directly from the Disbursement Account.  Disbursements made on account of merchandise purchasing and non-ADP payroll payments are transferred into two accounts:

c.      The merchandise purchasing account is maintained by Debtor rue services corporation at Bank of America (the "Merchandise Purchasing Account").  Funds in the Merchandise Purchasing Account are used to purchase merchandise by check.

d.      The payroll account is maintained by debtor rue21, inc. at Bank of America (the "Payroll Account") and is used on a case-by-case basis to pay compensation that becomes due to the Debtors' Employees, other than through ADP.

---

[12]   Payroll and benefits are generally managed by ADP, LLC ("ADP"), a third-party service provider, which provides monthly invoices in advance for amounts to be paid to the Debtors' employees.

### 3.    Bank Fees

72.    In the ordinary course, certain of the financial institutions at which the Bank Accounts are maintained, including Bank of America, charge, and the Debtors pay, honor, or allow the deduction from the appropriate account for, certain service charges and other fees, costs, and expenses (the "Bank Fees").   Historically, the Debtors estimate that they pay approximately $160,000 in Bank Fees each month, depending on transaction volume.   To maintain the integrity of their Cash Management System, the Debtors request authority, subject to the DIP Order, the DIP Documents, and the DIP Claims, to pay any prepetition Bank Fees for prepetition transactions that are charged postpetition and to continue to pay the Bank Fees in the ordinary course postpetition.

### 4.    Business Forms

73.    As part of their Cash Management System, the Debtors use various preprinted business forms (the "Business Forms") in the ordinary course.   To minimize expenses to their estates and avoid confusion during the pendency of these chapter 11 cases, the Debtors request that the Bankruptcy Court authorize the Debtors' continued use of all existing preprinted correspondence and business forms (including, without limitation, letterhead, checks, and other business forms) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

### 5.    Intercompany Transfers

74.    In the ordinary course of business, the Debtors engage in routine business transactions with each other (the "Intercompany Transactions") resulting in intercompany receivables and payables (the "Intercompany Claims").   Accordingly, at any given time there may be Intercompany Claims owed by one Debtor to another Debtor.   For example, in the

normal course of business, the Debtors purchase merchandise through the Merchandise Purchasing Account maintained by Debtor rue services corporation.  The funds used to purchase the merchandise are disbursed from the Disbursement Account maintained by Debtor rue21, inc. to the Merchandise Purchasing Account.  The Intercompany Claims are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.  The Debtors track all transfers in their respective accounting system and can ascertain, trace, and account for all Intercompany Transactions.  The Debtors will continue to track Intercompany Transactions on a postpetition basis.   Disallowing the continued use of Intercompany Transactions would unnecessarily disrupt the Cash Management System and the Debtors' operations to the detriment of the Debtors and their creditors and other stakeholders.  The Debtors seek the authority to continue the Intercompany Transactions in the ordinary course of business, in a manner consistent with prepetition practice.

75.    The Debtors' gift card program is another regularly occurring Intercompany Transaction that occurs in the ordinary course.  As described above, a third-party manages the Debtors' gift card program.  When a gift card is purchased, the funds used to purchase the gift card are transferred to either the Store Level Account or the ABL Paydown Account of the store where the gift card is purchased if the customer pays with cash, or to the Master Depository Account if the customer pays with a credit card.  Until a gift card is redeemed, it is recognized as a liability on the books and records of r services llc for tax purposes.  On a monthly basis, the books and records of r services llc are reconciled and any liability for redeemed gift cards is removed from the books and records of r services llc.

### G. Emergency Motion Authorizing the Debtors to Pay Certain Prepetition Claims of Lien Claimants and 503(b)(9) Claimants

76.     The Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to pay up to $3.5 million, on an interim basis, and up to $4.0 million, on a final basis, absent further order of the Bankruptcy Court, on account of prepetition claims held by certain shippers and warehousemen (the "Lien Claimants" whose prepetition claims shall be defined as the "Lien Charges"); and (b) authorizing the Debtors to pay up to $12.2 million, on a final basis, absent further order of the Bankruptcy Court, on account of certain prepetition claims held by section 503(b)(9) claimants (the "503(b)(9) Claimants" whose prepetition 503(b)(9) claims shall be defined as the "503(b)(9) Claims").  The Debtors estimate that, as of the Petition Date, there is approximately  $4.0 million outstanding on account of the Lien Charges and approximately $12.2 million outstanding on account of the 503(b)(9) Claims.

77.     The Debtors' business depends on the uninterrupted flow of inventory and other goods through its supply chain and distribution network, including the purchase, importation, storage, and shipment of the Debtors' Merchandise.  The Debtors' contract with vendors to design, manufacture, and supply the Merchandise.  All finalized Merchandise that the Debtors order from their vendors is shipped by the vendors to a third-party logistics company, PLC.  PLC ships the Merchandise to the Debtors' Distribution Center.  All Merchandise sold in the Debtors' brick and mortar stores is shipped from the Distribution Center to the rue21 stores via FedEx. All Merchandise sold online through the Company's e-commerce platform is shipped by PLC to an Ohio warehouse operated by TradeGlobal.  TradeGlobal currently fulfills the Debtors' online orders and ships Merchandise directly to rue21's online customers via United Parcel Service, Inc.

78.     The flow of merchandise from the Debtors' vendors and ultimately to stock the Debtors' brick and mortar stores or fulfill orders placed with the Debtors' e-commerce provider hinges on the services provided by, among others, various warehousemen, freight forwarders, and common carriers (collectively, the "Lien Claimants").  The Debtors' vendors generally ship the Merchandise to PLC on a "delivery duty paid" ("DDP") basis.   Under these DDP arrangements, the vendor pays to ship the Merchandise; however, title to the Merchandise and goods does not pass to the Debtors until it arrives at the Distribution Center.   Under this type of arrangement, the Lien Claimants may refuse to release Merchandise or other goods for shipment if they are not paid current.

79.     The Debtors may have received certain inventory, goods, or materials from vendors within the 20-day period immediately preceding the Petition Date.   Such goods are entitled to administrative expense priority status in accordance with section 503(b)(9) of the Bankruptcy Code.   In addition, because each of the 503(b)(9) Claimants provides goods that the Debtors use in their operations, such vendors may seek to assert statutory liens on the Debtors' interests in the goods.

80.     Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.   Rather, the Debtors obtain inventory, goods, or other materials from such claimants on an order-by-order basis.   As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.   Such refusal could negatively affect the Debtors' estates as the Debtors' business is dependent on the steady flow of inventory to stock their stores.

**H.** **Emergency Motion Authorizing the Debtors to Maintain and Administer their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto**

81.      The Debtors seek entry of interim and final orders authorizing the Debtors to maintain and administer their customer-related programs (collectively, the "Customer Programs") as described herein and honor certain prepetition obligations related thereto.  The Debtors estimate that, as of the Petition Date, there is approximately $2.37 million outstanding on account of Customer Programs.  Pursuant to the Interim Order, the Debtors seek interim relief to pay an aggregate amount not to exceed $1.745 million in connection with the Customer Programs that may come due prior to the Final Hearing.

82.      The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships.  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  Accordingly, maintaining the goodwill of their customers is important to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

**1.**     **The Refund and Exchange Program**

83.      The Debtors seek to honor their refund and exchange program (the "Refund and Exchange Program") which allows their customers to return, exchange, or receive credit for merchandise that is returned in its original condition within 30 days of purchase.  If merchandise is returned with the receipt/packing slip, the merchandise is refunded for the full purchase amount in the form of the original purchase method of payment (a "Refund").  For merchandise returned without a receipt/packing slip, a merchandise credit card (the "Merchandise Credit Card") is issued for the current selling price of the merchandise, or alternatively the merchandise

can be exchanged for other merchandise at the current selling price.  If the amount of a return is

less than $5.00, a Merchandise Credit Card is not issued and instead a cash refund is awarded.

84.     Programs like the Refund and Exchange Program are common in the retail

industry and similar programs are used by the Debtors' competitors.   Thus, the Debtors'

customers have a ready selection of alternative retailers willing to meet customers' needs and

take their business away from the Debtors.   As such, the Refund and Exchange Program is

critical to maintaining the goodwill of the Debtors' customer base and the Debtors'

competitiveness within their industry.  Without the Refund and Exchange Program, potential

customers may be unwilling to shop at the Debtors' stores at all, which would lead to a decline in

revenues, the ultimate cost of which would be borne by the Debtors' estates and, by extension,

their creditors and other parties in interest.

85.     Under the Refund and Exchange Program, only 1% of the Debtors' merchandise

was returned to the Debtors in March 2017.  The Debtors seek authorization to, in a manner

consistent with their past practices:   (a) honor outstanding obligations under the Refund and

Exchange Program that accrued prior to the Petition Date; and (b) maintain the Refund and

Exchange Program or some variation thereof after the Petition Date in the ordinary course of

business.

### 2.     The Gift Card Program

86.     The Debtors maintain a program pursuant to which their customers can purchase

physical, pre-paid, non-expiring gift cards in various denominations (the "<u>Gift Card Program</u>").

Online, through the Debtors' e-commerce site, gift cards can be purchased in denominations of

$5.00 in amounts varying between $20.00 and $250.00, and in stores, gift cards can be purchased

in any amount between $5.00 and $250.00 (collectively, the "<u>Gift Cards</u>").  Gift Cards can then

be redeemed either in stores or online for merchandise.

87.     On average, the Debtors pay Stored Value Solutions ("SVS") approximately $24,000 per month to process and administer the Gift Card Program.  As of the Petition Date, the Debtors estimate that they owe approximately $50,000 to SVS on account of the administration fees associated with the Gift Card Program (the "Gift Card Program Fees"), of which that amount, $25,000 will come due within the Interim Period.

88.     The Debtors estimate that as of the Petition Date, approximately $6.6 million[13] in issued Gift Cards are outstanding.[14]

### 3.     rueBucks Program

89.     The Debtors conduct special earning and redemption promotions (the "rueBucks Program") online and in stores during peak shopping seasons.   The rueBucks Program allows the Debtors to capitalize on seasonal inventory shopping and market to a larger shopping base than in off-peak times.  Under the rueBucks Program, when a shopper spends at least $40.00 on rue21 merchandise, the shopper will earn a coupon, or a "rueBuck" for $20.00 off their next $40.00 purchase.  Any rueBucks issued prepetition were redeemed by April 30, 2017, and the next rueBucks Program is scheduled to begin on May 24, 2017 ahead of the critical "back to school" season.  The earning period for the upcoming rueBucks Program will end on June 20, 2017, and any rueBucks earned during this period must be redeemed between June 21, 2017 and June 25, 2017.  Accordingly, as of the Petition Date, no rueBucks are outstanding.

90.     For fiscal year 2016, the Debtors estimate that the rueBucks Program generated approximately $23.3 million in net eligible sales.  rueBucks are a staple of the rue-brand and customers have come to rely on, and look forward to, this program.  As of the Petition Date, the

---

[13]   The gross amount of Gift Cards outstanding is $15.1 million, however, the amount that is actually reflected on the Debtors' books and records is $6.6 million as a result of annual breakage, *i.e.*, Gift Cards unused by customers.

[14]   This amount includes outstanding Merchandise Credit Card balances.

Debtors owe approximately $600,000 on account of rueBucks administrative fees, of which that amount, $400,000 will come due within the Interim Period.

### 4. Promotional Programs

91. In addition to the rueBucks Program, in the ordinary course of business, the Debtors have established certain promotional programs designed to generate revenues across the rue21 enterprise (collectively, the "Promotional Programs"). The Promotional Programs consist of seasonal and item specific sales and coupons that can be used to purchase merchandise at the Debtors' retail stores or online on the Debtors' website. Advertisements for the Promotional Programs are distributed in stores and through e-mail.

92. The Promotional Programs are an important part of the Debtors' marketing strategy, as they engender goodwill for the brand, target captive customers or customers who would otherwise be unlikely to purchase the Debtors' merchandise, help the Debtors to liquidate merchandise that is near the end of its seasonal life, and generate revenue by encouraging sales at the Debtors' store locations. For fiscal year 2016, the Promotional Programs significantly helped generate the Debtors' approximate $1.1 billion in sales. As of the Petition Date, the Debtors owe approximately $900,000 on account of administrative fees associated with the Promotional Programs, of which that amount, $500,000 will come due within the Interim Period.

### 5. Credit Card and Other Payment Processors

93. In addition to cash, Gift Cards, and Merchandise Credit Cards, the Debtors accept the following methods of payment from customers: (a) Visa, MasterCard, Discover, and American Express credit cards; (b) PayPal; (c) Visa Checkout; and (d) ATM/Debit Cards with a Visa or MasterCard logo (the "Non-Cash Payments"). To process Non-Cash Payments, the Debtors are party to certain agreements (the "Payment Processing Agreements") with certain payment processors (the "Payment Processing Companies"). Pursuant to the Payment

Processing Agreements, the Debtors generally receive the net customer sales less any standard chargebacks, returns, and interchange fees charged.  Generally, the interchange fees are set off from the funds that are remitted to the Debtors on account of the Non-Cash Payments on a daily basis, however, the Debtors pay processing fees on a monthly basis to Vantiv, Inc. ("Vantiv") and Discover (collectively, the "Processing Fees").  The standard interchange and processing rates charged by each Payment Processing Company vary, but are in the range of 1.27% to 3.05% per sale transaction.

94.     When customers either return merchandise to the Debtors following a purchase made by Non-Cash Payment or dispute charges with a Payment Processing Company, the Debtors may be obligated to refund a Payment Processing Company the purchase price of the returned or disputed merchandise, subject to certain adjustments (collectively, "Chargebacks," and together with the Processing Fees and interchange rates, the "Processing Obligations").  Generally, Chargebacks are satisfied by netting the amount charged against pending payments owed by a Payment Processing Company to the Debtors.  Due to the automated nature of the Processing Obligations, it is possible that certain Processing Obligations incurred by the Debtors immediately prior to the Petition Date may not have been fully set off against the payments received by the Debtors prior to the Petition Date.

95.     The Debtors' continued acceptance of Non-Cash Payments is essential to the operation of the Debtors' business because the majority of the Debtors' sales are made using Non-Cash Payments.  Declining to accept Non-Cash Payments would have a severe negative effect on the Debtors' ongoing operations, the cost of which would be incurred by their estates and, by extension, their creditors and all parties in interest.  On average, the Debtors pay Vantiv approximately $600,000 per month in Processing Fees.  As of the Petition Date, the Debtors

42

estimate that they owe approximately $800,000 to Vantiv on account of Processing Fees, all of
which will come due within the Interim Period.   Additionally, the Debtors believe they owe
approximately $20,000 in Processing Fees to Discover, all of which will become due  within the
Interim Period.

I.      **Emergency Motion Authorizing Debtors to Pay Prepetition Employee
Wages, Salaries, Other Compensation, and Reimbursable Employee
Expense, and to Continue Employee Benefits Programs**

96.      The Debtors seek entry of interim and final orders:   (a) authorizing, but not
directing, the Debtors to: (i) pay prepetition wages, salaries, other compensation, and
reimbursable employee expenses; and (ii) continue employee benefits programs in the ordinary
course, including payment of certain prepetition obligations related thereto.   The Debtors
estimate that, as of the Petition Date, there is approximately $6.4 million outstanding on account
of Employee Compensation and Benefits (as defined below).   Pursuant to the Interim Order, the
Debtors seek interim relief to pay an aggregate amount not to exceed $6 million in connection
with the Employee Compensation and Benefits that may come due prior to the Final Hearing.

97.      As of the Petition Date, the Debtors employ approximately 15,800 Employees,
including approximately 3,500 Full-Time Employees and approximately 12,300 Part-Time
Employees.   The Debtors' Employees perform a wide variety of functions that are critical to the
Debtors' business and, ultimately, to the administration of these chapter 11 cases and the
Debtors' estates.   In many instances, the Employees include personnel who are intimately
familiar with the Debtors' business, processes, and systems, and possess unique skills,
knowledge, and experience, and/or have developed relationships with vendors and distributors
that are essential to the Debtors' business.

98.      These Employees serve in a number of capacities supporting the Debtors'
operations at either the corporate office (the "Corporate Employees"), the Debtors' Distribution

Center (the "DC Employees"), or the retail store level (the "Retail Employees"). The overwhelming majority of the Part-Time Employees are employed at one of the Debtors' various retail store locations, with a small number working in either the corporate office or at the Debtors' Distribution Center. The Full-Time Employees are employed at all levels of the Debtors' business operations. The Full-Time Employees cannot easily be replaced in part because of the uncertainty caused by the commencement of these chapter 11 cases. Without their continued, uninterrupted services, the ability of the Debtors to maintain and administer their estates will be materially impaired.

99. In addition to the Employees, the Debtors currently retain approximately 35 Independent Contractors and Temporary Staff in the aggregate, although this number fluctuates based on the Debtors' specific needs at any given time. The Independent Contractors and Temporary Staff are a critical supplement to the Debtors' Employees.

100. The Debtors do not believe that amounts owed to any Employees on the Petition Date will exceed the statutory cap of $12,850 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. For the avoidance of doubt, the Debtors do not seek authority to pay any amounts in excess of $12,850 per Employee pursuant to the Interim Order.

### 1.   Employee Compensation and Withholding Obligations

(a)   Unpaid Compensation

101. In the ordinary course, the Debtors incur obligations to their Employees for, among other things, salaries, wages, overtime, and other obligations described herein (collectively, the "Employee Compensation"). The Debtors pay their Employees on a bi-weekly basis, whether accrued on a salaried or hourly basis. The Debtors' historical average bi-weekly gross Employee Compensation, including salaries, wages, and related compensation, has been approximately $9.7 million in the aggregate for the Employees. The Debtors estimate that their

average bi-weekly Employee Compensation will be approximately $9.7 million during the course of these chapter 11 cases. The majority of the Debtors' payroll is made by direct deposit through electronic transfer of funds to the Employees' bank accounts or by other electronic means. As described above, loss of the Unpaid Compensation that the Employees are owed could cause such Employees to experience financial hardship. Moreover, the Debtors estates will suffer irreparably if Employees are not paid on account of the services that they have provided. In light of the substantial benefit the Employees will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such a hardship.

(b)      Independent Contractors and Temporary Staff

102.      The Debtors rely on Independent Contractors and Temporary Staff in the ordinary course of their business. These Independent Contractors and Temporary Staff perform a wide range of services critical to the Debtors' operations, including, among other things, providing information technology and marketing assistance to Retail and Corporate Employees, and providing peak-season store-level staffing. The Employees rely on the support of the Independent Contractors and Temporary Staff to complete certain tasks in furtherance of the Debtors' business. The Debtors believe the authority to continue paying their Independent Contractors and Temporary Staff is critical to maintaining and administering their estates. Historically, the Debtors paid approximately $150,000 to Independent Contractors and Temporary Staff on a monthly basis.

103.      As of the Petition Date, the Debtors estimate that Independent Contractors and Temporary Staff are owed an aggregate of approximately $180,000 on account of services rendered prior to the Petition Date (the "Unpaid Contractor and Temporary Staffing Amounts"), all of which will become due and owing within the Interim Period. The Debtors do not believe

they owe any individual Independent Contractor or Temporary Staff amounts in excess of $12,850 and are not seeking to pay Unpaid Contractor and Temporary Staffing Amounts on account of any work performed by any individual Independent Contractor or Temporary Staff, as applicable, in excess of such amount during the Interim Period.

(c)    Withholding Obligations and Payroll Taxes

104.    During each applicable payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and similar deductions, as well as other pre-tax and after tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, legally ordered deductions, and miscellaneous deductions (collectively, the "Deductions"), and forward such amounts to various third-party recipients.

105.    In addition to the Deductions, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities.  The Debtors must then match the Employee Payroll Taxes from their own funds and pay additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes based on a percentage of gross payroll (the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes").  The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time as the Employees' payroll checks are disbursed.

106.    As of the Petition Date, the Debtors estimate that they owe approximately $1.5 million on account of the Deductions and the Payroll Taxes (collectively, the "Withholding Obligations"), all of which will come due within the Interim Period.

(d)    Payroll Processing

107.    Certain Withholding Obligations for the Debtors' Employees, and payroll processing services generally, are processed and administered by ADP.  On average, the Debtors pay ADP approximately $100,000 per month for this service.  As of the Petition Date, the Debtors estimate that they owe approximately $127,500 to ADP on account of payroll services (the "Unpaid Payroll Processing Fees"), all of which will come due within the Interim Period. The Debtors seek authority, but not direction, to pay the Unpaid Payroll Processing Fees in the ordinary course and consistent with past practice and to continue payroll processing in the ordinary course of the Debtors' business on a postpetition basis.

(e)    Corporate Credit Card Expenses

108.    The Debtors provide certain Employees with Wells Fargo Bank, N.A. ("Wells Fargo") travel and entertainment credit cards for ordinary course expenses that such Employees incur in performing their job functions (collectively, the "Corporate Credit Cards").   The Corporate Credit Cards are used by Employees to allow them to charge business-related travel and marketing expenses directly to the Debtors.  It is critical to the Debtors' business operations that the Debtors continue making direct payments on behalf of Employees for such expenses.

109.    Use of the Corporate Credit Cards is integral to the Debtors' cash management and account functions, and continuation of the Employees' ability to use the Corporate Credit Cards for procurement and travel purposes is essential to the Debtors' business operations.  On

average, the Debtors pay approximately $600,000 per month for amounts incurred on the Corporate Credit Cards.

110.    As of the Petition Date, the Debtors believe they owe approximately $150,000 in expenses charged to Corporate Credit Cards, all of which will become due and owing within the Interim Period.

(f)    Reimbursable Expenses

111.    Reimbursable Expenses include recruitment expenses, expenses required to run certain business programs, and travel-related expenses such as meal allowances, fuel costs, parking, and other standard business expenses.  Employees that pay for their own Reimbursable Expenses up front apply for reimbursement of Reimbursable Expenses by submitting receipts to their department manager.  Once the department manager has determined that the charges are for allowable reimbursable business expenses, the Debtors reimburse Employees for these expenses. The Debtors' inability to reimburse such expenses could impose hardship on such individuals.

112.    As of the Petition Date, the Debtors estimate that they owe approximately $135,000 in aggregate Reimbursable Expenses, all of which will come due within the Interim Period.

(g)    Relocation Expenses

113.    The Debtors pay certain expenses of Employees that are transferred in connection with their job (the "Relocation Expenses").  The majority of Relocation Expenses are reimbursed to the Employees or directly billed to the Debtors by the Debtors' relocation provider, American International Relocation Solutions LLC.  The Relocation Expenses include, but are not limited to, costs associated with the transportation of household goods, lease cancellation expenses, eligible home sale and purchase closing cost expenses, temporary living accommodations, and

other covered expenses.  Relocation benefits are subject to a repayment agreement that requires repayment of the full or partial relocation amount if the Employee voluntarily terminates employment prior to the completion of a specified period of service.

114.    As of the Petition Date, the Debtors believe they owe approximately $30,000 on account of Relocation Expenses, all of which will come due and owing within the Interim Period.

(h)    Tuition Reimbursement

115.    The Debtors reimburse certain tuition costs incurred by Employees (the "Tuition Assistance Program").  Pursuant to the Tuition Assistance Program, the Debtors reimburse certain Employees who maintain at least a B average in their courses for the costs of continuing education through an accredited program that either offers growth in an area related to the Employee's current position or in an area that may lead to promotional opportunities within the Debtors' business.  The Debtors will reimburse eligible Employees up to $7,000 per calendar year for college or graduate level courses.

116.    As of the Petition Date, three Employees participate in the Tuition Assistance Program and the Debtors estimate that they may owe approximately $21,000 in the aggregate under the Tuition Assistance Program.

(i)    Employee Bonus Plans

117.    To ensure optimal performance by the Employees, the Debtors have implemented the following non-insider bonus and incentive plans (collectively, the "Employee Bonus Plans"):

- Regional Director Bonus Plan: The Debtors maintain a regional director bonus plan (the "Regional Director Bonus Plan") for all regional directors.  To be eligible for an incentive payment under the Regional Director Bonus Plan, Employees must reach certain percentage thresholds based on their region's sales performance versus the Debtors' sales plan (the "Sales Performance Bonus").  Linked with the Sales Performance Bonus is an additional payout opportunity based on a region's shrink

results.[15]  The annual shrink results of a given region will be evaluated to determine the effect of inventory shrinkage on the inventory payout (the "Shrink Bonus").  Per the terms of the Regional Director Bonus Plan, regional directors may receive a Sales Performance Bonus payout of up to 20% of their annual salary, and when a region achieves 95% of the Debtors' annual sales plan, regional directors in that region are eligible for an additional Shrink Bonus payout of up to 15% of their annual salary.  Lastly, in addition to the Sales Performance Bonus and the Shrink Bonus, Employees may receive a bonus based on the Debtors' EBITDA performance (the "EBITDA Bonus") in an amount up to 10% of their annual salary.  In total, under the Regional Director Bonus Plan, regional directors may earn a bonus payout of up to 45% of their annual salary.

- Loss Prevention Bonus Plan: The Debtors maintain a loss prevention bonus plan (the "Loss Prevention Bonus Plan") for Employees employed in the loss prevention department.  Under the Loss Prevention Bonus Plan, certain Employees are eligible to receive a Shrink Bonus and a Sales Performance Bonus.[16]  Annual shrink results are evaluated first to determine Shrink Bonus eligibility, and depending on shrink results, a loss prevention Employee may earn a Shrink Bonus payout of up to 25% of their annual salary.  When a region's shrink results are less than 2.24% of total inventory for that region, that region's sales performance will then be evaluated to determine Sales Performance Bonus eligibility.  Per the terms of the Loss Prevention Bonus Plan, loss prevention Employee's may receive a Sales Performance Bonus payout of up to 100% of their Shrink Bonus payout.

- MMM/DMIT/DM and Store Manager Bonus Plans: Market MAD managers, district managers in training, district managers, and store managers are eligible to receive bonus payouts twice a year based on strong sales performance and shrink (the "MMM/DMIT/DM and Store Manager Bonus Plans").  Under the MMM/DMIT/DM and Store Manager Bonus Plans, for each month that an Employee meets or exceeds the Debtors' monthly sales plan, monthly bonus earnings accrue in a monthly sales bonus account.  The amount accrued each month is determined by an Employee's position and the percentage of the Debtors' monthly sales plan achieved.  Under the MMM/DMIT/DM and Sales Manager Bonus Plans, at the end of the spring season Employees receive a payout of half of the amount held in their sales bonus account, and the other half is paid out at the end of the fiscal year based on inventory shrinkage.  Depending on the Employee's position, if an Employee achieves a certain percentage of the Debtors' annual sales plan, a Shrink Bonus will also be awarded at the end of the fiscal year.

- Merchandising, Planning and Allocation Bonus Plan: Eligible merchandising, planning, and allocation Employees have the potential to receive a bonus based on the Debtors' EBITDA and the Employee's particular department and division's gross margin

---

[15]  In the retail industry, shrink refers to the percentage of product loss between the point of manufacture and the point of sale.

[16]  A small number of Employees employed in the loss prevention department are eligible to receive a Shrink Bonus and an EBITDA Bonus as opposed to a Shrink Bonus and a Sales Performance Bonus.

compared to the Debtors' original plan (the "Merchandising, Planning, and Allocation Bonus Plan"). Bonuses under the Merchandising, Planning, and Allocation Bonus Plan are awarded annually and bonus payout amounts vary based on a percentage of the Employee's annual earnings.

- Corporate EBITDA Bonus Plan: Corporate Employees are eligible to receive a bonus based on the Debtors' EBITDA goals (the "Corporate EBITDA Bonus Plan"). Under the Corporate EBITDA Bonus Plan, potential bonus payouts are awarded annually and bonus payout amounts vary based on a percentage of the Employee's annual earnings.

- DM Match Rate Bonus Plan: District managers that achieve a 50% customer relationship management ("CRM") match rate for the month of December are eligible to receive a $500 bonus. District managers achieving a 50% CRM match rate for the month of December may receive an additional $500 bonus if the district manager maintains a 50% average CRM match rate through the end of the following quarter.

- Real Estate Management Bonus Plan: The Debtors maintain a real estate management bonus plan for eligible senior managers and directors of real estate (the "Real Estate Management Bonus Plan"). Under the Real Estate Management Bonus Plan, eligible Employees may earn a bonus based on certain savings thresholds which are calculated based on the trailing twelve month occupancy cost incurred by the Debtors compared to newly negotiated occupancy costs for stores reaching the end of their lease (the "Portfolio Reposition Bonus"). In addition to the Portfolio Reposition Bonus, eligible Employees may earn an additional bonus by negotiating cost-savings deals for certain stores designated as "4 Wall Negative Stores." Approval of any deal is at the discretion of the Debtors' CEO, and bonus amounts will be calculated at 10% of the savings negotiated for any 4 Wall Negative Stores.

- Real Estate Lease Compliance Bonus Plan: The Debtors maintain a real estate lease compliance bonus plan for eligible Employees employed as real estate coordinators, lease compliance associates, or lease admin associates (the "Real Estate Lease Compliance Bonus Plan"). Under the Real Estate Lease Compliance Bonus Plan, eligible Employees may earn a bonus for meeting certain cost avoidance goals relating to incorrect billing practices. Bonuses under the Real Estate Lease Compliance Bonus Plan are awarded annually and bonus payout amounts vary based on a percentage of the Employee's annual earnings.

- DC Incentive Program: Lastly, under the DC incentive program, the Debtors' reward DC Employees that meet certain safety, attendance, and productivity thresholds (the "DC Incentive Program"). Under the DC Incentive Program, DC Employees earn money for each month that they meet various threshold requirements and receive a check for such earnings (separate from their paycheck) after each fiscal quarter.

118.    As of the Petition Date, the Debtors estimate that there may be approximately $464,500 outstanding on account of the Employee Bonus Plans,[17] of which $14,500 will come due during the Interim Period.

(j)    Annual Merit

119.    The Debtors offer certain eligible non-insider Employees annual merit based raises (the "Annual Merit Plan") to provide Employees with discretionary, merit based payments (the "Annual Merit Payments").  The Annual Merit Plan is currently open to eligible Employees hired before November 1, 2016.  The Annual Merit Payments are added to the Employees' base rate of pay and are paid bi-weekly with payroll.

(k)    Non-Insider Severance Program

120.    In the ordinary course of business, the Debtors maintain an informal severance program for all non-executive, non-insider Employees (the "Non-Insider Severance Program"). The relief sought hereunder will not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders").   Certain Employees are eligible for severance benefits if such non-executive, non-insider Employees are terminated due to a work-force adjustment or any not-for-cause employer-initiated termination. Pursuant to the Non-Insider Severance Program, eligible Employees are entitled to receive payments at base compensation levels (based on their job position) and are entitled to participate in the Medical Plan, Prescription Plan, Dental Plan, Vision Plan, and Flexible Spending Plan (the "Non Insider Severance Benefits") for a prescribed period of time as described below.

---

[17]   Note that approximately $450,000 of the Employee Bonus Plans will not be due to Employees until the end of the second quarter, and payment on account of such plans is conditioned upon satisfying certain requirements and milestones.

121.     Non-Insider Severance Benefits are provided to non-insider Employees based on informed standard company policies.  These policies provide that non-insider Employees accrue Non-Insider Severance Benefits at various rates based on length of service and level of employment.  Non-Insider Severance Benefits accrue at the following rates:

- DC Employees:

  - Under 2 years of service: 2 weeks of pay

  - 2-4 years of service: 4 weeks of pay

  - 5-11 years of service: 8 weeks of pay

  - 12+ years of service: 12 weeks of pay

- Corporate Employees: 1 week of pay for every year of service (rounded up), with a minimum of 2 weeks of pay and a maximum of 12 weeks of pay

122.     As of the Petition Date, the Debtors believe that 129 Employees that were severed prior to the Petition Date in connection with the Debtors' ongoing "reduction in force" program are owed $245,000 in accrued but unpaid Non-Insider Severance Benefits (the "Unpaid Non-Insider Severance Benefits"), all of which will become due and owing within the Interim Period. The Debtors do not believe they owe any eligible Employees prepetition amounts in excess of $12,850 and are not seeking to pay Unpaid Non-Insider Severance Benefits on account of any work performed by any Employee, as applicable, in excess of such amount pursuant to the Interim Order.

(l)       Store Closing Retention Bonus

123.     In addition to non-insider severance payments, Store managers and district managers managing stores that will be closed in conjunction with these chapter 11 cases are eligible for a short-stay bonus on account of continued employment with the Debtors during the duration of the store closing process (the "Store Closing Retention Bonus").  Amenable store

53

managers are eligible to earn a Store Closing Retention Bonus in an amount equal to up to four weeks' pay, and amenable district managers are eligible to earn a Store Closing Retention Bonus of up to eight weeks' pay.

### 2.    Employee Benefits Programs

124.    The Debtors offer their Employees the ability to participate in several insurance and benefits programs, including, among other programs, medical, prescription drug, dental, and vision plans, life insurance, accidental death and dismemberment insurance, disability benefits, employee assistance programs, and other employee benefit plans as described below (collectively, the "Employee Benefits Programs").  The Employee Benefits Programs are, in each case, available to Employees depending on their status as full-time or part-time Employees, their level with the company, and their length of service (the "Eligible Employees").

(a)    Health Benefit Plans

125.    The Debtors offer their Eligible Employees the opportunity to participate in a number of health benefit plans, including medical, prescription, stop-loss insurance, dental, vision, and healthcare assistance plans (collectively, the "Health Benefit Plans").  Specifically, the Debtors provide the following:

- Medical Plan: The Debtors' medical plan (the "Medical Plan") is a self-insured plan administered by Highmark Blue Cross Blue Shield ("Highmark") and UPMC Health Plan ("UPMC").  As of the Petition Date, the Debtors estimate that they owe approximately $1.3 million for unreimbursed medical claim payments advanced by Highmark and UPMC to medical providers.   The Debtors estimate that the ongoing monthly administrative cost of the Medical Plan will be approximately $115,000.

- Prescription Plan: The Debtors' prescription drug plan (the "Prescription Plan") is a self-insured plan administered by CVS/Caremark.  As of the Petition Date, the Debtors estimate that they owe approximately $35,000 on account of the Prescription Plan.

- Vision Plan: The Debtors also offer their Employees the option of participating in a vision plan (the "Vision Plan") administered by Davis Vision/Highmark.  As of the Petition Date, the Debtors estimate that they owe approximately $10,000 on account of the Vision Plan (including employer and employee contributions).

- <u>Dental Plan</u>: Additionally, the Debtors offer their Employees the option of participating in a dental plan (the "<u>Dental Plan</u>") administered by Delta Dental PPO. As of the Petition Date, the Debtors estimate that they owe approximately $55,000 on account of the Dental Plan (including employer contributions and employee contributions). The Debtors estimate that the ongoing monthly administrative cost of the Dental Plan is approximately $55,000.

- <u>Healthcare Assistance Program</u>: The Debtors offer their Employees the option of participating in a healthcare wellness support program administered by Health Advocate (the "<u>Healthcare Assistance Program</u>"). The Healthcare Assistance Program provides Employees assistance with healthcare and insurance-related issues. As of the Petition Date, the Debtors estimate that they owe approximately $4,000 on account of the Healthcare Assistance Program.

- <u>Flexible Spending Plan</u>: The Debtors also offer Eligible Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care and dependent day care expenses (the "<u>Flexible Spending Plan</u>"). There is a $2,600 health care annual limit and a $5,000 dependent care annual limit for each eligible Employee participating in the Flexible Spending Plan. The Flexible Spending Plan is administered by WageWorks. The Debtors estimate that approximately 405 Employees participate in the Flexible Spending Plan, which is fully funded by the enrolled Employees' payroll contributions. As of the Petition Date, the Debtors estimate that they hold approximately $0 of unremitted Employee contributions to the Flexible Spending Plan and owe approximately $1,500 in administrative fees to WageWorks (the "<u>Flexible Spending Plan Obligations</u>").

- <u>rueBaby HRA Plan</u>: The Debtors offer up to $250 to expecting mothers for certain eligible health care expenses via a health reimbursement account (the "<u>rueBaby HRA Plan</u>"). Expecting mothers are eligible to participate in the rueBaby HRA Plan after enrolling and completing a free maternity education and support program. Under the rueBaby HRA Plan, the Debtors contribute funds to a debit card in various amounts depending on the expecting mothers' enrollment trimester. As of the Petition Date, the Debtors estimate that they owe approximately $250 on account of the rueBaby HRA Plan.

- <u>COBRA</u>: Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("<u>COBRA</u>"), certain former Employees of the Debtors (the "<u>COBRA Participants</u>") may continue insurance coverage under the Medical Plan, Prescription Plan, Dental Plan, Vision Plan, and Flexible Spending Plan (the "<u>COBRA Benefits</u>"). Approximately 31 COBRA Participants elect to continue coverage through COBRA.[18] COBRA Participants are responsible for paying all premium costs associated with the COBRA Benefits. As of the Petition Date, the Debtors estimate that they owe approximately $0 for prepetition administrative service fees to ADP.

---

[18] Severed Employees electing to continue insurance coverage through COBRA will receive a premium subsidy from the Debtors at the active employee rate.

- Stop-Loss Insurance Policy: The Debtors maintain stop-loss insurance policies (the "Stop-Loss Insurance Policies") with Highmark and UPMC to protect against catastrophic claims under their Medical Plans—*i.e.*, claims in excess of $200,000 under the Highmark Medical Plan and claims in excess of $200,000 under the UPMC Medical Plan.  Under the Highmark Medical Plan, coverage for the Stop-Loss Insurance Policy is covered in the premiums paid to Highmark for Medical Plan coverage.  As of the Petition Date, the Debtors estimate that they owe approximately $5,000 on account of the Stop-Loss Insurance Policies.  The Debtors estimate that the ongoing monthly administrative cost of the UPMC Stop-Loss Insurance Policy is approximately $5,000.

(b)      Workers' Compensation and Other Insurance Programs

### (i)      Workers' Compensation

126.      The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which they have Employees (collectively, and as described herein, the "Workers' Compensation Program").  The Debtors currently maintain coverage under the Workers' Compensation Program through Sentry Insurance and Sentry Casualty Company (collectively, "Sentry").  The Debtors pay approximately $700,000 annually to maintain the Workers' Compensation Program.  Additionally, the Debtors' obligations to Sentry with respect to the Workers' Compensation Program and general liability claims  are backed by a $2.45 million letter of credit.

127.      Previously, the Debtors maintained workers' compensation and general liability insurance through Liberty Mutual Insurance ("Liberty Mutual").  To cover the costs of any outstanding legacy claims that may arise under the Liberty Mutual policies, the Debtors have provided Liberty Mutual with a deposit of approximately $85,000 (the "Legacy Claims Deposit").  Once Liberty Mutual certifies payment of all outstanding legacy claims, it will return the balance of the Legacy Claims Deposit to the Debtors.  Pursuant to the Interim Order and the Final Order, the Debtors seek authority, but not direction, to maintain the Legacy Claims Deposit in the ordinary course of business on a postpetition basis.

128.     In certain states, including Ohio, Washington, Wyoming, and North Dakota (collectively, the "Governmental Jurisdictions"), the Debtors are required to pay into a workers' compensation replenishment fund (the "Workers' Compensation Fund") to cover workers' compensation claims as they are adjudicated.  The Debtors have historically contributed to the Workers' Compensation Funds on a quarterly, bi-monthly, or annual basis depending on the Governmental Jurisdiction.  The Debtors pay approximately $182,000 annually to maintain the Workers' Compensation Program in the Governmental Jurisdictions.

**(ii)     Life Insurance, Accidental Death and Dismemberment Insurance, Disability Benefits, and Employee Assistance Programs**

129.     The Debtors provide their Employees with life insurance, accidental death and dismemberment insurance, short-term and long-term disability benefits, and employee assistance program benefits through various policies (collectively, the "Life, AD&D, Disability, and EAP Plans").  Liberty Mutual administers the policies for the Employees' life insurance, accidental death and dismemberment insurance, and short-term and long-term disability insurance.  Morneau Shepell administers the employee assistance programs.  As of the Petition Date, the Debtors believe they owe approximately $50,000 on account of the Life, AD&D, Disability, and EAP Plans (including employer contributions, employee contributions, and administrative costs), $50,000 of which will become due and owing within the Interim Period.  Pursuant to the Interim Order and the Final Order, the Debtors seek authority, but not direction, to pay any unpaid amounts on account of the Life, AD&D, Disability, and EAP Plans and to continue the Life, AD&D, Disability, and EAP Plans in the ordinary course of business on a postpetition basis.

(c)     Supplemental Insurance

130.     Under the Debtors' voluntary benefits program, the Debtors offer their Employees the option to purchase certain additional insurance benefits.  Through Metropolitan Life

Insurance Company, Employees can obtain auto and home insurance (collectively, the "MetLife Benefits").   Through Unum Life Insurance Company of America, Employees can purchase accident, short term disability, and critical illness insurance (the "Unum Benefits").   Lastly, through Nationwide (formerly known as Veterinary Pet Insurance), Employees may elect to purchase pet insurance (the "Pet Insurance Benefits" and collectively, the MetLife Benefits, the Unum Benefits, and the Pet Insurance Benefits are the "Supplemental Insurance Benefits").   All Supplemental Insurance Benefits are administered by The Farmington Company.

131.    The Debtors do not contribute to the Supplemental Insurance Benefits, which are 100% paid by deductions from participating Employees' monthly paychecks.   The Debtors deduct or remit approximately $8,000 per month on account of the Supplemental Insurance Benefits (the "Supplemental Insurance Amounts").   As of the Petition Date, the Debtors estimate that there is approximately $4,000 in accrued amounts to be deducted and/or remitted on account of the Supplemental Insurance Amounts (the "Unremitted Supplemental Insurance Amounts"), all of which will be due and owing during the Interim Period.

132.    The Debtors believe the Supplemental Insurance Amounts are generally held in trust by the Debtors and are not property of their estates.

(d)     401(k) Plan

133.    The Debtors maintain a retirement savings plan for the benefit of their Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").   The Debtors match Employees' 401(k) Plan contributions (the "401(k) Plan Contributions") on a dollar-for-dollar basis, up to 4% of the Debtors' net pre-tax profits to the 401(k) Plans (the "401(k) Matching Contributions").   Each Employee's 401(k) Plan Contributions are deducted automatically from each paycheck.   The 401(k) Plan is administered

by Great West Life & Annuity Insurance Company d/b/a Empower Retirement ("Empower") and allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.

134.     The Debtors do not pay any administrative costs in connection with the 401(k) Plan.  Each pay period, the Debtors deduct the Employees' 401(k) Plan Contributions from the Employees' paychecks (the "401(k) Deductions") and hold such amounts in trust until they are forwarded to Empower.   The Debtors deduct approximately $150,000 in the aggregate each month from Employee's paychecks on account of the 401(k) Deductions.  As of the Petition Date, the Debtors estimate that they are current on account of the 401(k) Deductions (the "Unremitted 401(k) Deductions"), but include this description out of an abundance of caution and seek authority to remit Unremitted 401(k) Deductions if any become due.

135.     The 401(k) Matching Contributions are made on a bi-weekly basis.  The Debtors pay approximately $1.5 million per year on account of 401(k) Matching Contributions.  As of the Petition Date, the Debtors estimate that they owe approximately $150,000 on account of 401(k) Matching Contributions (the "Unpaid 401(k) Contributions"), all of which will become due and owing within the Interim Period.

(e)     Paid Time Off and Paid Personal Time

136.     The Debtors provide vacation time to Eligible Employees as a paid time off benefit ("Paid Time Off").  In addition to Paid Time Off, Eligible Employees may receive up to five days of paid jury duty per year, paid personal time (granted to Eligible Employees every January), and up to seven paid holidays (collectively, "Paid Personal Time").  The amount of Paid Time Off and Paid Personal Time available to a particular Employee is generally determined by the Employee's position and length of employment.  Paid Time Off and Paid

Personal Time cannot be carried over from one calendar year to the next and the amount of Paid

Personal Time available to a particular Employee is determined by the Employee's hire date and

employment level. Certain Eligible Employees may earn up to a maximum of 160 hours (i.e.,

four weeks) of Paid Time Off.

137.    When an Eligible Employee elects to take Paid Time Off or Paid Personal Time,

that Employee is paid his or her regular hourly or salaried rate. Employees are not entitled to a

monetary award on account of unused Paid Personal Time. An Employee is only entitled to a

cash payment for unused Paid Time Off in the event that such Employee is terminated from the

Debtors' employment. Employees that are involuntarily terminated for poor performance or for

violations of company policy are not entitled to cash payments for unused Paid Time Off. As of

the Petition Date, the Debtors estimate that approximately $1.4 million in Paid Time Off has

been earned by Employees.

(f)    Sick Leave Policy

138.    Full Time Employees receive a certain number of paid sick days every January to

be used throughout the year (the "Sick Days"). Under the Debtors' sick leave policy, Sick Days

are pro-rated for the first partial calendar year for Employees hired after January based on the

number of days from the date of hire until the end of year (the "Sick Leave Policy"). Certain

Full Time Employees are entitled to a maximum of ten Sick Days per year. Full Time

Employees may not carry over unused Sick Days into the next calendar year. Employees are not

entitled to cash payments for unused sick leave.

(g)    Bereavement Leave Policy

139.    All Employees are eligible for bereavement leave between and including the date

of death and the date of the funeral to make any necessary arrangements associated with the

60

death of a family member.  Employees are allowed up to three paid days of bereavement leave

for immediate family members and up to one paid day of bereavement leave for all other family

members.  Employees are not entitled to cash payments for unused bereavement leave.

(h)     Unpaid Leave

140.     In addition to the various forms of paid leave, the Debtors provide certain forms

of unpaid leave, including unpaid military leave, unpaid personal leave, unpaid medical leave not

granted under the Family and Medical Leave Act of 1993 (the "FMLA"), and unpaid leave

granted under the FMLA for:  (a) birth, adoption, or foster care, (b) family care, (c) medical

emergencies, (d) military exigencies, and (e) military caregiving needs.

**J.     Emergency Motion Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock**

141.     The Debtors seek entry of interim and final orders:  (a) approving notification and

hearing procedures related to certain transfers of and declarations of worthlessness for federal or

state tax purposes with respect to equity securities in Debtor Rhodes Holdco, Inc. or any

Beneficial Ownership[19] thereof, including, for the avoidance of doubt, certain transfers of and

declarations of worthlessness with respect to equity securities in Rhodes Holdings, LP, Rhodes

Topco, Inc., Rhodes Midco, Inc., or Rhodes Sub LLC (any such record or Beneficial Ownership

---

[19]   "Beneficial Ownership" shall be determined in accordance with the applicable rules of section 382 of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1–9834 (as amended, the "IRC"), and the Treasury Regulations thereunder, and includes direct, indirect, and constructive ownership (e.g., a holding company would be considered to beneficially own all shares owned or acquired by its subsidiaries and a partner in a partnership (or a member of or other investor in any other entity or arrangement that is classified as a partnership for federal income tax purposes) would be considered to own beneficially its proportionate share of any equity securities owned by such partnership (or other entity or arrangement)), ownership by such holder's family members and entities acting in concert with such holder to make a coordinated acquisition of equity securities, and ownership of equity securities that such holder has an Option (as defined below) to acquire.  An "Option" to acquire stock includes all interests described in Treasury Regulations Section 1.382-4(d)(9), including any contingent purchase, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock, or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

of existing common stock the "Common Stock");[20] (b) directing that any purchase, sale, declaration of worthlessness, or other transfer of Common Stock in violation of the Procedures shall be null and void *ab initio*.

142.     The Debtors have incurred, and are currently incurring, significant NOLs and have significant tax credits (collectively, "Tax Attributes").  As of the end of their tax year ending January 28, 2017, the Debtors estimate that they had NOLs in the amount of approximately $82 million and tax credits in the amount of approximately $4 million, translating to potential future tax savings of approximately $35 million.  The Tax Attributes are of significant value to the Debtors and their estates because the Debtors may utilize the Tax Attributes to offset their future taxable income for up to 20 years (except to the extent reduced as a result of cancellation of indebtedness income pursuant to section 108 of the IRC), including to offset any taxable income generated by transactions consummated during these chapter 11 cases. Therefore, the value of the Tax Attributes may inure to the benefit of all of the Debtors' stakeholders.

## K.        Emergency Motion Authorizing the Payment of Certain Prepetition Taxes and Fees

143.     The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors, in their sole discretion, to remit and pay certain outstanding prepetition taxes, as described herein (the "Taxes and Fees Cap").  The Debtors estimate that, as of the Petition Date, there is approximately $10.44 million outstanding on account of Taxes and Fees (as defined below).  Pursuant to the Interim Order, the Debtors seek interim relief to pay an aggregate

---

[20]   For the avoidance of doubt, the definition of Common Stock shall not include any securities issued in connection with a chapter 11 plan of reorganization of the Debtors.

amount not to exceed $8.47 million in Taxes and Fees that may come due prior to the Final Hearing.

144.    In the ordinary course of business, the Debtors collect, incur, and pay sales taxes, use taxes, commercial activity taxes, income taxes, personal property taxes, franchise taxes and fees, gross receipt taxes, and various other governmental taxes, fees, and assessments (collectively, the "Taxes and Fees").  The Debtors remit the Taxes and Fees to various federal, state, and local governmental units and taxing authorities (collectively, the "Governmental Authorities").  Taxes and Fees are remitted and paid by the Debtors through checks and electronic transfers that are processed through their banks and other financial institutions

**L.    Emergency Motion Authorizing the Debtors to Pay Their Obligations under Insurance Policies Entered into Prepetition, Continue to Pay Brokerage Fees, and Renew, Supplement, Modify, or Purchase Insurance Coverage in the Ordinary Course of Business**

145.    The Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to: (i) pay obligations under insurance policies entered into prepetition; (ii) continue to pay certain brokerage fees; and (iii) renew, supplement, modify, or purchase insurance coverage in the ordinary course of business; and (b) granting related relief.  Pursuant to the Interim Order, the Debtors seek interim relief to pay an aggregate amount not to exceed $200,000 in connection with the Debtors' obligations on account of the Insurance Policies that may come due prior to the Final Hearing.

**1.    The Debtors' Insurance Policies**

146.    In the ordinary course of business, the Debtors maintain 14 insurance policies (collectively, the "Insurance Policies") predominantly administered by third-party insurance carriers (collectively, the "Insurance Carriers").  The Insurance Policies provide coverage for

general commercial liability, business automobile liability, umbrella excess liability, property liability, cyber liability, employment practices liability, crime liability, kidnap and ransom liability, excess executive liability, directors and officers liability, fiduciary liability, and excess management liability.  The total annual premiums for the Insurance Policies are approximately $1.6 million, plus applicable taxes and surcharges.

147.    The Debtors seek authority to continue honoring any amounts owed on account of the Insurance Policies in the ordinary course of business to ensure uninterrupted coverage under the Insurance Policies.  The Debtors seek authority to pay on an interim basis an aggregate amount not to exceed $200,000 in connection with the Debtors' obligations under the Insurance Policies that may become due during the interim period.

148.    Certain of the Insurance Policies are subject to regular audits (the "Insurance Policy Audits"), which may result in an adjustment of the premium payments.  Certain of these Insurance Policy Audits will not conclude until after the Petition Date and, therefore, the amount of potential Insurance Policy Audit related premium adjustments is difficult to know with certainty at this time.

**2.    Brokerage Fees**

149.    The Debtors' insurance broker is Arthur J. Gallagher & Co. (the "Broker"), which assists the Debtors in:  (a) obtaining comprehensive insurance coverage; (b) negotiating policy terms, provisions, and premiums; (c) assisting the Debtors with claims; and (d) providing ongoing support throughout the applicable policy periods.  The Broker's annual fees and commissions are approximately $287,810, which are paid in ten equal installments of $28,781.  As of the Petition Date, the Debtors do not believe that they owe any amounts to the Broker on account of fees, commissions, or any other prepetition obligations.

150.    The Debtors believe that continuation of the Broker's services are necessary to assure the Debtors' ability to secure Insurance Policies on advantageous terms at competitive rates, facilitate the proper maintenance of the Debtors' Insurance Policies postpetition, and ensure adequate protection of the Debtors' property postpetition.   Accordingly, the Debtors request authority to continue paying amounts owing to the Broker in a manner consistent with past practices on a postpetition basis.

**M.      Emergency Motion Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, Determining Adequate Assurance of Payment for Future Utility Services, and Establishing Procedures for Determining Adequate Assurance of Payment**

151.    The Debtors seek entry of interim and final orders: (a) prohibiting utility providers from altering, refusing, or discontinuing services; (b) determining adequate assurance of payment for future utility services; and (c) establishing procedures for determining adequate assurance of payment for future utility services.

152.    In connection with the operation of their business, the Debtors obtain water, sewer service, waste disposal, natural gas, electricity, telecommunications, internet access and service, and other similar services (collectively, the "Utility Services") from a number of utility providers or their brokers (collectively, the "Utility Providers").   In order to manage the Debtors' payments owed to the various Utility Providers, rue21, inc. entered into a Total Energy & Sustainability Service Agreement with Ecova, Inc. ("Ecova"), dated December 12, 2013 (the "Ecova Agreement").   Pursuant to the Ecova Agreement, the Debtors pay Ecova the amounts invoiced for the Utility Services plus Ecova's fee, of approximately $5,400 per month, in the ordinary course of business.   Pursuant to the leases for several of the Debtors' stores, certain Utility Services are billed directly to the Debtors' landlords as part of the Debtors' lease payments,

including 356 water and sewage services, 242 trash services, 190 electric services, 14 gas services, and 7 other miscellaneous services.

153.    Preserving Utility Services on an uninterrupted basis is essential to the Debtors' operations.   The Debtors' business includes approximately 1,179 brick and mortar retail locations, as well as a Distribution Center and corporate offices.   These locations require electricity, telecommunications, internet, water, waste management (including sewer and trash), and other utility services to operate.   Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be disrupted, which could jeopardize the Debtors' ability to effectively administer these chapter 11 cases.   Any disruption in Utility Services would also adversely affect customer goodwill and employee relations, which would negatively affect the Debtors' revenues.   Accordingly, it is essential that the Utility Services continue uninterrupted during the chapter 11 cases.

154.    The Debtors pay approximately $2.0 million each month for Utility Services, calculated as a historical average payment for the twelve-month period ended January 31, 2017, including services paid under the Ecova Agreement and certain services paid directly by the Company.   The Debtors estimate that their cost for Utility Services during the next 30 days (excluding any deposits to be paid or fees payable to Ecova) will be approximately $2.0 million. The Debtors estimate that the aggregate amount currently held as deposits or prepayments by the Utility Providers providing services to stores that the Debtors intend to continue operating is approximately $400,000.

155.    To provide additional assurance of payment, the Debtors propose to deposit $600,000 into a segregated account (the "Adequate Assurance Deposit").   The Adequate Assurance Deposit equals approximately two (2) weeks of Utility Services, calculated as a

historical average over the twelve months ended January 31, 2017, net of any prepetition deposits, letters of credit, or surety bonds already provided to the Utility Providers in the ordinary course of business.  The Adequate Assurance Deposit will be held in a segregated account at Bank of America for the benefit of the Utility Providers (the "Adequate Assurance Account") for the duration of these chapter 11 cases and may be applied to any postpetition payment defaults owed to the Utility Companies by the Debtors.  The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in accordance with their prepetition practices (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code.

### N.    Emergency Motion Authorizing the Debtors to Assume the Consulting Agreement and Approving Procedures for Store Closing Sales

156.    The Debtors seek entry of interim and final order: (a) authorizing the Debtors to assume the consulting agreement dated as of April 7, 2017, (as amended, revised, or supplemented from time to time, the "Consulting Agreement") by and among rue21, inc. and Gordon Brothers Retail Partners, LLC (the "Consultant"); (b) authorizing and approving store closings or similar themed sales in accordance with the terms of the store closing sale procedures (the "Store Closing Procedures") with such sales to be free and clear of all liens, claims, and encumbrances; and (c) authorizing procedures to conduct Store Closing Sales in any Additional Closing Stores.[21]

157.    Recognizing the need to right-size their store footprint to align with industry conditions, prior to the Petition Date the Debtors' management team and advisors, including

---

[21]    In support of the relief requested herein, the Debtors submit the Declaration of Stephen Coulombe, a managing director at BRG, which has been filed contemporaneously herewith (the "Coulombe Declaration").

BRG, undertook an extensive analysis of the Debtors' existing store footprint to determine if the Debtors should close stores in connection with their broader financial and operational restructuring initiatives.  The Debtors' management team, in the exercise of their sound business judgment and in consultation with their advisors ultimately determined that it is appropriate to close (the "Store Closings") at least 396 underperforming brick and mortar store locations (the "Closing Stores").

158.    In formulating the list of Closing Stores, the Debtors considered, among other factors, historical store profitability, recent sales trends, the geographic market in which the store is located, the potential to realize negotiated rent reductions with applicable landlords, and specific circumstances related to a store's performance.   The Closing Stores are either unprofitable, are significantly underperforming the Debtors' remaining portfolio, or are not a strategic fit with the Debtors' business going forward.  Many of the Closing Stores are located in geographic markets that the Debtors have made a strategic decision to exit, have experienced poor or negative sales trends, and no longer fit within the Debtors' business plan.  In order to maximize the value of their estates, the Debtors may need to close additional stores during these chapter 11 cases (such stores, the "Additional Closing Stores," and together with the Closing Stores, the "Stores").  The Stores to be closed (following liquidation of their inventory) are predominantly standalone rue21-branded retail and clearance outlet stores.

159.    The Debtors thereafter engaged the Consultant to begin liquidating:  (a) the saleable inventory located in the Stores as of April 14, 2017 and certain inventory that was then located in the Debtors' Distribution Center (collectively, the "Merchandise"); and (b) the furniture, fixtures, and equipment (the "FF&E" and, together with the Merchandise, the "Store Closure Assets") located in the Stores, and otherwise preparing the Stores for turnover to the

applicable landlords on the terms set forth in the Consulting Agreement.  The liquidation of the

Store Closure Assets is expected to yield approximately $37 million in net proceeds.  The Store

Closings began on or about April 14, 2017 and are expected to continue until at least June 25,

2017.

160.    The Debtors seek to assume the Consulting Agreement and allow the Consultant

to continue its work uninterrupted.  The Debtors have determined that:  (a) the services of the

Consultant are necessary for a seamless and efficient large-scale store closing process and to

maximize the value of the assets being sold; and (b) the Consultant is capable of performing the

required tasks on favorable financial terms.  The Consultant's affiliate, Gordon Brothers Asset

Advisors, has on prior occasions performed appraisals of the Debtors' assets on behalf of certain

interest parties.  The most recent such appraisal was completed in October 2016.

161.    Assumption of the Consulting Agreement will allow the Debtors to use the

experience and resources of the Consultant in performing large-scale liquidations at the Stores in

a format that allows the Debtors to retain control over the sale process and that will provide the

maximum benefit to their estates.  Prior to the Petition Date, the ability of the Debtors and the

Consultant to advertise the sales at the Closing Stores as "store closing" sales was limited in

some jurisdictions based on permitting requirements or by the terms of the Debtors' leases.  The

ability to use the "store closing" message in advertising is critical to drive sales, and thus, the

maximum possible recovery for the Debtors and their estates.  Such requirements hamper the

Debtors' ability to maximize value in selling their inventory.  Subject to the Bankruptcy Court's

approval, the Debtors intend to conduct the Store Closing Sales in accordance with the Store

Closing Procedures without complying with the Liquidation Sale Laws.

162.    For the purpose of orderly resolving any disputes between the Debtors and any Governmental Units (as defined in Bankruptcy Code section 101(27)) arising due to the Store Closing Procedures and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Bankruptcy Court authorize the Debtors to implement the following dispute resolution procedures as set forth in the interim and final orders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated:  May 15, 2017

Name:  Todd M. Lenhart

Title:   Acting Chief Financial Officer and Senior Vice President of Accounting

rue21, inc.