# EXHIBIT E

## Restructuring Support Agreement

**RHODES HOLDCO, RUE21, INC. AND EACH OF RUE21, INC.'S DOMESTIC SUBSIDIARIES**

**RESTRUCTURING SUPPORT AGREEMENT**

**As of May 15, 2017**

This Restructuring Support Agreement (together with the exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), dated as of May 15, 2017, is entered into by and among: (i) Rhodes Holdco, Inc. ("Holdings"), rue21, inc. ("rue21") and each of its subsidiaries (such subsidiaries, Holdings, and rue21, each a "rue21 Entity" and, collectively, the "rue21 Entities"); (ii) the lenders party to that certain Credit Agreement, dated as of October 10, 2013 (as amended, restated, modified, or supplemented from time to time in accordance with its terms, the "Term Loan Credit Agreement" and, collectively with any security agreement, intercreditor agreement, and any other collateral and ancillary documents, including any forbearance agreements, the "Term Loan Documents"), by and among Holdings and rue21, as borrower, Wilmington Savings Fund Society, FSB, in its capacity as successor administrative agent and collateral agent (solely in such capacity, the "Term Loan Agent"), and the lenders party thereto (the "Term Loan Lenders") that are (and any Term Loan Lender that may become in accordance with Section 14 hereof) signatories hereto (in their capacity as Term Loan Lenders and holders of Note Claims with respect to the holdings of Claims identified below their respective names on the signature pages hereto, the "Consenting Term Loan Lenders"); (iii) Affiliated Debt Funds and Non-Debt Fund Affiliates (each as defined in the Term Loan Credit Agreement; each, to the extent identified as "Consenting Sponsor Lenders" on the signature pages hereto, a "Consenting Sponsor Lender" and, collectively, the "Consenting Sponsor Lenders"); and (iv) the undersigned affiliates of the Sponsor (as defined in the Term Loan Credit Agreement) (solely in their capacities as holders of 100% of the direct and/or indirect existing equity interests (the "Interests") in the rue21 Entities (the "Consenting Sponsors" and, collectively with any Consenting Sponsor Lenders, the "Sponsor Entities"; together with the Consenting Tem Loan Lenders, the "Restructuring Support Parties"). This Agreement collectively refers to the rue21 Entities and the other Restructuring Support Parties as the "Parties" and each individually as a "Party."

Unless otherwise noted, capitalized terms used but not immediately defined have the meanings given to such terms elsewhere in this Agreement or in the Restructuring Term Sheet (as defined below), as applicable.

## RECITALS

WHEREAS, the Parties have engaged in good faith, arm's-length negotiations regarding certain transactions (the "Restructuring Transactions") pursuant to the terms and conditions set forth in this Agreement, consistent with the terms and conditions of the term sheet attached hereto as Exhibit A (the "Restructuring Term Sheet");

WHEREAS, it is anticipated that the Restructuring Transactions will be implemented through jointly administered voluntary cases commenced (the date of such commencement, the "Petition Date") by the rue21 Entities (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court"), pursuant to a joint plan of reorganization of the rue21 Entities (the "Plan"), which will be filed by the rue21 Entities in the Chapter 11 Cases and which Plan shall contain the terms and conditions as set forth herein and shall be consistent in all material respects with the Restructuring Term Sheet; and

WHEREAS, (i) the Consenting Term Loan Lenders (in their capacities as such, the "Term DIP Lenders") have committed pursuant to that certain Commitment Letter dated as of May 15, 2017 (the "Term DIP Commitment Letter") to (x) loan up to $50,000,000 in New Money Loans and (y) to exchange and convert up to $100,000,000 of Existing Term Loans into $100,000,000 of Roll-Up Loans, in each case, pursuant to a $150,000,000 superpriority senior secured debtor-in-possession facility (the "Term DIP Financing") that will be entered into by the rue21 Entities, Wilmington Savings Fund Society, FSB (in its capacity as such, the "Term DIP Agent") and the Term DIP Lenders; and (ii) the Consenting Term Loan Lenders have agreed to the rue21 Entities' use of cash collateral, in each case, on terms consistent with the Restructuring Term Sheet and otherwise pursuant to the DIP Orders and the applicable Definitive Documentation (as defined herein).

NOW, THEREFORE, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

## AGREEMENT

1.    RSA Effective Date.  This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (such date, the "RSA Effective Date") that:

    (a)    this Agreement has been executed by all of the following:

        (i)    each rue21 Entity;

        (ii)    Consenting Term Loan Lenders holding, in the aggregate, at least 75.00% in principal amount of all claims outstanding under the Term Loan Documents (any such claims, the "Term Loan Claims"; and together with any claims under that certain Indenture dated as of October 10, 2013 among Rhodes Merger Sub, Inc. and Wells Fargo Bank, National Association, as trustee (as amended) (the "Note Claims"), the "Claims"); and

        (iii)    the Sponsor Entities; and

(b)      the reasonable and documented fees and out-of-pocket expenses of the Term Loan Advisors, the Cross-Holder Advisors (subject to <u>Section 16</u> hereof) and the Sponsor Advisor (each as defined in <u>Section 16</u> hereof) invoiced and outstanding as of the date hereof have been paid in full in cash.

2.      <u>Exhibits and Schedules Incorporated by Reference</u>.  Each of the exhibits attached hereto and any schedules to such exhibits (collectively, the "<u>Exhibits and Schedules</u>") is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between this Agreement (excluding the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (excluding the Exhibits and Schedules) shall govern.   In the event of any inconsistency between the terms of this Agreement (including the Exhibits and Schedules) and the Plan, the terms of the Plan shall govern.

3.      <u>Definitive Documentation</u>.

(a)      The definitive documents and agreements governing the Restructuring Transactions or the Sale (as applicable) (collectively, the "<u>Definitive Documentation</u>") shall include, without limitation:

(i)      the Plan (and all exhibits thereto);

(ii)      the confirmation order with respect to the Plan (the "<u>Confirmation Order</u>") and any motion or other pleadings related to the Plan or confirmation of the Plan;

(iii)      the related disclosure statement (and all exhibits thereto) with respect to the Plan (the "<u>Disclosure Statement</u>");

(iv)      the solicitation materials with respect to the Plan (collectively, the "<u>Solicitation Materials</u>");

(v)      the motion (the "<u>Solicitation Motion</u>") seeking approval of, and the order of the Bankruptcy Court approving, the Disclosure Statement and the Solicitation Materials (such order, the "<u>Solicitation Order</u>");

(vi)      the DIP Orders;

(vii)      the postpetition debtor-in-possession credit agreement for the Term DIP Financing (the "<u>Term DIP Credit Agreement</u>") to be entered into in accordance with the Term DIP Commitment Letter, the Restructuring Term Sheet and the DIP Orders, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of

3

the foregoing) related to or executed in connection therewith (collectively, the "Term DIP Documents");

(viii)   the postpetition debtor-in-possession credit agreement (the "ABL DIP Credit Agreement" and, together with the Term DIP Credit Agreement, the "DIP Credit Agreements") for the $125,000,000 superpriority senior secured debtor-in-possession facility (the "ABL DIP Financing") to be entered into on terms substantially similar to the terms set forth in the draft ABL DIP Financing documents provided to the Restructuring Support Parties on the date hereof and otherwise in accordance with the DIP Orders by the rue21 Entities, Bank of America, N.A., as Administrative Agent (in its capacity as such, the "ABL DIP Agent") and the lenders party thereto (the "ABL DIP Lenders"), including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "ABL DIP Documents");

(ix)   the credit agreements for each of (i) the Exit Term Facility to be entered into on the Plan Effective Date (as defined below) (the "Exit Term Loan Credit Agreement"), including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "Exit Term Loan Credit Documents") and (ii) an asset-based credit facility to be entered into on the Plan Effective Date (the "Exit ABL Credit Agreement" and, together with the Exit Term Loan Credit Agreement, the "Exit Credit Agreements"), including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith or any commitment therefor (collectively, the "Exit ABL Credit Documents" and, together with the Exit Term Loan Credit Documents, the "Exit Credit Documents");

(x)   the charter, bylaws and any governance documents that will govern Holdings, as reorganized on the Plan Effective Date; and

(xi)    to the extent applicable, the Sale Motion, the Bidding Procedures Order, Sale Order, the purchase agreement governing the Sale, and any "stalking horse" purchase agreement entered into in connection with the Sale process (each capitalized term as defined below).

(b)    Except as set forth herein, the Definitive Documentation (and any modifications, supplements or amendments thereto) will, after the RSA Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement (including the Exhibits and Schedules) and be in form and substance reasonably satisfactory in all respects to each of: (i) the rue21 Entities; (ii) the Consenting Term Loan Lenders who hold, in the aggregate, more than 50% in principal amount outstanding of all Term Loan Claims held by Consenting Term Loan Lenders (the "Required Consenting Term Loan Lenders"); (iii) a majority of the Ad Hoc Cross-Holder Group (as defined in the Restructuring Term Sheet) solely with respect to the General Unsecured Claims Carve-Out (as defined in the Restructuring Term Sheet); and (iv) the Sponsor Entities, solely to the extent such Definitive Documentation or such other documents referenced herein (or such amendments, modifications or supplements), as applicable, with respect to the Sponsor Entities, (A) adversely affects, directly or indirectly, in any respect the economic rights, waivers, or releases proposed to be granted to, or received by, the Sponsor Entities pursuant to the Plan (including, but not limited to, through the treatment (or change to the treatment) under the Plan of any claim or interest), other than such different treatment that may be consented to by any Sponsor Entity, (B) adversely affects, directly or indirectly, in any respect any obligation any of the Sponsor Entities may have pursuant to the Plan, or (C) with respect to the DIP Orders, adversely affects, directly or indirectly, in any respect the adequate protection, waivers, or releases proposed to be granted to the Consenting Sponsor Lenders under any of the DIP Orders (such rights of the Sponsor Entities to consent or approve Definitive Documentation, the "Sponsor Entities Consent Right"); provided, however, with respect to any Sponsor Entity's capacity as a Consenting Sponsor Lender, the Sponsor Entities Consent Right shall only apply to the extent the rights, benefits or obligations of such Consenting Sponsor Lender are adversely and disproportionately affected as compared to the rights, benefits and obligations of the other Consenting Term Loan Lenders.

4.    Milestones.  As provided in and subject to Sections 6 and 9 of this Agreement, the rue21 Entities shall implement the Restructuring Transactions or the Sale (as applicable) in accordance with the following milestones (the "Milestones"); provided that the rue21 Entities may extend a Milestone only with the express prior written consent of the Required Consenting Term Loan Lenders:

(a)    the rue21 Entities shall commence the Chapter 11 Cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code with the Bankruptcy Court by no later than May 16, 2017 (the "Petition Date");

(b)    the Bankruptcy Court shall enter the Interim DIP Order, subject to compliance with Section 3 hereof, approving the Term DIP Financing and ABL DIP Financing on an interim basis by no later than three (3) business days following the Petition Date;

(c)    the rue21 Entities shall file with the Bankruptcy Court a motion requesting an extension of the date by which they must assume or reject unexpired leases of non-residential real property, subject to compliance with Section 3 hereof, by no later than ten (10) days following the Petition Date;

(d)    the rue21 Entities shall file with the Bankruptcy Court, by no later than fifteen (15) days following the Petition Date, the Plan, Disclosure Statement, and the Solicitation Motion, in each case, subject to compliance with Section 3 hereof;

(e)    either (i) the lenders party to that certain ABL Credit Agreement, dated as of October 10, 2013 (as amended, restated, modified, or supplemented from time to time in accordance with its terms and collectively with any letter of credit documentation, security agreement, intercreditor agreement, and any other collateral and ancillary documents, including any forbearance agreements, the "Existing ABL Documents"), by and among Holdings and rue21, as borrower, Bank of America, N.A., in its capacity as administrative agent and collateral agent, and the lenders party thereto shall have agreed to convert all of their claims arising under the Existing ABL Documents and ABL DIP Documents into loans under the Exit ABL Credit Agreement pursuant to the Plan (which Exit ABL Credit Agreement shall provide for commitments in an amount of not less than $125 million), or (ii) the rue21 Entities shall have obtained a binding written commitment, subject to compliance with Section 3 hereof, for an asset-based loan facility in an amount sufficient to repay in full on the Plan Effective Date the claims arising under the ABL DIP Documents (which asset-based loan facility shall provide for commitments in an amount of not less than $125 million), in each case, by no later than one business day prior to the Debtors' second borrowing request under the Term DIP Credit Agreement as described in the sections entitled "2. Second Draw" and "Conditions Precedent to Second Draw" set forth on page 2 of the Restructuring Term Sheet;

(f)    the Bankruptcy Court shall enter the Final DIP Order, subject to compliance with Section 3 hereof, approving the Term DIP Financing and the ABL DIP Financing on a final basis by no later than thirty-five (35) days following the Petition Date;

6

(g)     the Bankruptcy Court shall enter the Solicitation Order, which order shall be subject to compliance with Section 3 hereof, by no later than fifty (50) days following the Petition Date (such date "Solicitation Order Deadline");

(h)     the Bankruptcy Court shall enter the Confirmation Order, which order shall be subject to compliance with Section 3 hereof, by no later than one hundred and five (105) days following the Petition Date;

(i)     the Plan shall become effective (the "Plan Effective Date") by no later than one hundred and fifteen (115) days following the Petition Date;

(j)     in the event the Bankruptcy Court does not enter the Solicitation Order by the Solicitation Order Deadline, then the rue21 Entities shall file with the Bankruptcy Court a motion to approve the sale of substantially all of their assets (the "Sale") under section 363 of the Bankruptcy Code (the "Sale Motion"), subject to compliance with Section 3 hereof, by no later than fifty-five (55) days following Petition Date;

(k)     in the event the rue21 Entities file a Sale Motion, the Bankruptcy Court shall enter an order approving the bidding procedures governing the Sale process (the "Bidding Procedures Motion"), subject to compliance with Section 3 hereof, by no later than seventy-five (75) days following the Petition Date;

(l)     in the event the rue21 Entities file a Sale Motion, the Bankruptcy Court shall enter an order approving the Sale (the "Sale Order"), subject to compliance with Section 3 hereof, by no later than one hundred and ten (110) days following the Petition Date; and

(m)     in the event the rue21 Entities file a Sale Motion, the rue21 Entities shall consummate the Sale by no later than one hundred and twenty (120) days following the Petition Date.

5.     Commitments of the Consenting Term Loan Lenders.

(a)     Each Consenting Term Loan Lender and each Consenting Sponsor Lender shall (severally and not jointly), from the RSA Effective Date until (x) the occurrence of the Termination Date (as defined in Section 12), with respect to such Consenting Term Loan Lender, or (y) the Termination Date or Sponsor Termination Date (as defined in Section 12), with respect to such Consenting Sponsor Lender:

(i)     support and cooperate with the rue21 Entities to make commercially reasonable efforts to consummate the Restructuring Transactions or the Sale (as applicable) in accordance with the terms and conditions of this Agreement and the Restructuring Term Sheet (but without limiting the applicable consent and

7

approval rights provided in this Agreement and the Definitive Documentation), by: (i) voting all of its Claims, whether now or hereafter owned, to accept any filed Plan, consistent with the terms of the Restructuring Term Sheet in accordance with the Solicitation Order; (ii) timely returning a duly-executed ballot in connection therewith; and (iii) not "opting out" of any releases under the Plan;

(ii)     support and use commercially reasonable efforts to consummate the Term DIP Financing pursuant to the Term DIP Commitment Letter, the DIP Orders and the Term DIP Documents (including the exchange and conversion of Existing Term Loans into Roll-Up Loans);

(iii)    not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan; provided however, that all votes tendered by the Consenting Term Loan Lenders to accept the Plan shall be immediately revoked and deemed void *ab initio* upon the occurrence of a Termination Date without any further notice to or action, order, or approval of the Bankruptcy Court;

(iv)     support, and not object to, or materially delay or impede, or take any other action to materially interfere, directly or indirectly, with the Restructuring Transactions or the Sale (as applicable);

(v)      support, and not object to, or materially delay or impede, or take any other action to materially interfere, directly or indirectly, with the entry by the Bankruptcy Court of any of the DIP Orders, and shall not propose, file, support or file a pleading with the Bankruptcy Court seeking entry of an order authorizing, directly or indirectly, any use of cash collateral or debtor-in-possession financing other than as proposed in each of the DIP Orders;

(vi)     not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of, or in respect of, the rue21 Entities other than the Plan, or encourage or cause any party to do any of the foregoing, including, but not limited to, any action taken directly or indirectly to induce the Term Loan Agent to undertake any action set forth in this subsection;

(vii)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring

Transactions or the Sale (as applicable), negotiate in good faith appropriate additional or alternative provisions to address any such impediment; <u>provided</u> that the economic outcome for the Consenting Term Loan Lenders, and the anticipated timing of the closing and other material terms of this Agreement must be substantially preserved in any such alternate provisions; and

(viii)   not object to, or otherwise contest, any application filed with the Bankruptcy Court seeking: (i) entry of an order by the Bankruptcy Court, consistent with the engagement letter between the rue21 Entities and the respective rue21 Advisor (defined below) previously shared with the Consenting Term Loan Lenders, Consenting Sponsor Lenders, and the Sponsor Entities (each such order, a "<u>Retention Order</u>"), authorizing the rue21 Entities to retain and employ Kirkland & Ellis LLP, Berkeley Research Group, LLC, and Rothschild, Inc. (collectively, the "<u>rue21 Advisors</u>"); or (ii) allowance of any completion, transaction, or success fee (or similar fee) set forth in the respective rue21 Advisor's engagement letter with the rue21 Entities so long as such completion, transaction, or success fee (or similar fee) is consistent with the terms of the applicable rue21 Advisor's Retention Order.

(b)   Each Consenting Term Loan Lender covenants to the other Consenting Term Loan Lenders that, in the event the Plan is not confirmed, any subsequent transaction proposed in the Chapter 11 Cases that is supported by the Required Consenting Term Loans Lenders shall provide for the treatment of general unsecured claims against the rue21 Entities as set forth in the section entitled "Treatment of General Unsecured Claims" in the Restructuring Term Sheet.

(c)   Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any Consenting Term Loan Lender nor the acceptance of the Plan by any Consenting Term Loan Lender shall (x) be construed to prohibit any Consenting Term Loan Lender from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documentation, or exercising its rights or remedies specifically reserved herein or in the Term Loan Documents or the Definitive Documentation; (y) be construed to prohibit or limit any Consenting Term Loan Lender from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, from the RSA Effective Date until the occurrence of a Termination Date, such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement, are not prohibited by this Agreement, and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions or the Sale (as applicable) or (z) limit the ability of a Consenting Term Loan Lender to sell or enter into any transactions in connection with any

9

Claims, Interests or any other claims against or interests in the rue21 Entities, subject to <u>Section 14</u> of this Agreement.

6.      <u>Commitment of the rue21 Entities</u>.

(a)     Subject to Sub-Clause (ii) of this <u>Section 6(a)</u>, the rue21 Entities shall, from the RSA Effective Date until the occurrence of a Termination Date:

(i)     operate their businesses in the ordinary course, including, but not limited to, maintaining their accounting methods, using their commercially reasonable efforts to preserve their assets and their business relationships, continuing to operate their billing and collection procedures, and maintaining their business records in accordance with their past practices;

(ii)    prepare the Definitive Documents and any related documents, and distribute the applicable documents to the Required Consenting Term Loan Lenders as soon as reasonably practicable, but in no event less than at least (3) days before the date when the rue21 Entities intend to file such document and afford reasonable opportunity to provide prompt comment and review to the respective legal and financial advisors of the Required Consenting Term Loan Lenders;

(iii)   commence the Chapter 11 Cases by no later than May 16, 2017;

(iv)    timely comply with all Milestones;

(v)     pursuant to the Milestones, timely (A) file the motion seeking entry, and seek entry by the Bankruptcy Court of each, of the DIP Orders, (B) file the Disclosure Statement and Solicitation Motion and seek entry by the Bankruptcy Court of the Solicitation Order, and (C) file the Plan and seek entry by the Bankruptcy Court of the Confirmation Order;

(vi)    (A) support and use commercially reasonable efforts to execute and complete the Restructuring Transactions set forth in this Agreement and the Plan or the Sale (as applicable), (B) negotiate in good faith all Definitive Documentation and take any and all necessary and appropriate actions in furtherance of this Agreement, and (C) make commercially reasonable efforts to complete the Restructuring Transactions or the Sale (as applicable) in accordance with each applicable Milestone;

(vii)   support and use commercially reasonable efforts to consummate the (x) Term DIP Financing pursuant to the Term DIP Commitment Letter, the DIP Orders and the Term DIP Documents (including the exchange and conversion of Existing Term Loans

into Roll-Up Loans) and (y) the ABL DIP Financing pursuant to the DIP Orders and the ABL DIP Documents;

(viii)    timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Term Loan Lenders, to any motion filed with the Bankruptcy Court by a party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(ix)    timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Term Loan Lenders, to any motion filed with the Bankruptcy Court by a party seeking the entry of an order modifying or terminating the rue21 Entities' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(x)    timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Term Loan Lenders, to any motion, application, or adversary proceeding (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Term Loan Claims, or (B) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims;

(xi)    to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in this Agreement or the Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Required Consenting Term Loan Lenders; provided, however, that the economic outcome for the Required Consenting Term Loan Lenders, the anticipated timing of confirmation and the effective date of the Plan, and other material terms as contemplated herein must be substantially preserved, as determined by the Required Consenting Term Loan Lenders;

(xii)    maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized;

(xiii)    promptly notify the Required Consenting Term Loan Lenders in writing of any governmental or third party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

11

(xiv)   if the rue21 Entities know of a breach by any rue21 Entity in any respect of the obligations, representations, warranties, or covenants of the rue21 Entities set forth in this Agreement, furnish prompt written notice (and in any event within three (3) days of such actual knowledge) to the Required Consenting Term Loan Lenders and promptly take all remedial action necessary to cure such breach by any such rue21 Entity; and

(xv)   pay in cash (A) prior to the Petition Date, all reasonable and documented fees and out-of-pocket expenses accrued prior to the Petition Date for which invoices or receipts are furnished by the Term Loan Advisors or the Sponsor Advisor, (B) after the Petition Date, subject to any applicable orders of the Bankruptcy Court, all reasonable and documented fees and out-of-pocket expenses incurred by the Term Loan Advisors and the Cross-Holder Advisors (subject to Section 16 hereof) on and after the Petition Date from time to time, but in any event within seven (7) days of delivery to the rue21 Entities of any applicable invoice or receipt and (C) on the Plan Effective Date, reimbursement to the Term Loan Advisors and the Sponsor Advisor for all reasonable and documented fees and out-of-pocket expenses incurred and outstanding in connection with the Restructuring Transactions or the Sale (as applicable).

(b)   The rue21 Entities shall not seek, solicit, or support any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets (other than sales in the ordinary course of business or sales of *de minimis* assets), financing (debt or equity) or restructuring of the rue21 Entities, other than the Restructuring Transactions or the Sale (each, an "Alternative Transaction"); provided, however, that (i) if any of the rue21 Entities receive a proposal or expression of interest regarding any Alternative Transaction from the RSA Effective Date until the occurrence of a Termination Date, the rue21 Entities shall promptly notify counsel to the other Parties of any such proposal or expression of interest, with such notice to include the material terms thereof, including the identity of the person or group of persons involved, and (ii) the rue21 Entities shall promptly furnish counsel to the other Parties with copies of any written offer, oral offer, or any other information that they receive relating to the foregoing and shall promptly inform counsel to the other Parties of any material changes to such proposals.  The rue21 Entities shall not enter into any confidentiality agreement with a party interested in an Alternative Transaction unless such party consents to identifying and providing to counsel to the Parties (under a reasonably acceptable confidentiality agreement) the information contemplated under this Section 6(b).

7.    <u>Commitment of the Sponsor Entities</u>.  In addition to the commitments undertaken by the Sponsor Entities in their respective capacities as Consenting Term Loan Lenders set forth in <u>Section 5</u> hereof, each Sponsor Entity shall (severally and not jointly and severally), from the RSA Effective Date until the occurrence of a Termination Date or a Sponsor Termination Date, as applicable:

(a)    support and cooperate with the rue21 Entities to make commercially reasonable efforts to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement and the Restructuring Term Sheet (but without limiting the applicable consent and approval rights provided in this Agreement and the Definitive Documentation), by:  (i) voting all of its claims (including all of its Claims) against any of rue21 Entities, and Interests, now or hereafter owned by such Sponsor Entity (or for which such Sponsor Entity now or hereafter serves as the nominee, investment manager, or advisor for holders thereof), to accept the Plan in accordance with the Solicitation Order; (ii) timely returning a duly-executed ballot in connection therewith; and (iii) not "opting out" of any releases under the Plan (except such Sponsor Entity shall no longer be prohibited from not "opting out" of granting such a release to any Consenting Term Loan Lender in the event any such Consenting Term Loan Lender, as applicable, has materially breached or terminated this Agreement);

(b)    not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan; <u>provided</u> that, upon the occurrence of a Termination Date or a Sponsor Termination Date, all tenders, consents, and votes tendered by the Sponsor Entities (as applicable) shall be immediately revoked and deemed void *ab initio*, in each case, without any further notice to or action, order, or approval of the Bankruptcy Court;

(c)    to the extent any legal or structural impediment that would prevent, hinder, or delay the consummation of the Restructuring Transactions or the Sale (as applicable), negotiate in good faith appropriate additional or alternative provisions to address any such impediment; <u>provided</u> that the economic outcome for the Consenting Term Loan Lenders, the anticipated timing of the closing and other material terms of this Agreement must be substantially preserved in any such alternate provisions;

(d)    not, directly or indirectly, seek, support, negotiate, engage in any discussions relating to or solicit any Alternative Transaction;

(e)    not (i) pledge, encumber, assign, sell, or otherwise transfer, including by the declaration of a worthless stock deduction for any tax year ending on or prior to the Plan Effective Date, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, directly or indirectly, any portion of its right, title, or interests in any of its shares,

stock, or other interests in the rue21 Entities or beneficial ownership thereof (including, for the avoidance of doubt, certain transfers of and declarations of worthlessness with respect to equity securities in Rhodes Holdings LP, Rhodes Topco, Inc., Rhodes Midco, Inc. or Rhodes Sub LLC), or (ii) acquire any interest or rights in any outstanding indebtedness of the rue21 Entities (other than the acquisition of Roll-Up Loans in exchange for Existing Term Loans held by any Sponsor Entity as of the date hereof), in each case, to the extent such pledge, encumbrance, assignment, sale, acquisition, declaration of worthlessness or other transfer will limit, reduce, eliminate or otherwise impair or adversely affect any of the rue21 Entities' tax attributes (including by reason of sections 108 or 382 of the Internal Revenue Code of 1986);

(f)     not directly or indirectly (i) object to, delay, impede or take any other action to interfere with the pursuit, implementation, or consummation of the Restructuring Transactions or the Sale (as applicable); (ii) propose, file, support, vote, or consent to any discussions regarding the negotiation or formulation of, or otherwise pursue, any proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring for any of the rue21 Entities other than as contemplated and agreed to in connection with the Restructuring Transactions or the Sale (as applicable); or (iii) take any other action that is inconsistent with, or that would delay or obstruct the proposal or consummation of the Restructuring Transactions or the Sale (as applicable); and

(g)     not object to, or otherwise contest, any application filed with the Bankruptcy Court seeking: (i) entry of a Retention Order by the Bankruptcy Court; or (ii) allowance of any completion, transaction, or success fee (or similar fee) set forth in the respective rue21 Advisor's engagement letter with the rue21 Entities so long as such completion, transaction, or success fee (or similar fee) is consistent with the terms of the applicable rue21 Advisor's Retention Order.

Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any Sponsor Entity nor the acceptance of the Plan by any Sponsor Entity shall (x) be construed to prohibit any Sponsor Entity from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documentation, or exercising its rights or remedies specifically reserved herein or in the Term Loan Documents or the Definitive Documentation; (y) be construed to prohibit or limit any Sponsor Entity from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, from the RSA Effective Date until the occurrence of a Termination Date or a Sponsor Termination Date, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, are not prohibited by this Agreement, and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions or the Sale (as applicable); or (z) limit the ability of a Sponsor Entity to sell or enter into any transactions in connection with any Claims, Interests or any other claims against or

interests in the rue21 Entities, subject to this <u>Section 7</u> and <u>Section 14</u>, as applicable, of this Agreement.

8.    <u>Required Consenting Term Loan Lender Termination Events</u>.    Each of the Required Consenting Term Loan Lenders shall have the right, but not the obligation, upon notice to the other Parties, to terminate the respective obligations of the Consenting Term Loan Lenders under this Agreement upon the occurrence of certain events specified below, unless waived, in writing, by the Required Consenting Term Loan Lenders on a prospective or retroactive basis (a "<u>Consenting Term Loan Lender Termination Event</u>"):

(a)    the failure to meet any of the Milestones unless (i) such failure is the result of any act, omission, or delay on the part of the Consenting Term Loan Lenders in violation of their obligations under this Agreement or (ii) such Milestone is extended in accordance with <u>Section **4**</u> of this Agreement;

(b)    the occurrence of a material breach of this Agreement by any rue21 Entity that has not been cured (if susceptible to cure) within three (3) business days after written notice to the rue21 Entities of such material breach by the Required Consenting Term Loan Lenders asserting such termination;

(c)    the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(d)    the dismissal of one or more of the Chapter 11 Cases;

(e)    the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(f)    any Definitive Documentation does not comply with <u>Section **3**</u> of this Agreement or any other document or agreement necessary to consummate the Restructuring Transactions or the Sale (as applicable) is not reasonably satisfactory to the Required Consenting Term Loan Lenders;

(g)    any rue21 Entity (i) amends, or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is materially inconsistent with this Agreement; (ii) suspends or revokes the Restructuring Transactions or the Sale (as applicable); or (iii) publicly announces its intention to take any such action listed in sub-clauses (i) and (ii) of this subsection;

(h)    any rue21 Entity accepts an Alternative Transaction, subject to <u>Section 7(b)</u>, hereof, including, but not limited to filing with the Bankruptcy Court, or publicly announcing that it will file with the Bankruptcy Court, any plan of reorganization inconsistent with this Agreement and the Restructuring Term Sheet;

15

(i)     any rue21 Entity files any motion or application seeking authority to sell any material assets without the prior written consent of the Required Consenting Term Loan Lenders, provided, however, that the rue21 Entities may file motions or applications seeking authority to sell assets in conjunction with the Sale without triggering a Consenting Term Loan Lender Termination Event;

(j)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of any of the Restructuring Transactions or the Sale (as applicable); provided, however, that the rue21 Entities shall have three (3) business days after the issuance of such ruling or order to obtain relief that would allow consummation of the applicable Restructuring Transaction or the Sale (as applicable) in a manner that (i) does not prevent or diminish in a material way compliance with the terms of this Agreement, or (ii) is reasonably acceptable to the Required Consenting Term Loan Lenders;

(k)     the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not in the form of the applicable DIP Order or otherwise consented to by the Required Consenting Term Loan Lenders;

(l)     the rue21 Entities' failure to consummate the ABL DIP Financing;

(m)     the occurrence of any Event of Default under the Term DIP Documents, the ABL DIP Documents or the DIP Order, as applicable, that has not been cured (if susceptible to cure);

(n)     a breach by any rue21 Entity of any representation, warranty, or covenant of such rue21 Entity set forth in this Agreement that (to the extent curable) remains uncured for a period of three (3) business days after the receipt by the rue21 Entities of written notice and description of such breach from any other Party;

(o)     either (i) any rue21 Entity or any Restructuring Support Party files a motion, application, or adversary proceeding (or any rue21 Entity or Restructuring Support Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Term Loan Claims, or (B) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims; or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order that is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect;

16

(p)     any rue21 Entity terminates its obligations under and in accordance with Section 9 of this Agreement;

(q)     the Required Consenting Term Loan Lenders terminate their obligations under and in accordance with this Section 8;

(r)     if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the rue21 Entities' exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(s)     the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of any of the rue21 Entities or that would materially and adversely affect any of the rue 21 Entities' ability to operate their businesses in the ordinary course;

(t)     the commencement of an involuntary case against any rue21 Entity or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of such rue21 Entity, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, provided that such involuntary case is not dismissed within a period of thirty (30) days after the commencement thereof, or if any court grants the relief sought in such involuntary proceeding;

(u)     any rue21 Entity (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except as provided in this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary case, proceeding or petition described above, (iii) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (iv) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, (v) makes a general assignment or arrangement for the benefit of creditors or (vi) takes any corporate action for the purpose of authorizing any of the foregoing;

(v)     if (i) any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Required Consenting Term Loan Lenders or (ii) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the rue21 Entities have failed to timely object to such motion;

(w)      if any of the DIP Orders, the Solicitation Order, the Confirmation Order, or the Sale Order are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Required Consenting Term Loan Lenders or a motion for reconsideration, reargument, or rehearing with respect to such orders has been filed and the rue21 Entities have failed to timely object to such motion; or

(x)      the occurrence of any Maturity Date (as defined in each of the DIP Credit Agreements).

9.      <u>rue21 Entities' Termination Events</u>.  Each rue21 Entity may, upon notice to the Restructuring Support Parties, terminate its obligations under this Agreement upon the occurrence of any of the following events (each, a "<u>Company Termination Event</u>"), subject to the rights of the rue21 Entities to fully or conditionally waive, in writing, on a prospective or retroactive basis, the occurrence of a Company Termination Event:

(a)      a breach by a Restructuring Support Party of any representation, warranty, or covenant of such Restructuring Support Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions or the Sale (as applicable) that (to the extent curable) remains uncured for a period of three (3) business days after notice to all Restructuring Support Parties of such breach and a description thereof;

(b)      the occurrence of a breach of this Agreement by any Restructuring Support Party that has the effect of materially impairing any of the rue21 Entities' ability to effectuate the Restructuring Transactions or the Sale (as applicable) and has not been cured (if susceptible to cure) within three (3) business days after notice to all Restructuring Support Parties of such breach and a description thereof;

(c)      upon notice to the Restructuring Support Parties, if the board of directors of any rue21 Entity determines, after receiving advice from outside counsel, that (i) proceeding with the Restructuring Transactions or the Sale (as applicable) (including, without limitation, adherence to the terms of this Agreement) would be inconsistent with the exercise of its fiduciary duties or (ii) an Alternative Transaction is more favorable than the Plan and continued support of the Plan would be inconsistent with the exercise of its fiduciary duties;

(d)      the entry by the Bankruptcy Court of an order terminating the rue21 Entities' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

(e)      either the order approving the Disclosure Statement, the Confirmation Order or Sale Order is reversed, stayed, dismissed, vacated, reconsidered

or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the rue21 Entities;

(f)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions or the Sale (as applicable); provided, however, that the rue21 Entities have made commercially reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement;

(g)     the Required Consenting Term Loan Lenders terminate their obligations under and in accordance with Section 8; or

(h)     the Definitive Documentation does not comply with Section **3** of this Agreement.

10.     The Sponsor Entities' Termination Events.  Each Sponsor Entity shall have the right, but not the obligation, upon notice to the other Parties, to terminate its obligations under this Agreement upon the occurrence of any of the following events (each, a "Sponsor Termination Event" and, together with the Required Consenting Term Loan Lender Termination Events and the Company Termination Events, the "Termination Events"), unless waived, in writing, by the Sponsor Entities on a prospective or retroactive basis:

(a)     the failure to meet any of the Milestones unless (i) such failure is the result of any act, omission, or delay on the part of such Sponsor Entities in violation of their obligations under this Agreement or (ii) such Milestone is extended in accordance with Section 4 of this Agreement;

(b)     a breach by any rue21 Entity or Restructuring Support Party (other than a Sponsor Entity), which breach is not directly or indirectly caused by an act or failure to act of any Sponsor Entity, of any representation, warranty, or covenant of such rue21 Entity or Restructuring Support Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (if susceptible to cure) remains uncured for a period of three (3) business days after notice to all Parties of such breach and a description thereof;

(c)     the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(d)     the dismissal of one or more of the Chapter 11 Cases;

(e)     the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(f)  to the extent any Definitive Documentation or any other document referenced herein necessary to consummate the Restructuring Transactions or the Sale (as applicable) is subject to the Sponsor Entities Consent Right, such Definitive Documentation or other document referenced herein is not reasonably satisfactory to the Sponsor Entities in accordance with Section 3 of this Agreement;

(g)  if the rue21 Entities withdraw the treatment to the Sponsor Entities under the Plan or file any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement or the Plan, in each case, that materially adversely impacts or would reasonably be expected to impact the Sponsor Entities Consent Right;

(h)  the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of any of the Restructuring Transactions or the Sale (as applicable); provided, however, that the rue21 Entities shall have three (3) business days after the issuance of such ruling or order to obtain relief that would allow consummation of the applicable Restructuring Transaction or the Sale (as applicable) in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, or (ii) is reasonably acceptable to the Sponsor Entities;

(i)  the Required Consenting Term Loan Lenders or any rue21 Entity terminates its or their obligations under and in accordance with Section 8 or Section 9, as applicable, of this Agreement;

(j)  if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the rue21 Entities' exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(k)  if the Bankruptcy Court or any other court of competent jurisdiction enters an order denying confirmation of the Plan (unless caused by a default by the Sponsor Entities of their obligations hereunder) or refusing to approve the Disclosure Statement and, in each case, the deadline for entry of the Confirmation Order or the Solicitation Order, respectively, set forth in the Milestones has expired and has not otherwise been extended by the consent of the Required Consenting Term Loan Lenders provided, however, if either such deadline is extended by the Required Consenting Term Loan Lenders, the Sponsor Entities shall be deemed to have consented to such extended deadline; or

(l)  if (i) either of the Solicitation Order, the Confirmation Order or the Sale Order are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Sponsor Entities to the extent required

under the Sponsor Entities Consent Right or (ii) a motion for reconsideration, reargument, or rehearing with respect to such orders has been filed and the rue21 Entities have failed to timely object to such motion.

11.    Mutual Termination; Automatic Termination.   This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among Holdings, on behalf of itself and each other rue21 Entity, and the Required Consenting Term Loan Lenders.   Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically without further required action upon the occurrence of the Plan Effective Date.

12.    Effect of Termination.

(a)    The earliest date on which termination of this Agreement is effective (i) as to a Party other than a Sponsor Entity in accordance with Sections 8 (as to a Consenting Term Loan Lender), 9 (as to a rue21 Entity) or 11 of this Agreement shall be referred to, with respect to such Party, as a "Termination Date" and (ii) as to a Sponsor Entity in accordance with Section 10 or 11 of this Agreement shall be referred to, with respect to such Sponsor Entity, as a "Sponsor Termination Date".

(b)    Upon the occurrence of a Termination Date or Sponsor Termination Date (as applicable), subject to clause (d) of this Section 12, (x) the terminating Party's obligations and (y) in the case of the occurrence of the Termination Date and Sponsor Termination Date in accordance with Section 11 of this Agreement, all Parties' obligations, in each case, under this Agreement shall be terminated effective immediately, and such Party or Parties shall be released from its commitments, undertakings, and agreements; provided, however, that each of the following shall survive any such termination:   (a) any claim for breach of this Agreement that occurs prior to such Termination Date or Sponsor Termination Date (as applicable), and all rights and remedies with respect to such claims shall not be prejudiced in any way; and (b) Sections 5(b), 12, 16 (for purposes of enforcement of obligations accrued through the Termination Date or Sponsor Termination Date (as applicable)), 20, 22, 23, 24, 25, 26, 27, 28, 30, with respect to the second proviso of the third sentence and the fourth sentence of 33, 34, 35, and 36.   During the period commencing on the Sponsor Termination Date and ending on the Termination Date, the proviso in the immediately preceding sentence shall not be modified or amended.   The automatic stay imposed by section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of and otherwise enforce this Agreement pursuant to and in accordance with the terms hereof.

(c)    Notwithstanding the foregoing, in the event any Sponsor Entity terminates this Agreement following the occurrence of a Sponsor Termination Event,

this Agreement shall not terminate or be terminable by any other Party solely on the basis of such termination, and this Agreement shall remain in full force and effect, except that (i) such terminating Sponsor Entity shall no longer be a Party to the Agreement and shall be relieved of all obligations hereunder; provided that such terminating Sponsor Entity shall be a beneficiary of the survival provisions set forth in the proviso of the first sentence of Section 12(b); (ii) such other Parties shall be permitted to take further actions otherwise permitted hereunder with respect to any Definitive Documentation or other document or matter or any Restructuring Transaction without any liability hereunder, except the rights and obligations of such other Parties under this Agreement shall remain in full force and effect; (iii) the Consenting Term Loan Lenders (other than any Consenting Term Loan Lender that has breached this Agreement and such breach caused the occurrence of a Sponsor Termination Event pursuant to which such Sponsor Entity has terminated this Agreement) shall no longer be obligated to not "opt out" of any releases proposed to be granted to any Sponsor Entity under the Plan; (iv) such other Parties shall not be obligated to grant or support the grant of any releases to such Sponsor Entity under the Plan; and (v) all of the applicable rights and remedies of the remaining Parties under this Agreement, the Term Loan Documents and applicable law shall be reserved in all respects.

(d)     Notwithstanding anything to the contrary in this Agreement, following the commencement of the Chapter 11 Cases, the occurrence of any Required Consenting Term Loan Lender Termination Event shall result in an automatic termination of this Agreement following five (5) business days' written notice unless waived in writing by the Required Consenting Term Loan Lenders, and the automatic stay imposed by section 362 of the Bankruptcy Code shall not prohibit a Party from delivering such notice.

13.     Cooperation and Support.

(a)     The rue21 Entities shall provide draft copies of all "first day" and other motions, applications, petitions and other documents that any rue21 Entity intends to file with the Bankruptcy Court in the Chapter 11 Cases to counsel for each Restructuring Support Party at least three (3) days (or as soon as is reasonably practicable under the circumstances) prior to the date when such rue21 Entity intends to file such document, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing; provided that all such "first day" motions, applications, and other documents that any rue21 Entity intends to file with the Bankruptcy Court in the Chapter 11 Cases (other than the Definitive Documentation) shall be in form and substance reasonably satisfactory to the Required Consenting Term Loan Lenders, and shall be in form and substance reasonably satisfactory to (i) the Ad Hoc Cross-Holder Group solely with respect to the General Unsecured Claims Carve-Out and (ii)

the Sponsor Entities solely to the extent the substance of any such filing adversely impacts or would reasonably be expected to adversely impact the Sponsor Entities Consent Right; provided that the engagement letter of A&G Realty Partners, LLC and the order of the Bankruptcy Court approving its retention shall be acceptable to the Required Consenting Term Loan Lenders in their sole discretion.  The rue21 Entities will use reasonable efforts to provide draft copies of all other material pleadings that any rue21 Entity intends to file with the Bankruptcy Court to counsel to each Restructuring Support Party at least three (3) days prior to filing such pleading (or as soon as is reasonably practicable under the circumstances), and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.  For the avoidance of doubt, the Parties agree, consistent with Section 3 hereof, (a) to negotiate in good faith the Definitive Documentation that is subject to negotiation and completion on the RSA Effective Date and (b) that, notwithstanding anything herein to the contrary, the Definitive Documentation, including any motions or orders related thereto, shall be consistent rights of the Restructuring Support Parties set forth in Section 3. The rue21 Entities shall (i) provide to the Restructuring Support Parties' advisors, and shall direct its employees, officers, advisors, and other representatives to provide the Restructuring Support Parties' advisors, (A) reasonable access (without any material disruption to the conduct of the rue21 Entities' businesses) during normal business hours to the rue21 Entities' books and records; (B) reasonable access during normal business hours to the management and advisors of the rue21 Entities; and (C) timely and reasonable responses to all reasonable diligence requests, in each case, for the purposes of evaluating the rue21 Entities' assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs or entry into any of the Restructuring Transactions or the Sale (as applicable); and (ii) promptly notify the Restructuring Support Parties of any newly commenced material governmental or third party litigations, investigations, or hearings against any of the rue21 Entities.

(b)      The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring Transactions or the Sale (as applicable).  Furthermore, subject to the terms of this Agreement, each of the Parties shall execute and deliver any other agreements or instruments, seek regulatory approvals and take other similar actions outside of the Chapter 11 Cases as may be reasonably appropriate or necessary, from time to time, to carry out the purposes and intent of this Agreement or to effectuate the solicitation of the Plan, the Plan, the Restructuring Transactions, or the Sale, as applicable, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

14.    <u>Transfers of Claims and Interests</u>.

(a)    Each Restructuring Support Party shall not, after the RSA Effective Date and until the termination of this Agreement, (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Restructuring Support Party's Claims or Interests, as applicable, in whole or in part, or (ii) deposit any of such Restructuring Support Party's Claims or Interests, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such Claims or Interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "<u>Transfer</u>" and the Restructuring Support Party making such Transfer is referred to herein as the "<u>Transferor</u>"), unless such Transfer is to (x) another Restructuring Support Party or (y) any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to Holdings a Transferee Joinder substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Transferee Joinder</u>").  Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations.  Any Transfer made in violation of this <u>Section 14</u> shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the rue21 Entities and/or any Restructuring Support Party, and shall not create any obligation or liability of any rue21 Entity or any other Restructuring Support Party to the purported transferee.

(b)    Notwithstanding clause (a) of this <u>Section 14</u>, (i) the foregoing provisions shall not preclude any Qualified Marketmaker (as defined below) from settling or delivering any Claims to settle any confirmed transaction pending as of the date of such Qualified Marketmaker's entry into this Agreement (subject to compliance with applicable securities laws and it being understood that such Claims so acquired and held (*i.e.*, not as a part of a short transaction) shall be subject to the terms of this Agreement) and (ii) a Restructuring Support Party may effect a Transfer of its Claims or Interests, as applicable, to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker become a Restructuring Support Party; <u>provided</u> that any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such claims is to a transferee that is or becomes a Restructuring Support Party at the time of such Transfer by executing and delivering a Transferee Joinder and to the extent any Restructuring Support Party is acting in its capacity as a Qualified Marketmaker, it may effect a Transfer of any claims that it acquires from a holder of such claims that is not a Restructuring Support Party without the requirement that the transferee be or become a Restructuring Support Party.  Notwithstanding the foregoing, if, at the time of the proposed Transfer of such Claims to the Qualified

Marketmaker, such Claims (A) may be voted on the Plan, the proposed Transferor must first vote such Claims in accordance with the requirements of this Agreement or (B) have not yet been and may not yet be voted on the Plan and such Qualified Marketmaker does not effect a Transfer of such Claims to a subsequent transferee prior to the third (3rd) business day prior to the expiration of the voting deadline (such date, the "Qualified Marketmaker Joinder Date"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) business day immediately following the Qualified Marketmaker Joinder Date, become a Restructuring Support Party with respect to such Claims in accordance with the terms hereof for the purposes of voting in favor of the Plan as contemplated hereunder (provided that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Restructuring Support Party with respect to such Claims at such time that the transferee of such Claims becomes a Restructuring Support Party with respect to such Claims).  For these purposes, "Qualified Marketmaker" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers any of the Claims (or other debt securities or other debt) or enter with customers into long and short positions in Claims (or other debt securities or other debt), in its capacity as a dealer or market maker in such Claims and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

15.    <u>Further Acquisition of Claims or Interests</u>.  Except as set forth in <u>Section 14</u>, nothing in this Agreement shall be construed as precluding any Restructuring Support Party or any of its affiliates from acquiring additional claims arising from the Term DIP Financing or the ABL DIP Financing (the "<u>DIP Claims</u>"), Claims or interests in the instruments underlying any Claims or DIP Claims; <u>provided</u>, <u>however</u>, that any such additional Claims or DIP Claims acquired by any Restructuring Support Party or by any of its affiliates shall automatically be subject to the terms and conditions of this Agreement.  Upon any such further acquisition by a Restructuring Support Party (other than a Qualified Marketmaker) or any of its affiliates, such Restructuring Support Party shall promptly notify counsel to the rue21 Entities, who will then promptly notify the counsel to the other Restructuring Support Parties.

16.    <u>Fees and Expenses</u>.  Subject to <u>Section 12</u>, and in accordance with and subject to the DIP Orders, which orders shall provide for the payment of all reasonable and documented fees and out-of-pocket expenses described in this Agreement and the Definitive Documentation, the rue21 Entities shall pay or reimburse when due all reasonable and documented fees and out-of-pocket expenses (including travel costs and expenses) of the following (regardless of whether such fees and expenses were incurred before or after the Petition Date) that are incurred through and including the date on which a Termination Date or Sponsor Termination Date has occurred: (a) Jones Day as counsel for all Consenting Term Loan Lenders and for the Term Loan Agent; (b) PJT Partners ("<u>PJT</u>") as financial advisor for the Consenting Term Loan Lenders ; (c) Appel Associates LLC as operational consultant for the Consenting Term Loan Lenders (collectively

with Jones Day and PJT, the "Term Loan Advisors"); (d) Simpson Thacher & Bartlett LLP as counsel to the Consenting Sponsor Lenders (the "Sponsor Advisor"); and (e) Milbank, Tweed, Hadley & McCloy LLP ("Milbank") (and one local counsel) as counsel to the Ad Hoc Cross-Holder Group (the "Cross-Holder Advisors") for fees and expenses incurred after the Petition Date in an aggregate amount not to exceed $250,000, it being understood that Milbank may apply any payments received prior to the date hereof against any of its outstanding fees and expenses. The rue21 Entities' payment of fees and out-of-pocket expenses owing to PJT shall be in accordance with that certain Engagement Agreement, dated March 29, 2017 (the "PJT Engagement Agreement"). The PJT Engagement Agreement shall continue to be in full force and effect during the pendency of the Chapter 11 Cases, unless terminated in accordance with its terms.

17.     Consents and Acknowledgments.

(a)     Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for acceptances of any Plan. The acceptance of a Plan by each of the Restructuring Support Parties will not be solicited until such Restructuring Support Party has received the Disclosure Statement and Solicitation Materials in accordance with the Solicitation Order and applicable law, and will be subject to sections 1125, 1126, and 1127 of the Bankruptcy Code.

(b)     By executing this Agreement, but subject to the occurrence of the Termination Date, each Restructuring Support Party (including, for the avoidance of doubt, any entity that may execute this Agreement or a Transferee Joinder after the RSA Effective Date) consents to the rue21 Entities' use of its cash collateral and incurrence of debtor-in-possession financing expressly as authorized by the DIP Orders until the occurrence of a Termination Date.

(c)     By executing this Agreement, each Consenting Term Loan Lender (including, for the avoidance of doubt, any entity that may execute this Agreement or a Transferee Joinder after the RSA Effective Date) forbears from exercising remedies with respect to any Default or Event of Default as defined under the Term Loan Documents, as applicable, that is caused by the rue21 Entities' entry into this Agreement or the other documents related to this Agreement and the transactions contemplated in this Agreement. For the avoidance of doubt, the forbearance set forth in this Section 17(c) shall not constitute a waiver with respect to any Default or Event of Default under the Term Loan Credit Agreement and shall not bar any Restructuring Support Party from filing a proof of claim or taking action to establish the amount of such claim. Except as expressly provided in this Agreement, nothing herein is intended to, nor does, in any manner waive, limit, impair, or restrict any right of any Consenting Term Loan Lender or the ability of each Consenting Term Loan Lender or the Term Loan Agent, to protect and preserve any right, remedy, condition, or approval requirement under this Agreement or the Definitive

Documentation.  Upon the termination of this Agreement, the agreement of the Consenting Term Loan Lenders to forbear from exercising rights and remedies in accordance with this <u>Section 17(c)</u> shall immediately terminate without requirement of any demand, presentment or protest of any kind, all of which the rue21 Entities hereby waive.

18.   <u>Representations and Warranties</u>.

(a)   Each Restructuring Support Party hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)   it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)   the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii)   the execution and delivery by it of this Agreement does not violate its certificates of incorporation, or bylaws, or other organizational documents;

(iv)   the execution, delivery, and performance by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, except (i) any of the foregoing as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws, (ii) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (iii) filings of amended certificates of incorporation or articles of formation or other organizational documents with applicable state authorities, and other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the rue21 Entities, and (iv) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain or take, as applicable, would not be reasonably likely, individually or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the transactions contemplated hereby;

(v) this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(vi) to the extent it is a Consenting Term Loan Lender, it is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter into this Agreement;

(vii) to the extent it is a Consenting Term Loan Lender, other than pursuant to this Agreement, its Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind that would adversely affect in any way its performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(viii) it (A) either (1) is the sole owner of the Claims and Interests identified below its name on its signature page hereof and in the amounts set forth therein, or (2) has all necessary investment or voting discretion with respect to the principal amount of Claims and Interests identified below its name on its signature page hereof, and has the power and authority to bind the owner(s) of such Claims and Interests to the terms of this Agreement; (B) is entitled (for its own accounts or for the accounts of such other owners) to all of the rights and economic benefits of such Claims and Interests; and (C) to the knowledge of the individuals working on the Restructuring Transactions or the Sale (as applicable), does not directly or indirectly own any Claims other than as identified below its name on its signature page hereof.

(b) Each rue21 Entity hereby represents and warrants on a joint and several basis (and not any other person or entity other than the rue21 Entities) that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i) it has the requisite corporate or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part, including approval of each of the independent directors of each of the corporate entities that comprise the rue21 Entities;

(iii)    the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates in any material respect, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases of any rue21 Entity's undertaking to implement the Restructuring Transactions or the Sale (as applicable) through the Chapter 11 Cases) under any material contractual obligation to which it or any of its affiliates is a party;

(iv)    the execution and delivery by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, other than, for the avoidance of doubt, the actions with governmental authorities or regulatory bodies required in connection with implementation of the Restructuring Transactions or the Sale (as applicable);

(v)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(vi)    it has sufficient knowledge and experience to evaluate properly the terms and conditions of a Plan and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

19.    <u>Survival of Agreement</u>.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the rue21 Entities and in contemplation of possible chapter 11 filings by the rue21 Entities and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

20.    <u>Waiver</u>.  If the transactions contemplated herein are or are not consummated, or following the occurrence of a Termination Date, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights.  The Parties acknowledge that this Agreement, the Restructuring Transactions, the Sale, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, the Restructuring Term Sheet, this Agreement, the Restructuring Transactions, the Sale any related documents, and all negotiations relating thereto shall not be construed as or deemed to be an admission of any kind or be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

21.    <u>Relationship Among Parties</u>.  Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint except for the rue21 Entities' obligations set forth in <u>Section 6</u> hereof; (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (iv) the Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the rue21 Entities and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended; and (v) no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

22.    <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

23.    <u>Governing Law & Jurisdiction</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement, to the extent possible, in the Bankruptcy Court, and, solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement, (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any party hereto.

24.    <u>Waiver of Right to Trial by Jury</u>.  Each of the Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort or otherwise, between

any of the Parties arising out of, connected with, relating to, or incidental to the relationship established between any of them in connection with this Agreement.  Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

25.    <u>Successors and Assigns</u>.    Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

26.    <u>No Third-Party Beneficiaries</u>.    Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

27.    <u>Notices</u>.    All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing.   Any notice of termination or breach shall be delivered to all other Parties.

       (a)    If to any rue21 Entity:

           rue21, inc.
           800 Commonwealth Dr.
           Warrendale, Pennsylvania  15086
           Attn:  Benjamin Gross
           Email:  bgross@rue21.com

           *With a copy to:*

           Kirkland & Ellis LLP
           601 Lexington Avenue
           New York, New York  10022
           Attn:  Jonathan S. Henes, P.C., Nicole L. Greenblatt, P.C., Robert A. Britton
           Email: jhenes@kirkland.com
               ngreenblatt@kirkland.com
               rbritton@kirkland.com

       (b)    If to the Consenting Term Loan Lenders:

           To each Consenting Term Loan Lender at the addresses or e-mail addresses set forth below the Consenting Term Loan Lender's signature page to this Agreement (or to the signature page to a Joinder Agreement as the case may be).

*With a copy to:*

Jones Day
250 Vesey Street
New York, New York  10281
Attn:    Scott J. Greenberg
              Michael J. Cohen
Email:  sgreenberg@jonesday.com
              mcohen@jonesday.com

(c)       If to the Ad Hoc Cross-Holder Group

To each member of the Ad Hoc Cross-Holder Group at the addresses or e-mail addresses set forth below for such member's signature page to this Agreement (or to the signature page to a Joinder Agreement as the case may be).

*With a copy to:*

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
Attn:  Gerard Uzzi
            Eric Stodola
Email: guzzi@milbank.com
            estodola@milbank.com

(d)       If to the Sponsor Entities:

To each Sponsor Entity at the address or e-mail addresses set forth below such Sponsor Entity's signature page to this Agreement.

*With a copy to:*

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attn:   Elisha D. Graff
Email: egraff@stblaw.com

28.    <u>Entire Agreement</u>.  This Agreement (including the Exhibits and Schedules) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

29.    Amendments.  Except as otherwise provided herein, this Agreement (including the Exhibits and Schedules) may not be modified, amended, or supplemented without the prior written consent of the rue21 Entities and the Required Consenting Term Loan Lenders; provided, however,  that, in addition, (a) only to the extent required under the Sponsor Entities Consent Right, any modification of, or amendment or supplement to, any exhibit hereto shall require the prior written consent of the Sponsor Entities and (b) any modification of, or amendment or supplement to, the General Unsecured Claims Carve-Out shall require the prior written consent of the Ad Hoc Cross-Holder Group; provided, further, that the prior written consent of all Parties shall be required to modify, amend or supplement any of Sections 1, 7, 8, 9, 10, 11, or 29 hereof.

30.    Reservation of Rights.

(a)    Except as expressly provided in this Agreement or the Restructuring Term Sheet, including Sections 5(a), 6(a) and 7(a) of this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties.

(b)    Without limiting sub-clause (a) of this Section 30 in any way, if the Plan or the Sale (as applicable) is not consummated in the manner set forth, and on the timeline set forth, in this Agreement, or if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses, subject to Section 20 of this Agreement.  This Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

31.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

32.    Other Support Agreements.  Until a Termination Date, no rue21 Entity shall enter into any other restructuring support agreement related to a partial or total restructuring of the rue21 Entities' balance sheet unless such support agreement is consistent in all respects with the Restructuring Term Sheet and is reasonably acceptable to the Required Consenting Term Loan Lenders and, solely to the extent required under the Sponsor Entities Consent Right, the Sponsor Entities.

33.    Public Disclosure.  The rue21 Entities shall submit drafts to the Term Loan Advisors and the Sponsor Advisor of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this

Agreement to the general public (each a "Public Disclosure") at least three (3) days before making any such disclosure.  Any Public Disclosure shall be reasonably acceptable to the Required Consenting Term Loan Lenders before it is publicly disclosed, released, filed or published.  This Agreement, as well as its terms, its existence, and the existence of the negotiation of its terms are expressly subject to any existing confidentiality agreements executed by and among any of the Parties as of the date hereof; provided, however, that, after the Petition Date, the Parties may disclose the existence of, or the terms of, this Agreement or any other material term of the transaction contemplated herein without the express written consent of the other Parties; provided, further, however, that no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party), other than advisors to the rue21 Entities, the principal amount or percentage of any holdings under the Term Loan Documents held by any of the Consenting Term Loan Lenders, in each case, without such Consenting Term Loan Lender's prior written consent.  Any public filing of this Agreement, with the Bankruptcy Court or otherwise, that includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the amount of Claims held by each Consenting Term Loan Lender, and, in the case of managed accounts, the specific name of the account managed (provided that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

34.    Headings.    The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

35.    Interpretation.    This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

36.    Representation by Counsel.    Each Party hereto acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party hereto with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

37.    Fiduciary Duties.    Notwithstanding anything to the contrary in this Agreement, nothing herein shall require any of the Parties hereto or its subsidiaries or affiliates or any of its respective directors, officers or members, as applicable (each in such person's capacity as a director, officer or member), to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations under applicable law.

*[Signatures and exhibits follow]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date and year first written above.

**RHODES HOLDCO, INC.**

By: _____
Name:  **Melanie Cox**
Title:    **President and Chief Executive Officer**

**RUE21, INC.**

By: _____
Name:  **Melanie Cox**
Title:    **President and Chief Executive Officer**

**R SERVICES LLC**

By: _____
Name:  **Melanie Cox**
Title:    **President and Chief Executive Officer**

**RUE SERVICES CORP.**

By: _____
Name:  **Melanie Cox**
Title:    **President and Chief Executive Officer**

*[Company Signature Page to Restructuirng Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**APOLLO TACTICAL VALUE SPN INVESTMENTS, L.P.**

By: Apollo Tactical Value SPN Management, LLC,
     its Investment Manager

By:     _____
Name:    Joseph D. Gla\_\_
Title:    Vice President

Principal Amount of Term Loan Claims:    ██████████████

Principal Amount of Note Claims:    ██████████████

Notice Address: Apollo Management, L.P.
                9 West 57th Street - 37th Floor
                New York, NY 10019

Fax: 1(972)439-1539
Attention: Apollo Tactical Value SPN Investments, L.P.
Email: 19724391539@tls.ldsprod.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**APOLLO TOWER CREDIT FUND, L.P.**

By: Apollo Tower Credit Management, LLC,
    its Investment Manager

By:        _____
Name:    Joseph D. Glatt
Title:     Vice President

Principal Amount of Term Loan Claims:    ████████████

Principal Amount of Note Claims:    ████████████

Notice Address: Apollo Management, L.P.
                9 West 57th Street - 37th Floor
                New York, NY 10019

Fax: 1(972)805-4299
Attention: Apollo Tower Credit Fund, L.P.
Email: 19728054299@tls.ldsprod.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**APOLLO CENTRE STREET PARTNERSHIP, L.P.**

By: Apollo Centre Street Management, LLC,
    its Investment Manager

By:    _____
Name:    Joseph D. Glatt
Title:    Vice President

Principal Amount of Term Loan Claims:    █████████████

Principal Amount of Note Claims:    █████████████

Notice Address: Citco Fund Services (U.S.A) Inc.
                Harborside Financial Center, Plaza 10
                3 Second Street, 5th Floor
                Jersey City, New Jersey 07311

Fax: 1(214)572-3377 and 1(212)381-9807
Attention: Apollo Centre Street Partnership, L.P.
Email: 12145723377@tls.ldsprod.com and ApolloBackOfficeOps@citco.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**APOLLO ZEUS STRATEGIC INVESTMENTS, L.P.**

By: Apollo Zeus Strategic Management, LLC,
    its Investment Manager

By:    _____
Name:   Joseph D. Gla...
Title:    Vice President

Principal Amount of Term Loan Claims:    ██████████

Principal Amount of Note Claims:    ██████████

Notice Address: c/o Apollo Capital Management, L.P.
             9 West 57th Street - 37th Floor
             New York, NY 10019

Fax: 1(469)331-8119
Attention: Apollo Zeus Strategic Investments, L.P.
Email: 14693318119@tls.ldsprod.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**APOLLO MOULTRIE CREDIT FUND, L.P.**

By: Apollo Moultire Credit Fund Management, LLC,
    its Investment Manager

By:       _____
Name:    Joseph D. Glatt
Title:     Vice President

Principal Amount of Term Loan Claims: ██████████

Principal Amount of Note Claims: ██████████

Notice Address: Apollo Management, L.P.
                9 West 57th Street - 37th Floor
                New York, NY 10019

Fax: 1(469)209-7865
Attention: Apollo Moultrie Credit Fund, L.P.
Email: 14692097865@tls.ldsprod.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**APOLLO HERCULES PARTNERS, L.P.**

By: Apollo Hercules Management, LLC,
    its Investment Manager

By:    _____
Name:    Joseph D. Glatt
Title:    Vice President

Principal Amount of Term Loan Claims:    ██████████

Principal Amount of Note Claims:    ██████████

Notice Address: Apollo Management, L.P.
               9 West 57th Street - 37th Floor
               New York, NY 10019

Fax:  1(972)646-6336
Attention: Apollo Hercules Parnters, L.P.
Email: 19726466336@tls.ldsprod.com and HERC.Notices@globalop.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**AESI (HOLDINGS) II, L.P.**

By: Apollo European Strategic Management, L.P.,
    its Investment Manager
By: Apollo European Strategic Management GP, L.P.,
    its General Partner

By: _____
Name:    Joseph D. Glatt
Title:    Vice President

Principal Amount of Term Loan Claims:    ██████████

Principal Amount of Note Claims:    ██████████

Notice Address: Apollo Management, L.P.
              9 West 57th Street - 37th Floor
              New York, NY 10019

Fax:  1(469)615-2846
Attention: AESI (Holdings) II, L.P.
Email: 14696152846@tls.ldsprod.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**APOLLO KINGS ALLEY CREDIT FUND, L.P.**

By: Apollo Kings Alley Credit Fund Management, LLC,
　　its Investment Manager

By:　　　_____
Name:　　Joseph D. Glatt
Title:　　Vice President


Principal Amount of Term Loan Claims:　　███████████

Principal Amount of Note Claims:　　███████████

Notice Address: Apollo Management, L.P.
　　　　　　　9 West 57th Street - 37th Floor
　　　　　　　New York, NY 10019


Fax: 1(469)680-4351
Attention: Apollo Kings Alley Credit Fund, L.P.
Email: 14696804351@tls.ldsprod.com and kings.notices@sscinc.com


*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**APOLLO THUNDER PARTNERS, L.P.**

By: Apollo Thunder Management, LLC,
    its Investment Manager

By:    _____
Name:    Joseph D. Glatt
Title:    Vice President

Principal Amount of Term Loan Claims:    █████████████

Principal Amount of Note Claims:    █████████████

Notice Address: Apollo Management, L.P.
                9 West 57th Street - 37th Floor
                New York, NY 10019

Fax:  1(214)919-7950
Attention: Apollo Thunder Partners, L.P.
Email: 12149197950@tls.ldsprod.com and thunder.notices@globeop.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**APOLLO UNION STREET PARTNERS, L.P.**

By: Apollo Union Street Management, LLC,
    its Investment Manager

By:       _____
Name:    Joseph D. Glatt
Title:     Vice President

Principal Amount of Term Loan Claims:    ████████████

Principal Amount of Note Claims:    ████████████

Notice Address: Apollo Management, L.P.
               9 West 57th Street - 37th Floor
               New York, NY 10019

Fax: 1(469)685-1829
Attention: Apollo Union Street Partners, L.P.
Email: 14696851829@tls.ldsprod.com and APUN.notices@globcop.com

*[Signature Page to Restructuring Support Agreement]*

DocuSign Envelope ID: E04D9782-A5C3-428C-8491-CBA62774F4F1

**CONSENTING TERM LOAN LENDER**

Avery Point IV CLO, Limited
By: Bain Capital Credit, LP, as Portfolio Manager

By:

Name:     Sally Dornaus

Title:     Managing Director/Chief Financial Officer

Principal Amount of Term Loan Claims:     ▮▮▮▮▮▮

Principal Amount of Note Claims:     ▮▮▮▮▮▮▮▮▮

Notice Address:

Fax: 617-652-3110
Attention:
Email:     Bain Capital Credit Docs
          baincapitalcreditdocs@baincapital.com

*[Signature Page to Restructuring Support Agreement]*

DocuSign Envelope ID: E04D9782-A5C3-428C-8491-CBA62774F4F1

Cavalry CLO III, Ltd.
By: Bain Capital Credit, LP, as Collateral Manager

By:

Name:     Sally Dornaus
Title:     Managing Director/Chief Financial Officer

Principal Amount of Term Loan Claims:

Principal Amount of Note Claims:

Notice Address:

Fax: 617-652-3110
Attention:          Bain Capital Credit Docs
Email:
baincapitalcreditdocs@baincapital.com

DocuSign Envelope ID: E04D9782-A5C3-428C-8491-CBA62774F4F1

Cavalry CLO IV, Ltd.
By: Bain Capital Credit, LP, as Collateral Manager

By: _____
Name:    Sally Dornaus
Title:    Managing Director/Chief Financial Officer

Principal Amount of Term Loan Claims:    █████████

Principal Amount of Note Claims:    ████████████

Notice Address:

Fax:
617-652-3110
Attention:
Bain Capital Credit Docs
Email:
baincapitalcreditdocs@baincapital.com

DocuSign Envelope ID: E04D9782-A5C3-428C-8491-CBA62774F4F1

Cavalry CLO V, Ltd.
By: Bain Capital Credit, LP, as Collateral Manager

By:

Name:   Sally Dornaus
Title:   Managing Director/Chief Financial Officer

Principal Amount of Term Loan Claims:

Principal Amount of Note Claims:

Notice Address:

Fax:
617-652-3110
Attention:
Bain Capital Credit Docs
Email:baincapitalcreditdocs@baincapital.com

4

**CONSENTING TERM LOAN LENDER**

**BOF Holdings II-A, LLC**

By:
Name: Richard Siegel
Title: Authorized Signatory

Principal Amount of Term Loan Claims: ██████████

Principal Amount of Note Claims: ███████

Notice Address:
600 5th Ave, 19th Floor
New York, NY 10020

Fax:          212.314.1006
Attention:    Sean Britain
Email:        sbritain@bayside.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**Grace Bay Holdings II, LLC**

By: _____
Name:   Richard Siegel
Title:   Authorized Signatory


Principal Amount of Term Loan Claims:   █████████

Principal Amount of Note Claims:   ██████


Notice Address:
600 5th Ave, 19th Floor
New York, NY 10020


Fax:         212.314.1006
Attention:   Sean Britain
Email:       sbritain@bayside.com


[*Signature Page to Restructuring Support Agreement*]

**CONSENTING TERM LOAN LENDER**

**Benefit Street Partners LLC**

By:

Name:            A.  McMillan

Title:            CCO

Principal Amount of Term Loan Claims:

Principal Amount of Note Claims:

Notice Address:

Fax:
Attention:
Email:
a.mcmillan@benefitstreetpartners.com

**CONSENTING TERM LOAN LENDER**

**BENNETT OFFSHORE RESTRUCTURING FUND, INC.**

By: Bennett Offshore Investment Corporation, its investment manager

By:
Name:   James D. Bennett
Title:   President

Principal Amount of Term Loan Claims:   ████████

Principal Amount of Note Claims:   ████████

Notice Address:
Bennett Offshore Restructuring Fund, Inc.
c/o Bennett Offshore Investment Corporation
2 Stamford Plaza, Suite 1501
281 Tresser Blvd
Stamford, CT 06901
Fax:  (203) 353-3113
Attention:   Chad Quinn
Email:        cquinn@bennettmgmt.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**BENNETT RESTRUCTURING FUND, L.P.**

By:  Restructuring Capital Associates, L.P., its general partner

By:  Bennett Capital Corporation, its general partner

By:  _____
Name:   James D. Bennett
Title:   President

Principal Amount of Term Loan Claims:   ████████████

Principal Amount of Note Claims:   ████████████

Notice Address:
Bennett Restructuring Fund, L.P.
2 Stamford Plaza, Suite 1501
281 Tresser Blvd
Stamford, CT 06901
Fax:  (203) 353-3113
Attention:   Chad Quinn
Email:         cquinn@bennettmgmt.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2012-2 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By: _____

Name:    David M. O'Mara

Title:    Deputy General Counsel


Principal Amount of Term Loan Claims:    ████████████████████


Principal Amount of Note Claims:    ███████████████


Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:


*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2013-1 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By: _____

Name:    David M. O'Mara
Title:    Deputy General Counsel


Principal Amount of Term Loan Claims:    ███████████████████


Principal Amount of Note Claims:    ████████████


Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2013-2 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By: _____

Name:    David M. O'Mara
Title:     Deputy General Counsel

Principal Amount of Term Loan Claims:    ████████████████████

Principal Amount of Note Claims:    ██████████████

Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2013-3 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By: _____

Name:    David M. O'Mara
Title:    Deputy General Counsel


Principal Amount of Term Loan Claims:    ███████████████


Principal Amount of Note Claims:    ██████████


Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2013-4 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By: _____

Name:    David M. O'Mara
Title:    Deputy General Counsel


Principal Amount of Term Loan Claims:    ██████████████████


Principal Amount of Note Claims:    ████████████


Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:


*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2014-1 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By: _____

Name:    David M. O'Mara
Title:    Deputy General Counsel


Principal Amount of Term Loan Claims:    ████████████████████


Principal Amount of Note Claims:    ████████████████


Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2014-2 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By: _____

Name:    David M. O'Mara
Title:    Deputy General Counsel


Principal Amount of Term Loan Claims:    ███████████████████████


Principal Amount of Note Claims:    ███████████████


Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2014-3 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By: _____

Name:   David M. O'Mara
Title:   Deputy General Counsel


Principal Amount of Term Loan Claims:   ████████████████████


Principal Amount of Note Claims:   ████████████


Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2014-4 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By:

Name:    David M. O'Mara
Title:    Deputy General Counsel

Principal Amount of Term Loan Claims:

Principal Amount of Note Claims:

Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2015-1 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By: _____

Name:    David M. O'Mara
Title:    Deputy General Counsel


Principal Amount of Term Loan Claims:    ██████████████████

Principal Amount of Note Claims:    ██████████


Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2015-2 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By: _____

Name:    David M. O'Mara
Title:      Deputy General Counsel

Principal Amount of Term Loan Claims:   ██████████████████

Principal Amount of Note Claims:   ██████████

Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2015-3 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By: _____

Name:   David M. O'Mara
Title:   Deputy General Counsel


Principal Amount of Term Loan Claims:   ████████████████████


Principal Amount of Note Claims:   ████████████


Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2015-4 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By: _____

Name:   David M. O'Mara
Title:   Deputy General Counsel


Principal Amount of Term Loan Claims:   ████████████████████


Principal Amount of Note Claims:   ██████████████


Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**BLUEMOUNTAIN CLO 2016-1 Ltd.**
By: BlueMountain CLO Management, LLC, its portfolio manager

By: _____

Name:    David M. O'Mara
Title:    Deputy General Counsel


Principal Amount of Term Loan Claims:    ███████████████


Principal Amount of Note Claims:    █████████


Notice Address:
BlueMountain CLO Management, LLC
280 Park Ave., 12th Floor
New York, NY 10017
Attn: General Counsel
legalnotices@bmcm.com

Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**[CITADEL EQUITY FUND LTD.**
**By:  Citadel Advisors LLC, its Portfolio Manager]**

By:
Name:                    MICHAEL WEINER
Title:                    Authorized Signatory

Principal Amount of Term Loan Claims:

Principal Amount of Note Claims:

Notice Address:
Citadel Equity Fund Ltd.
c/o Citadel LLC
131 South Dearborn Street
Chicago, IL  60603

Fax: 312-267-7300
Attention:  Legal
Department
Email:  Citadel
AgreementNotice@citadel.com

with King +
Spolding
LLP

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**TRS OAK II LTD**
**By:  DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH, its sole member**
**By: Deutsche Bank AG New York Branch**

By:  *Deirdre Cesario*
Name:    Deirdre Cesario
Title:        Vice President

By:  *Andrew Mac Donald*
Name:
Title:        **Andrew MacDonald**
                ˑAssistant Vice President

Principal Amount of Term Loan Claims:          ███████

Principal Amount of Note Claims:            ██

Notice Address:
TRS Oak II Ltd
c/o DB Services New Jersey, Inc.
5022 Gate Parkway, Suite 400
Jacksonville, FL  32256

Fax: 732-289-9359
Attention:    Paramjit Sihra
Email:
Paramjit.sihra@db.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**[Blue Falcon Limited]**

By:
Name:
Title:

Michael W. Weilheimer
Vice President

Principal Amount of Term Loan Claims:

Principal Amount of Note Claims:

Notice Address:

Fax: 617-482-2178
Attention:MikeDevlin
Email:mdevlin@eatonvance.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**[Eaton Vance International (Ireland) U.S. High Yield Bond Fund]**

By:

Name:          Michael W. Weilheimer

Title:          Vice President

Principal Amount of Term Loan Claims:

Principal Amount of Note Claims:

Notice Address:

Fax: 617-482-2178
Attention:MikeDevlin
Email:mdevlin@eatonvance.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**[Eaton Vance Multisector Income Fund]**

By:

Name:     Michael W  Weilheimer

Title:     Vice President

Principal Amount of Term Loan Claims:     ███████████████

Principal Amount of Note Claims:     ███████████████

Notice Address:

Fax: 617-482-2178
Attention:MikeDevlin
Email:mdevlin@eatonvance.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**[EATON VANCE TRUST COMPANY COLLECTIVE INVESTMENT TRUST
FOR EMPLOYEE BENEFIT PLANS - HIGH YIELD FUND]**

By:
Name:
Title:

Michael W  Weilheimer
Vice President

Principal Amount of Term Loan Claims: ████████████

Principal Amount of Note Claims: ████████████

Notice Address:

Fax: 617-482-2178
Attention:MikeDevlin
Email:mdevlin@eatonvance.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**[EATON VANCE TRUST COMPANY COMMON TRUST FUND - HIGH YIELD
COMMON TRUST FUND]**

By:

Name:                Michael W  Weilheimer

Title:               Vice President

Principal Amount of Term Loan Claims:        ████████

Principal Amount of Note Claims:        ████████

Notice Address:

Fax: 617-482-2178
Attention:MikeDevlin
Email:mdevlin@eatonvance.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

[High Income Opportunities Portfolio]

By:
Name:
Title:

Michael W Weilheimer
Vice President

Principal Amount of Term Loan Claims: ████████████

Principal Amount of Note Claims: ████████

Notice Address:

Fax: 617-482-2178
Attention: MikeDevlin
Email: mdevlin@eatonvance.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**[Boston Income Portfolio]**

By:
Name:            Michael W Weilheimer
Title:           Vice President

Principal Amount of Term Loan Claims:  ███████████

Principal Amount of Note Claims:  ████████

Notice Address:

Fax: 617-482-2178
Attention:MikeDevlin
Email:mdevlin@eatonvance.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**[The Regents of the University of California]**

By:

Name:

Title:

Michael W  Weilheimer
Vice President

Principal Amount of Term Loan Claims:

Principal Amount of Note Claims:

Notice Address:

Fax: 617-482-2178
Attention:MikeDevlin
Email:mdevlin@eatonvance.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**EMPYREAN INVESTMENTS, LLC**

By: _____

Name:   C. Martin Meekins

Title:   Authorized Person


Principal Amount of Term Loan Claims:   ██████████

Principal Amount of Note Claims:   ██████


Notice Address:

c/o Empyrean Capital Partners, LP
10250 Constellation Blvd., Suite 2950
Los Angeles, CA 90067
Attention: C. Martin Meekins
Email: mmeekins@empyrean.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**ECO Master Fund, Ltd.**

By:

Name:    Steven M. Friedman
Title:    Director

Principal Amount of Term Loan Claims:    █████████

Principal Amount of Note Claims:    ██████

Notice Address:
Eos Partners
320 Park Avenue, 9th Floor
New York, NY 10022
Phone: 212-593-4046
Fax: NA
Attention: Michael Schott
Email: mschott@eospartners.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**HFR DS ECO Master Trust**

By: _____

Name:    Steven M. Friedman
Title:     Director

Principal Amount of Term Loan Claims:    █████████

Principal Amount of Note Claims:    ██████

Notice Address:
Eos Partners
320 Park Avenue, 9th Floor
New York, NY 10022
Phone: 212-593-4046
Fax: NA
Attention: Michael Schott
Email: mschott@eospartners.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

JPMorgan Chase Bank, N.A. *, with respect to
only its Credit Trading group

By:

Name: Jeffrey L. Panzo

Title: Vice President

Principal Amount of Term Loan Claims: ▉▉▉▉▉▉

Principal Amount of Note Claims: ▉▉▉▉▉▉

*The Restructuring Support Agreement (the "**Agreement**") applies only to the Credit Trading Group of JPMorgan Chase Bank, N.A. ("**CTG**") and the Term Loan Claims ("**Claims**") beneficially held by such group in the aggregate principal amount(s) set forth below the signature of JPMorgan Chase Bank, N.A. on behalf of, and with respect to, CTG. Accordingly, the terms "Consenting Term Loan Lender", "Party", and "Parties" for all purposes of the Agreement mean and refer only to CTG and such business unit's holdings of the Notes. For the avoidance of doubt, the Agreement does not apply to (i) credit facilities, claims, securities, notes, other obligations or any other interests in the Debtors that may be held, acquired or sold by, or any activities, services or businesses conducted or provided by, any other group or business unit within, or affiliate of JPMorgan Chase Bank, N.A., (ii) any credit facilities or indentures to which JPMorgan Chase & Co. or any of its affiliates ("**Morgan**") is a party in effect as of the date hereof, (iii) any new indenture, amendment to an existing indenture, or debt or equity securities offering involving Morgan, (iv) any direct or indirect principal activities undertaken by any Morgan entity engaged in the venture capital, private equity or mezzanine businesses, or portfolio companies in which they have investments, (v) any ordinary course sales and trading activity undertaken by employees who are not a member of CTG, (vi) any Morgan entity or business engaged in providing private banking or investment management services, or (vii) any Term Loan Claims, loans, notes, or related claims that may be beneficially owned by non-affiliated clients of JPMorgan Chase Bank, N.A. or any of its affiliates or for which Morgan acts in a fiduciary capacity.

Notice Address:
JPMorgan Chase Bank, N.A.
277 Park Avenue, Floor 11
New York, NY, 10172-0003
Mail Code: NY1-L204
Attn: Jeffrey L. Panzo
Email: Jeffrey.L.Panzo@jpmorgan.com

**CONSENTING TERM LOAN LENDER**

**Octagon Investment Partners XXI, Ltd**
**By: Octagon Credit Investors, LLC**
**    as Collateral Manager**

By:
Name:
Title:                   Gretchen Mohr Lam
                        Portfolio Manager

Principal Amount of Term Loan Claims:          █████████████

Principal Amount of Note Claims:              █████████████

<u>Notice Address:</u>

James Motsinger
U.S. Bank Corporate Trust Services
1 Federal St. – 3" Floor
Boston, MA 02110
Phone: 617-603-6518
Fax: 866-316-7564
Email: Octagon.XXI@usbank.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**Octagon Investment Partners XX, Ltd**
**By: Octagon Credit Investors, LLC**
**as Portfolio Manager**

By:
Name:
Title:          **Gretchen Mohr Lam**
                **Portfolio Manager**

Principal Amount of Term Loan Claims:          █████████

Principal Amount of Note Claims:          █████████

Notice Address:

Kevin Yang
U.S. Bank Corporate Trust Services
1 Federal St. – 3rd Floor
Boston, MA 02110
Phone: 617-603-7692
Fax: 866-940-6390

*[Signature Page to Restructuring Support Agreement]*

## CONSENTING TERM LOAN LENDER

**Octagon Senior Secured Credit Master Fund Ltd.**
**By: Octagon Credit Investors, LLC**
     **as Investment Manager**

By:
Name:
Title:

     **Gretchen Mohr Lam**
     Portfolio Manager

Principal Amount of Term Loan Claims:      ██████████

Principal Amount of Note Claims:      ██████████████

Notice Address:

Michael Gudas
State Street Global Services
200 Clarendon Street
Boston, MA 02116
Phone: 617-662-9729
Fax: 617-330-0799
General Inquiries Group e-mail:
sscoctagonbankloans@statestreet.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**Octagon Loan Funding Ltd.**
**By: Octagon Credit Investors, LLC**
    **as Collateral Manager**

By:
Name:
Title:      **Gretchen Mohr Lam**
          Portfolio Manager

Principal Amount of Term Loan Claims: ███████████

Principal Amount of Note Claims: ███████████

Notice Address:

James Motsinger
U.S. Bank Corporate Trust Services
1 Federal St. – 3ʳᵈ Floor
Boston, MA 02110
Phone: 617-603-6518
Fax: 844 296-5714
Octagon.Loan.Funding@usbank.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**Octagon Investment Partners XIV, Ltd**
**By: Octagon Credit Investors, LLC**
     **as Collateral Manager**

By:
Name:
Title:
     **Gretchen Mohr Lam**
       Portfolio Manager

Principal Amount of Term Loan Claims:    ████████

Principal Amount of Note Claims:    ████████

Notice Address:

Shounell Merville
U.S. Bank Corporate Trust Services
1 Federal St. – 3rd Floor
Boston, MA 02110
Phone: 617-603-6706
Fax: 877-377-9163
Email: cdo.oct14@cdo.usbank.com

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING TERM LOAN LENDER**

**US Bank N.A., solely as trustee of the
DOLL Trust (for Qualified Institutional
Investors only), (and not in its individual
capacity)
By: Octagon Credit Investors, LLC
as Portfolio Manager**

By:
Name:        Gretchen Mohr Lam
Title:          Portfolio Manager

Principal Amount of Term Loan Claims:       ███████████

Principal Amount of Note Claims:       ███████████

Notice Address:

Joanna Schembri
U.S. Bank Corporate Trust Services
1 Federal St. – 3" Floor
Boston, MA 02110
Phone: 617-603-6529
Fax: 866-941-6661

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**Octagon High Income Master Fund Ltd.**
**By: Octagon Credit Investors, LLC, in**
**its capacity as investment manager**

By:
Name:
Title:
      **Gretchen Mohr Lam**
       Portfolio Manager

Principal Amount of Term Loan Claims:  ███████████

Principal Amount of Note Claims:  ███████████

Notice Address:

Katherine McIsaac
U.S. Bank Corporate Trust Services
1 Federal St. – 3rd Floor
Boston, MA 02110
Phone: 617-603-6771
Fax: 855-206-3978

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING TERM LOAN LENDER**

**Octagon Investment Partners XVI, Ltd**
**By: Octagon Credit Investors, LLC**
    **as Collateral Manager**

By:
Name:
Title:    **Gretchen Mohr Lam**
          Portfolio Manager

Principal Amount of Term Loan Claims: ██████████

Principal Amount of Note Claims: ██████████

Notice Address:

Kevin Yang
U.S. Bank Corporate Trust Services
1 Federal St. – 3rd Floor
Boston, MA 02110
Phone: 617-603-7692
Fax: 855-239-3623

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**Octagon Investment Partners XVIII, Ltd**
**By: Octagon Credit Investors, LLC**
     **as Collateral Manager**

By:
Name:
Title:

       Gretchen Mohr Lam
       Portfolio Manager

Principal Amount of Term Loan Claims:      █████████

Principal Amount of Note Claims:      █████████

<u>Notice Address</u>:

Patrick Creahan
U.S. Bank Corporate Trust Services
1 Federal St. – 3rd Floor
Boston, MA 02110
Phone: 617-603-6757
Fax: 855-665-8363

**CONSENTING TERM LOAN LENDER**

**Octagon Investment Partners XVII, Ltd**
**By: Octagon Credit Investors, LLC**
    **as Collateral Manager**

By:
Name:
Title:
               **Gretchen Mohr Lam**
               Portfolio Manager

Principal Amount of Term Loan Claims: ███████████

Principal Amount of Note Claims: ███████████

<u>Notice Address:</u>

Joanna Schembri
U.S. Bank Corporate Trust Services
1 Federal St. – 3rd Floor
Boston, MA 02110
Phone: 617-603-6529
Fax: 855-665-8362

*[Signature Page to Restructuring Support Agreement]*

## CONSENTING TERM LOAN LENDER

**Octagon Investment Partners XIX, Ltd**
**By: Octagon Credit Investors, LLC**
    **as collateral manager**

By:
Name:
Title:
    **Gretchen Mohr Lam**
    Portfolio Manager

Principal Amount of Term Loan Claims:

Principal Amount of Note Claims:

Notice Address:

Patrick Creahan
U.S. Bank Corporate Trust Services
1 Federal St. – 3rd Floor
Boston, MA 02110
Phone: 617-603-6757
Fax: 855-671-4096
Email: Octagon.XIX@usbank.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**Octagon Investment Partners XXII, Ltd**
**By: Octagon Credit Investors, LLC**
    **as Collateral Manager**

By:
Name:
Title:
          **Gretchen Mohr Lam**
          Portfolio Manager

Principal Amount of Term Loan Claims:  ██████████

Principal Amount of Note Claims:  ██████████

Notice Address:

Patrick Creahan
U.S. Bank Corporate Trust Services
1 Federal St. – 3rd Floor
Boston, MA 02110
Phone: 617-603-6757
Fax: 855-245-1748
Email for Notices: Octagon.XXII.notices@usbank.com

**CONSENTING TERM LOAN LENDER**

**Octagon Investment Partners 24, Ltd.**
**By: Octagon Credit Investors, LLC**
**as Collateral Manager**

By:
Name:    Gretchen Mohr Lam
Title:       Portfolio Manager

Principal Amount of Term Loan Claims:      ███████

Principal Amount of Note Claims:      ████████

<u>Notice Address:</u>

Shounell Merville
U.S. Bank Corporate Trust Services
1 Federal St. – 3rd Floor
Boston, MA 02110
Phone: 617-603-6706
Fax: 844-585-9319
Email: Octagon.24@usbank.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**LumX Octagon High Income Fund Limited**

By:
Name:  S. BHASIN-WOODS          Carl McConnell
Title:  DIRECTOR

Principal Amount of Term Loan Claims:

Principal Amount of Note Claims:

Notice Address:


Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**MERCER QIF FUND PLC - Mercer Investment Fund 1**
By:  _____
Name:    Jeffrey Peskind
Title:    CEO, Phoenix Investment Adviser LLC
          Sub-Investment Manager

Principal Amount of Term Loan Claims:          ███████

Principal Amount of Note Claims:          ███████

Notice Address:
420 Lexington Avenue Suite 2040
New York, NY 10170

Fax: 917-210-3995
Attention:    Operations
Email:    pa.team@phoenixinvadv.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**JLP CREDIT OPPORTUNITY MASTER FUND LTD**

By:
Name:   Jeffrey Peskind
Title:   CEO, Phoenix Investment Adviser LLC
         Investment Manager

Principal Amount of Term Loan Claims:   ██████████

Principal Amount of Note Claims:   ████████

Notice Address:
420 Lexington Avenue Suite 2040
New York, NY 10170

Fax: 917-210-3995
Attention:   Operations
Email:   pa.team@phoenixinvadv.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**Scoggin Capital Management II LLC**

By: _____
Name:        Craig Effron
Title:        Manager, IM, Scoggin Management LP

Principal Amount of Term Loan Claims:        ███████████

Principal Amount of Note Claims:        ████████

Notice Address:
660 Madison Ave, 20th Fl.
New York, NY  10065

Fax: 646 607-5686
Attention:        Nicole Kramer
Email: NKramer@scogcap.com

**CONSENTING TERM LOAN LENDER**

**Scoggin International Fund, Ltd.**

By: _____
Name:    Craig Effron
Title:    Manager, IM, Scoggin Management LP

Principal Amount of Term Loan Claims:    ███████████

Principal Amount of Note Claims:    ███████████

<u>Notice Address</u>:
660 Madison Ave, 20th Fl.
New York, NY  10065

Fax: 646 607-5686
Attention:    <u>Nicole Kramer</u>
Email: NKramer@scogcap.com

**CONSENTING TERM LOAN LENDER**

**Scoggin Worldwide Fund, Ltd.**

By:
Name:    Craig Effron
Title:    Director

Principal Amount of Term Loan Claims:

Principal Amount of Note Claims:

Notice Address:
660 Madison Ave, 20th Fl.
New York, NY  10065

Fax: 646 607-5686
Attention:    Nicole Kramer
Email: NKramer@scogcap.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**Southpaw Credit Opportunity Master Fund LP**

By:

Name: Kevin Wyman, Managing

Title: Member of General Partner -
**Southpaw GP LLC**

Principal Amount of Term Loan Claims: ███████

Principal Amount of Note Claims: ███████

<u>Notice Address</u>: Southpaw Asset Management LP
2 Greenwich Office Park West
Greenwich, CT 06831

Fax: 203-779-1115
Attention: Michael Andersen
Email: mandersen@southpawasset.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**STONEHILL MASTER FUND LTD.**
By:  Stonehill Capital Management LLC, its Advisor

By:   _Paul Malek_

Name:     Paul Malek
Title:      General Counsel

Principal Amount of Term Loan Claims:        ██████

Principal Amount of Note Claims:        ████████

<u>Notice Address</u>:
c/o Stonehill Capital Management LLC
885 Third Ave., 30th Floor
New York, NY  10022

Fax: (212) 838-2291
Attention:       Steven Nelson;
                Jonathan Sacks

Email: ops@stonehillcap;
jsacks@stonehillcap.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**STONEHILL INSTITUTIONAL PARTNERS, L.P.**
By:  Stonehill Capital Management LLC, its Advisor

By: _____

Name:        Paul Malek

Title:        General Counsel


Principal Amount of Term Loan Claims:        ████████


Principal Amount of Note Claims:        ████████████


Notice Address:
c/o Stonehill Capital Management LLC
885 Third Ave., 30th Floor
New York, NY  10022


Fax: (212) 838-2291
Attention:        Steven Nelson;
                Jonathan Sacks

Email: ops@stonehillcap;
jsacks@stonehillcap.com

2

**CONSENTING TERM LOAN LENDER**

**STRUCTURED CREDIT OPPORTUNITIES FUND II, LP**

By: Tricadia Capital Management, LLC, as investment manager

By:

Name:       Ian Cohen

Title:      Chief Financial Officer

Principal Amount of Term Loan Claims:       ███████████

Principal Amount of Note Claims:       ██████

Notice Address:

780 Third Avenue, 29th Floor
New York, New York 10017

Fax: (646) 218-1585
Attention:       James McKee, General
Counsel

Email:
jmckee@tricadiacapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**TRICADIA CREDIT STRATEGIES MASTER FUND, LTD.**

By: Tricadia Capital Management, LLC, as investment manager

By:
Name:        Ian Cohen
Title:        Chief Financial Officer

Principal Amount of Term Loan Claims:          ███████

Principal Amount of Note Claims:          ████

Notice Address:

780 Third Avenue, 29th Floor
New York, New York 10017

Fax: (646) 218-1585
Attention:        James McKee, General
                  Counsel
Email:
jmckee@tricadiacapital.com

**CONSENTING TERM LOAN LENDER**

**NINETEEN77 GLOBAL MULTI-STRATEGY ALPHA MASTER LIMITED**

By: UBS O'Connor LLC, its investment advisor

By:

Name:    Joseph Workman

Title:    Deputy General Counsel

By:

Name:    James Del Medico

Title:    Head of Operations


Principal Amount of Term Loan Claims:    ████████████████

Principal Amount of Note Claims:    ████████████


Notice Address:

One North Wacker Drive, Floor 32
Chicago, Illinois 60606

Attention:  Jeff Richmond and Stephen Byrne
Email:        jeff.richmond@ubs.com; Stephen.byrne@ubs.com

With a copy to:

General Counsel
Ol-oconnor-legal-notifications@ubs.com


*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

Voya Investment Management, on behalf of itself and/or certain of its affiliates and/or funds:

Axis Specialty Limited
ISL Loan Trust
Voya Investment Trust Co. Plan for Employee Benefit Investment Funds - Voya Senior Loan Trust Fund
Voya Investment Trust Co. Plan for Common Trust Funds - Voya Senior Loan Common Trust Fund
Voya CLO 2012-2, Ltd.
Voya CLO 2012-3, Ltd.
Voya CLO 2012-4, Ltd.
Voya CLO 2013-1, Ltd.
Voya CLO 2013-2, Ltd.
Voya CLO 2013-3, Ltd.
Voya CLO 2014-1, Ltd.
Voya CLO 2014-2, Ltd.
Voya CLO 2014-3, Ltd.
Voya CLO 2014-4, Ltd.
Voya CLO 2015-1, Ltd.
Voya CLO 2015-2, Ltd.
Voya CLO 2015-3, Ltd.
Medtronic Holding Switzerland GMBH
The City of New York Group Trust
California Public Employees' Retirement System

By: _____
Name:    Ralph Bucher
Title:    Senior Vice President, Chief Credit Officer


Principal Amount of Term Loan Claims:    ████████

Principal Amount of Note Claims:    ████


Notice Address:
7337 E. Doubletree Ranch Road
Suite 100
Scottsdale, AZ 85258

Attention: Robert Wilson
Email: Robert.Wilson@voya.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING TERM LOAN LENDER**

**Hutchin Hill Capital Primary Fund, ltd.**

By:
Name:      Scott A. Kislin
Title:       Chief Legal Officer

Principal Amount of Term Loan Claims:            █████████

Principal Amount of Note Claims:               █████████

Notice Address:

888 Seventh Avenue, Floor 22
New York, NY 10106

Fax:
Attention:     Tim Daggett
Email:           tim.daggett@hutchinhill.com

**CONSENTING TERM LOAN LENDER**

**PENTWATER CAPITAL MANAGEMENT LP**

By:

Name:          **Neal Nenadovic**

Title:          Chief Financial Officer
            Pentwater Capital Management LP

Principal Amount of Term Loan Claims:

Principal Amount of Note Claims:

Notice Address:
614 Davis Street
Evanston, IL 60201
Fax: 312-589-6499
Attention: Andrew Cohen
Email: acohen@pwcm.com

**CONSENTING SPONSOR LENDER**

**Apax Global Alpha Limited**
Signed for and on behalf of Apax Global Alpha Limited acting by its manager Apax Guernsey
Managers Limited

By:

Name:   MARK DESPRES
Title:    DIRECTOR

Principal Amount of Term Loan Claims:

Principal Amount of Note Claims:

Notice Address:

Apax Partners, L.P.
601 Lexington Avenue, 53rd Floor
New York, NY 10022
Attention: Mark Zubko, Samuel Clayman and Mark Despres
Email: Mark.Zubko.@apax.com and SamuelClayman@apax.com and Mark.Despres@apax.com

**CONSENTING SPONSOR**

**Rhodes Holdings, L.P.**

By:      Rhodes GP, LLC, its General Partner

By: _____
Name: A for Cello......
Title: Partner

Interests held:      ███████████████████████

Notice Address:

Apax Partners, L.P.
601 Lexington Avenue, 53rd Floor
New York, NY 10022
Attention:      Mark Zubko and Samuel Clayman
Email:      Mark.Zubko@apax.com and Samuel.Clayman@apax.com

**<u>Exhibit A</u> to the Restructuring Support Agreement**

**Restructuring Term Sheet**

**DIP AND TERM LOAN EXCHANGE TERM SHEET**

**May 15, 2017**

This non-binding indicative term sheet (the "DIP and Term Loan Exchange Term Sheet") sets forth the principal terms of a potential superpriority, secured debtor-in-possession credit facility (the "DIP Facility"; the credit agreement evidencing the DIP Facility, the "DIP Credit Agreement" and, together with the other definitive documents governing the DIP Facility and the DIP Orders (as defined herein), the "DIP Documents," each of which shall be in form and substance acceptable to the DIP Agent and the DIP Lenders (as defined herein)) to be entered into with the Loan Parties (as defined herein) and procedures with respect to the Borrower's (as defined below) offer to exchange Existing Term Loans (having the meaning of "Loans" under the Existing Term Loan Credit Agreement (as defined below)) in connection therewith (the "Exchange Procedures").  The DIP Facility and Exchange Procedures will be subject to the approval of the Bankruptcy Court (as defined herein) and consummated in cases under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court"), in accordance with (i) interim (the "Interim DIP Order") and final orders (the "Final DIP Order" and, together with the Interim DIP Order, "DIP Orders") of the Bankruptcy Court approving the Exchange Procedures and authorizing the Loan Parties to enter into the DIP Facility, each of which shall be in form and substance acceptable to the DIP Agent and the DIP Lenders, and (ii) the DIP Documents to be executed by the Loan Parties.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in that certain Credit Agreement, dated as of October 10, 2013 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Existing Term Loan Credit Agreement"), among Rhodes Holdco, Inc. ("Holdings"), rue21, Inc. (the "Borrower"), Wilmington Savings Fund Society, FSB, as successor administrative agent and collateral agent  (the "Existing Term Loan Agent") and the lenders from time to time party thereto (the "Existing Term Lenders").

This DIP and Term Loan Exchange Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protections of Federal Rule of Evidence 408 and any other applicable statutes or doctrines protecting the disclosure of confidential information and information exchanged in the context of settlement discussions.  The Borrower and Holdings are not authorized to disclose this DIP and Term Loan Exchange Term Sheet to any person other than (i) their affiliates and their professional advisors and (ii)  Bank of America, N.A., as administrative agent  and collateral agent (the "Existing ABL Agent") and its professional advisors, under that certain ABL Credit Agreement dated as of October 10, 2013 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Existing ABL Credit Agreement"), among Holdings, the Borrower, the Existing ABL Agent, the guarantors from time to time party thereto and the lenders from time to time party thereto, in each case, who shall agree to maintain its confidentiality.

THIS NON-BINDING DIP AND TERM LOAN EXCHANGE TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER OR COMMITMENT WITH RESPECT TO ANY CREDIT FACILITY. THE TRANSACTION DESCRIBED HEREIN WILL BE SUBJECT TO CREDIT APPROVAL BY THE LENDERS, THE NEGOTIATION AND COMPLETION OF DEFINITIVE DOCUMENTS IN FORM AND SUBSTANCE ACCEPTABLE TO THE DIP AGENT AND THE DIP LENDERS, THE ENTRY BY THE BANKRUPTCY COURT OF THE DIP ORDERS, IN EACH CASE, IN FORM AND SUBSTANCE ACCEPTABLE TO THE DIP AGENT AND THE DIP LENDERS, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH AGREED DEFINITIVE DOCUMENTS AND THE APPLICABLE DIP ORDERS.

| Item | Description |
|------|-------------|
| **DIP Terms** | |
| DIP Borrower | > rue21, inc., as debtor-in-possession (the "<u>DIP Borrower</u>") |
| Guarantors | > Rhodes Holdco and each domestic subsidiary of rue21, including, without limitation, each Guarantor under the Existing Term Loan Credit Agreement, each as a debtor-in-possession (collectively, the "<u>DIP Guarantors</u>" and, together with the DIP Borrower, the "<u>Debtors</u>" or the "<u>Loan Parties</u>") |
| DIP Agent | > WSFS, as administrative agent and collateral agent (the "<u>DIP Agent</u>") |
| DIP Lenders | > Certain  lenders party to the Existing Term Loan Credit Agreement (the "<u>DIP Lenders</u>")<br>> The obligation of any DIP Lender to fund any loan under the DIP Facility may be fulfilled on behalf of such DIP Lender by any of such DIP Lender's affiliated or related funds or financing vehicles.  The DIP Lenders may, by notice to the DIP Borrower, modify the funding mechanics of the DIP Facility to mitigate or avoid any adverse tax effects on the DIP Lenders, provided that any such change shall not result in a material cost or expense (other than fronting or similar fees) to the DIP Lenders or the Debtors |
| Amount & Type | > A superpriority Senior Secured Debtor-in-Possession Term Loan credit facility in an aggregate principal amount not to exceed $150 million consisting of the following 2 tranches, subject to the terms and conditions of this DIP and Term Loan Exchange Term Sheet and the definitive credit documentation:<br>– "New Money Loan Tranche": $50 million multiple draw senior secured term loan facility (such loans, the "<u>New Money Loans</u>"; the commitments thereof, the "<u>New Money Commitments</u>")<br>– "Roll-up Loan Tranche": $100 million tranche of term loans resulting from the exchange of Existing Term Loans pursuant to the Exchange Procedures (such loans, the "<u>Roll-Up Loans</u>") |
| Exchange Procedures | > The Loan Parties and the Existing Term Lenders that hold at least 75% in principal amount outstanding under the Existing Term Loan Credit Agreement (the "<u>Requisite Lenders</u>") shall enter into a Restructuring Support Agreement (the "<u>RSA</u>") (which shall be in form and substance acceptable to the DIP Agent and the DIP Lenders)<br>> Pursuant to and upon execution of the RSA (the "<u>Exchange Commencement Date</u>"), the Loan Parties shall implement an offer to all Existing Term Loan Lenders to exchange their respective pro rata share of up to $100 million of the Existing Term Loans for (x) their respective pro rata share of up to $100 million of Roll-Up Loans under the DIP Facility and (y) their respective commitment to loan their respective pro rata share of New Money Loans pursuant to the New Money Commitments (such offer, the "<u>Exchange Offer</u>")<br>> The Loan Parties shall implement the Exchange Offer via transmittal of offering and commitment materials to "public-side" and "private-side" Existing Term Loan Lenders through the lender site maintained by the Existing Term Loan Agent.<br>> The Exchange Offer shall be open from the Exchange Commencement Date until a date to be determined, but no later than one business day before the Petition Date, which may be extended by agreement of the Loan Parties and the Initial Committing DIP Lenders (as defined below)<br>> Upon the completion of the Exchange Offer, the Initial Committing DIP Lenders' New Money Commitments shall be reduced pro rata, based on the New Money Commitments of Existing Term Lenders that elect to participate in the Exchange Offer, but in no case below any Initial Committing DIP Lenders' pro rata share of the total New Money Commitments based on their total aggregate principal holdings of Existing Term Loans |
| 1. Initial Draw | > $**20** million upon or within 3 business days of Interim DIP Order |

-1-

| Item | Description |
|---|---|
| > Conditions Precedent to Initial Draw | > Entry into RSA by Debtors and the Requisite Lenders, in form and substance acceptable to the DIP Agent and the DIP Lenders<br>> Entry of Interim DIP Order in form and substance acceptable to the DIP Agent and the DIP Lenders approving DIP Facility, the Exchange Procedures, any debtor-in-possession financing provided by the lenders under the Existing ABL Credit Agreement (which debtor-in-possession financing shall be in form and substance acceptable to the DIP Agent and the DIP Lenders) and use of cash collateral within three (3) business days of the date of commencement of the Chapter 11 Cases (the "Petition Date")<br>> Filing of first day motions and entry of first day orders, in form and substance acceptable to the DIP Agent and the DIP Lenders<br>> Entry of order approving GOB sales, in form and substance acceptable to the DIP Agent and the DIP Lenders<br>> Filing of lease rejection motion regarding stores being closed, in form and substance acceptable to the DIP Agent and the DIP Lenders<br>> All DIP Documents shall have been executed by the Loan Parties and the other parties thereto<br>> No material adverse change since the Petition Date<br>> Received Budget in form and substance acceptable to the DIP Lenders (the "DIP Budget")<br>> Payment of all fees and expenses<br>> Receipt of satisfactory "know your customer" and similar information<br>> Upon entry of the Interim DIP Order, the DIP Agent shall, for the benefit of itself and the DIP Lenders, have valid and perfected first priority liens on the DIP Collateral (as defined below) to the extent set forth in the Interim DIP Order, subject only to liens permitted by the DIP Documents, and all filing and recording fees and taxes with respect to such liens and security interests that are then due and payable shall have been duly paid.<br>> The satisfaction of other customary terms and conditions (including, without limitation, delivery of secretary and officer certificates, notice of borrowing, evidence of insurance, and legal opinions) and such other conditions as shall be required by the DIP Agent and the DIP Lenders |
| 2. Second Draw | > $20 million |
| > Conditions Precedent to Second Draw | > The Debtors shall file a plan (the "Plan") and related disclosure statement (the "Disclosure Statement"), in each case, consistent with the RSA and in form and substance acceptable to the DIP Lenders as soon as practicable but no later than 15 days of commencement of the Chapter 11 Cases<br>> Interim DIP Order in full force and effect, and shall not have been amended or otherwise modified; in compliance with Interim DIP Order<br>> The Debtors shall have satisfied the Milestone (as defined in the RSA) set forth in section 4(e) of the RSA.<br>> Reps and warranties true and correct in all material respects<br>> No default or event of default<br>> DIP loans made subject to and in accordance with the Budget |
| Final Draw | > $10 million shall be available, with the consent, and at the sole discretion, of DIP Lenders (50% threshold) and provided (i) the Final DIP Order approving DIP Facility, the Exchange Procedures, any debtor-in-possession financing provided by the lenders under the Existing ABL Credit Agreement and use of cash collateral shall be in form and substance acceptable to the DIP Agent and the DIP Lenders and shall have been entered on or before 35 days after the Petition Date, (ii) the Final DIP Order shall be in full force and effect, and shall not have been amended or otherwise modified; in compliance with the Final DIP Order and (iii) the order rejecting leases of stores being closed shall be in form and substance acceptable to the DIP Agent and the DIP Lenders and shall have been entered by the Bankruptcy Court. |

| Item | Description |
|------|-------------|
| DIP Liens/Collateral | > Second lien on all ABL Priority Collateral (as defined in the ABL/First Lien Intercreditor Agreement, dated October 10, 2013 (the "Intercreditor Agreement"))<br>  &ndash; Primes liens on ABL Priority Collateral securing Existing Tem Loans<br>> First priority lien on all other Company assets,<br>  &ndash; Primes liens on Term Priority Collateral (as defined in the Intercreditor Agreement) securing Existing Term Loans<br>  &ndash; First priority liens on all unencumbered assets including, without limitation, proceeds of avoidance actions<br>> Allowed super-priority administrative expense claim<br>> All of the forging liens (collectively, the "DIP Liens") on all of the forging collateral (collectively, the "DIP Collateral") shall be created on terms, and pursuant to documentation, satisfactory to the DIP Agent and the DIP Lenders in their discretion |
| Use of Proceeds | > Working capital and other general corporate purposes and fund the costs of administration of the Chapter 11 Cases, in each case, solely in accordance with the DIP Budget (subject to any permitted variances)<br>> Pay DIP obligations, including without limitation, fees, costs, and expenses<br>> Neither any carve-out, nor any cash collateral nor the DIP Facility may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to the DIP Facility or the Existing Term Loan Credit Agreement, or the security interests and liens securing the DIP Facility or the obligations under the Existing Term Loan Credit Agreement with respect thereto, or to fund prosecution or assertion of any claims, or to otherwise litigate against the DIP Agent, the DIP Lenders, the Existing Term Loan Agent or the Existing Term Lenders, provided that up to $35,000 of any carve-out shall be made available to any official unsecured creditors' committee appointed in the Chapter 11 Cases (the "Creditors' Committee") for investigation costs in respect of the stipulations contemplated below |
| Milestones | > Entry into Interim DIP Order within three (3) business days of the Petition Date<br>> Filing of Motion Requesting an Extension of the Date to Assume and Reject Leases within 10 days of the Petition Date<br>> Entry of Final DIP Order within 35 days of Petition Date<br>> Plan, Disclosure Statement and proposed solicitation materials and motion to approve the Disclosure Statement and solicitation procedures, in each case, filed within 15 days of Petition Date<br>> Entry of order approving Disclosure Statement and solicitation procedures within 50 days of Petition Date; if not approved by such date, Loan Parties shall file within 55 days of Petition Date a motion to approve sale of substantially all assets (the "Sale") under section 363 of the Bankruptcy Code ("Sale Motion"), which Sale Motion, terms of such Sale and related bidding procedures shall be in form and substance acceptable to the DIP Agent and the DIP Lenders<br>> Order of the Bankruptcy Court confirming the Plan entered within 105 days of Petition Date<br>> Effective date of the Plan shall occur within 115 days of Petition Date<br>> If Sale Motion filed, entry of order approving bidding procedures in form and substance acceptable to the DIP Agent and the DIP Lenders within 75 days of the Petition Date<br>> If Sale Motion filed, entry of order approving the Sale in form and substance acceptable to the DIP Agent and the DIP Lenders within 110 days of the Petition Date<br>> If Sale Motion filed, the Sale shall be consummated within 120 days of the Petition Date<br>> Draws subject to minimum levels of free rent in bankruptcy and go-forward rent concessions |
| DIP Credit Rating | > Within 15 days of Petition Date<br>> Company required to initiate Moody's and S&P ratings process for DIP Facility prior to Petition Date<br>> A private letter rating is acceptable |

| Item | Description |
|---|---|
| DIP Term Loan Maturity Date and Termination Date | > Earliest of (i) six (6) months after the Petition Date, (ii) the effective date of a plan of reorganization pursuant to and in accordance with the RSA, (iii) the date all DIP obligations become due and payable under the definitive DIP credit documentation, whether by acceleration or otherwise, (iv) the date of the closing of a sale of all or substantially all of the Debtors' assets, (v) the first business day on which the Interim DIP Order expires by its terms or is terminated, unless the Final DIP Order has been entered and become effective prior thereto, (vi) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Agent and the requisite DIP Lenders, and (vii) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the DIP Agent and the requisite DIP Lenders |
| Early Payment Premium | > 2% of New Money Loans, payable in full in cash to all DIP Lenders upon the refinancing of the DIP Facility prior to maturity with another debtor-in-possession credit facility |
| OID | > 2.5% of New Money Loans |
| Interest Rate | > New Money Loans: 12% per annum<br>> Roll-Up Loans: L+4.625% |
| Put Option Premium | > 3% of New Money Loans, payable in full in cash to the initial lenders that commit to provide the New Money Commitments before the Exchange Commencement Date (the "Initial Committing DIP Lenders") upon entry of Interim Order |
| DIP Agent Fee | > $75,000 |
| Default Interest Rate | > Incremental 2% per annum upon the incurrence and continuation of an event of default |
| Events of Default | > Customary and appropriate for similar debtor-in-possession financings, including, without limitation, payment default, breaches of loan documents, reps and warranties, Milestones, compliance with DIP Budget (subject to permitted variances), termination or breach of RSA, the debtors engage in an alternative transaction, bankruptcy and lien related defaults, etc., together with such additions and modifications as determined by the DIP Lenders, and cross-default to the debtor-in-possession senior revolving credit agreement to be provided by the ABL Lenders (such facility, the "DIP ABL Facility") |
| Covenants | > Affirmative and negative covenants customary and appropriate for similar debtor-in-possession financings, together with such additions and modifications as determined by the DIP Lenders, including, without limitation, bankruptcy related covenants and compliance with DIP Budget and permitted variances (i.e., receipts, disbursements, etc.) |
| Budget | > Must be in form and substance acceptable to the DIP Agent and the DIP lenders;[1] to the extent any updated DIP Budget is not acceptable to the DIP Agent and the DIP Lenders, the then existing DIP Budget will remain the "DIP Budget" until replaced by an updated DIP Budget acceptable to the DIP Agent and the DIP Lenders<br>> DIP Budget shall reflect no projected disbursements for payment of "critical vendors" |
| Compliance with Budget | > Compliance with the DIP Budget on a line-by-line basis, subject to permitted variances; permitted line-by-line variances TBD |

---

[1] Any budgeted professional fees will need to be acceptable to the DIP Lenders and reflected in the DIP Budget prior to the delivery of any commitments to fund, or any funding of, the DIP Facility.

| Item | Description |
|------|-------------|
| Reps and Warranties | > Customary and appropriate for similar debtor-in-possession financings, together with such additions and modifications as determined by the DIP Lenders |
| Mandatory Prepayments | > Subject to the terms of the Intercreditor Agreement, 100% of net cash proceeds of (i) asset sales (other than ordinary course), subject to the General Unsecured Claims Carve-Out (as defined below), (ii) casualty events and (iii) incurrence of indebtedness (other than permitted indebtedness under the DIP Documents) |
| Reporting | > Reporting and information covenants customary and appropriate for similar debtor-in-possession financings, together with such additions and modifications as determined by the DIP Lenders, including, without limitation, (i) rolling 13-week cash flow projections, (ii) line-by-line variance reports, (iii) no less than three (3) days prior to filing, drafts of all first and second day pleadings, motions, applications and any other documents in connection therewith filed by or on behalf of the Debtors or delivered to the U.S. Trustee, or distributed to any official committee, and (iv) no less than one (1) day prior to filing, drafts of any other pleadings, motions, applications and documents filed by or on behalf of the Debtors or delivered to the U.S. Trustee, or distributed to any official committee |
| Adequate Protection for Prepetition Term Loan Lenders | > Replacement liens on all prepetition collateral<br>> Additional liens on all previously unencumbered assets<br>> Allowed super-priority administrative expense claim to the extent of diminution in value<br>> Payment of reasonable and documented out of pocket fees and expenses of the Existing Term Loan Agent and the ad hoc group of Existing Term Lenders represented by Jones Day (the "Ad Hoc TL Group") and, so long as the RSA has not been terminated as a result of a breach by the ad hoc group of existing cross-holders represented by Milbank, Tweed, Hadley & McCloy LLP (the "Ad Hoc Cross-Holder Group"), the Ad Hoc Cross-Holder Group in an aggregate amount not to exceed $250,000 for fees and expenses incurred from and after the Petition Date. |
| Fees and Expenses; Indemnification | > Loan Parties obligated under the DIP Facility to pay all reasonable, documented out-of-pocket fees, costs and expenses incurred or accrued by the DIP Agent and/or the DIP Lenders (including all unpaid prepetition fees, costs and expenses) in connection with any and all aspects of the DIP Facility and the Chapter 11 Cases, including, without limitation, the reasonable fees and expenses of legal counsel and other advisors and professionals, hired by or on behalf of the DIP Agent and/or the DIP Lenders (limited to one primary counsel and one local counsel for each of the DIP Agent and the DIP Lenders collectively)<br>> The Loan Parties will indemnify the DIP Agent and DIP Lenders, and hold them harmless from and against all reasonable out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility, except solely for gross negligence, bad faith or willful misconduct of such indemnified party to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction |
| Cooperation | > The Loan Parties will assist the DIP Agent and the DIP Lenders in the syndication of the DIP Facility and the Exchange Offer as reasonably requested, and will provide customary information and documents in connection therewith |
| Documentation | > The DIP Credit Agreement and the other DIP Documents shall be prepared by counsel for the DIP Agent (and to be based on the Existing Term Loan Credit Agreement and the other "Loan Documents" (as defined in the Existing Term Loan Credit Agreement)), and shall be in form and substance acceptable to the DIP Agent and the DIP Lenders.  No security documents will be required but instead, the DIP Agent and the DIP Lenders will rely on the DIP Orders; provided, however, that if security documents are required in connection with the DIP ABL Facility, they shall also be required in connection with DIP Facility. |

| Item | Description |
|------|-------------|
| Stipulations | > The DIP Orders shall contain stipulations as to, among other things, the amount, validity, priority and enforceability of the secured indebtedness and obligations under the Existing Term Loan Credit Agreement |
| Waivers | > Final DIP Order shall include waivers of the "equities of the case" exception to section 552(b), a 506(c) waiver and a marshaling waiver |
| Releases | > Pursuant to the DIP Orders, the Loan Parties shall release all claims against the DIP Agent, the DIP Lenders, the Existing Term Loan Agent, the Existing Term Lenders and the Restructuring Support Parties (as defined in the RSA), subject to a customary challenge period for the Creditors' Committee of 60 days following the formation of the Creditors' Committee or 75 days following the entry of the Interim DIP Order for a creditor or party in interest other than the Creditors' Committee |
| Governing Law | > The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code |
| Miscellaneous | > The DIP and Term Loan Exchange Term Sheet does not purport to summarize all of the conditions, covenants, representations, warranties, events of default and other terms and provisions which would be contained in definitive credit documentation, if any, relating to matters covered hereby, all of which shall be acceptable in form and substance to the DIP Agent and DIP Lenders |

| Item | Description |
|------|-------------|
| **Restructuring Terms** | |
| Restructuring Support and Exchange Agreement | > All Existing Term Lenders shall be offered the opportunity to execute the RSA.<br>> Pursuant to the RSA, Existing Term Lenders may either commit to (x) exchange their Existing Term Loans for a like amount of Roll-Up Loans and to commit to their respective pro rata share of the New Money Commitment and vote their existing claims arising under the Existing Term Loan Credit Agreement (the "Existing Term Loan Claims") to accept the Plan (and support all transactions implemented thereunder) or (y) vote their Existing Term Loan Claims to accept the Plan (and support all transactions implemented thereunder).<br>> The Plan shall be consistent with terms of and schedules and exhibits to the RSA |
| Treatment of New Money Loan Claims | > Upon the effective date of the Plan, the claims arising from the New Money Loans shall be converted into a like amount of term loans under the Senior Secured Term Loan of $50 million face ("Exit Term Loan Facility") |
| Treatment of Roll-Up Loan Claims | > Upon the effective date of the Plan, the claims arising from the Roll-Up Loans shall be converted into (x) 77% of the equity interests in reorganized rue21, inc. (the "New Equity") in the event the GUC Acceptance Scenario (as defined below) occurs or (y) 80% of the New Equity if the GUC Acceptance Scenario does not occur, in each case, subject to dilution for any New Equity issued under a Management Incentive Plan |
| Treatment of Existing Term Loan Claims | > Upon the effective date of the Plan, the Existing Term Loan Claims shall be converted into (x) 19% of the New Equity in the event the GUC Acceptance Scenario occurs or (y) 20% of the New Equity if the GUC Acceptance Scenario does not occur, in each case, subject to dilution for any New Equity issued under a Management Incentive Plan. |
| Treatment of General Unsecured Claims | > Upon the effective date of the Plan, if the class of allowed general unsecured claims (including the Note Claims (as defined in the RSA)) votes to accept the Plan (the "GUC Acceptance Scenario"), such class shall receive their pro rata share (based upon all allowed general unsecured claims) of (a) 4% of the New Equity, subject to dilution for any New Equity issued under a Management Incentive Plan, and (b) 100% of the proceeds of avoidance actions (which shall be preserved for the Debtors' estates for the exclusive benefit of holders of general unsecured claims and pursued, settled, abandoned or otherwise treated in a manner that is cost-neutral to the Debtors' estates and otherwise in accordance with procedures to be established by the Debtors and any Official Committee of Unsecured Creditors) other than any actions against (1) trade vendors that are continuing to do business with reorganized rue21, inc. and the factors that are continuing to finance such trade vendors, (2) any of the Restructuring Support Parties (as defined in the RSA) and DIP Lenders, including lenders of the Roll-Up Loans, in each case, in their capacities as such, and (3) any professional of the Debtors or Restructuring Support Parties; provided that holders of claims arising under the Existing Term Loan Credit Agreement shall be permitted to vote, but shall waive all rights to, and shall not receive any distribution of the foregoing property on account of such claims.  In the event the class of general unsecured claims under the Plan rejects the Plan, holders of allowed general unsecured claims shall not receive any distribution under the Plan.  For the avoidance of doubt, the Plan will include, for each Debtor, a single class of general unsecured claims that will include the Note Claims.<br>> In the event of a Sale, consideration of equal value shall be set aside from the net cash proceeds of the Sale and holders of allowed general unsecured claims shall receive their pro rata share of such consideration.<br>> In the event that the Plan is not consummated for any reason, other than the failure of the class of general unsecured claims to vote to accept the Plan, notwithstanding anything to the contrary in this Term Sheet, any subsequent plan or transaction shall provide for economically equal treatment on similar conditions set forth in this section; provided that, in the event of such a subsequent plan, such treatment shall only provide for the recoveries described in this section if the class of general unsecured claims (or such other class in which the Note Claims are classified) vote to accept such |

plan, and if the holders of claims in such class (or such other class in which the Note Claims are classified) reject such plan, such holders shall not receive any distribution of property under such plan (the provisions of this section collectively referred to as the "General Unsecured Claims Carve-Out").

| Item | Description |
|------|-------------|
| Exit Term Loan Facility Terms | |
| Interest Rate | > 12.5% per annum cash rate, payable quarterly in arrears |
| Amortization | > 5% per annum, payable quarterly in arrears commencing January 2018 |
| Excess Cash Flow Sweep | > 65% payable quarterly commencing January 2018; repaid at par; excess cash flow definition to be agreed |
| Voluntary Prepayments | > Prepay, in whole or in part, the Exit Term Loan Facility at the Company's discretion, subject to the payment of the Prepayment Premium (as defined below) |
| Prepayment Premium | > 102% of par (the "Prepayment Premium") |
| Right of First Refusal on ABL Take Out | > Exit Term Loan Facility lenders shall have a right of first refusal in the event the Reorganized Debtors seek to refinance the amount outstanding under the Existing ABL Credit Agreement |
| Maturity Date | > 5 years from closing date of the Exit Term Loan Facility |

| Item | Description |
|------|-------------|
| Other Requirements | |
| Exculpation and Releases | > Plan shall provide for exculpation and releases of Debtors, Initial Committing DIP Lenders, DIP Lenders, DIP Agent, the Restructuring Support Parties, Existing Term Loan Agent, and Existing ABL Agent with respect to, among other things, the Debtors, the Chapter 11 Cases, the Plan and all transactions contemplated thereunder and the negotiation, formulation and solicitation thereof, the Disclosure Statement, the RSA and the DIP Facility and the negotiation, formulation and consummation thereof.  The Plan shall provide for compulsory releases of the DIP Agent, the DIP Lenders, the Existing Term Loan Agent, the members of the Ad Hoc TL Group, the members of the Ad Hoc Cross-Holder Group and the Restructuring Support Parties, and each of their respective representatives (in their capacities as such) in respect of the foregoing matters; provided, however, that such compulsory releases shall not include releases of any Existing Term Lenders that do not participate in the DIP Facility. |
| Corporate Governance | > Board of Reorganized rue 21, inc. to consist of 5 directors (the "New Board")<br>> Initial Committing DIP Lenders to appoint 4 of the 5 directors<br>   − Bayside and Stonehill to each have the right to designate one director to the New Board<br>   − Voya to retain board observer rights for 18 months post-bankruptcy |
| Management Incentive Plan | > A Management Incentive Plan on terms to be determined in the sole discretion of the New Board. |
| New Equity | > New Equity must be freely tradable and DTC-eligible |
| Tax Issues | > The Plan shall be structured to preserve or otherwise maximize favorable tax attributes (including tax basis) of the Debtors to the extent practicable. |

**Exhibit B** **to the Restructuring Support Agreement**

**Form of Transferee Joinder**

**Form of Transferee Joinder**

This joinder (this "Joinder") to the Restructuring Support Agreement (the "Agreement"), dated as of May [__], 2017, by and among: (i) Rhodes Holdco ("Holdings"), rue21, inc. ("rue21") and each of rue21's subsidiaries (such subsidiaries, Holdings and rue21, each a "rue21 Entity," and collectively, the "rue21 Entities") and (ii) the Consenting Term Loan Lenders, is executed and delivered by [_____] (the "Joining Party") as of [_____]. Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

1.    Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as Annex 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Restructuring Support Parties.

2.    Representations and Warranties.  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof and upon the effectiveness of any Transfers, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the Claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in Section 18 of the Agreement to each other Party.

3.    Governing Law.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.    Notice.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile:
Email:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**


By: _____

Name:

Title:


Principal Amount of Term Loan Claims:          $_____


Principal Amount of Note Claims:          $_____


<u>Notice Address</u>:



Fax:

Attention:

Email:

**<u>Annex 1</u> to the Form of Transferee Joinder**