FILED
9/8/17 7:37 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Case No. 17-22045-GLT |
| | : | |
| rue21, inc., *et al.*,[1] | : | Chapter 11 |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | Related to Dkt. Nos. 695, 917 |

### MEMORANDUM OPINION

After just over 100 days in bankruptcy, rue21, inc.[2] and its debtor–affiliates stand poised to obtain confirmation of their chapter 11 plan.  Over that brief span, rue21 negotiated a largely consensual plan that significantly deleverages its balance sheet, reduces its store footprint, jettisons cumbersome leases, provides for future liquidity needs, and earned the support of over 93% of its impaired creditors.

But is it happening too fast?  The Official Committee of Unsecured Creditors opposes the Plan to the extent it releases the Debtors' claims against its equity holder.  The claims currently have no merit, but the Committee suggests they could be resurrected by a favorable ruling from the Supreme Court of the United States over the next ten months.  The Committee asks this Court to preserve those claims by striking the release language from the plan and inserting a new provision which creates a liquidating trust to prosecute the claims if they ever become viable.

After considering the evidence presented at the confirmation hearing, the Court finds no basis to delay confirmation pending a ruling that may never come.  It also finds no basis

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax-identification number, include: rue21, inc. (1645); Rhodes Holdco, Inc. (6922); r services llc (9425); and rue services corporation (0396).  The location of the Debtors' service address is:  800 Commonwealth Drive, Warrendale, Pennsylvania 15086.

[2]    Capitalized terms not otherwise defined herein shall have the same meaning ascribed in the Plan, as defined herein. Note that the registered corporate names of Debtors rue21, inc., r services llc, and rue services corporation begin with a lower case "r," and this Memorandum will honor that convention.

to materially rewrite a plan that the creditor body overwhelmingly accepted.  For the reasons set forth herein, the Court overrules the Committee's objection and will approve confirmation of the Plan.

## I.

rue21 is a specialty fashion retailer of girls' and guys' apparel and accessories, employing approximately 3,500 full-time and 15,800 part-time employees as of the petition date. At the time of its bankruptcy filing, rue21 sold merchandise through an online store and 1,179 brick-and-mortar stores located in strip malls, regional malls, and outlet centers throughout the contiguous forty-eight states.[3]

rue21 has been in the retail clothing business for over thirty-seven years under a variety of organizational and ownership forms.  It was originally a trade name of Pennsylvania Fashions, Inc., a company that exited from chapter 11 bankruptcy proceedings in 2004, after which funds advised by Saunders, Karp & Megrue Partners, LLP (the "SKM Funds") owned the majority of rue21 shares.  In 2005, the SKM Funds became associated with Apax Partners L.P. ("Apax") which became the advisor to the SKM Funds.

In 2009, rue21 made its initial public offering ("IPO") and became a publicly traded company on the NASDAQ Global Select Market under the ticker "RUE."  After a second IPO in 2010, the SKM Funds controlled by Apax owned 29% of the publicly traded shares in rue21.  In 2013, Apax-controlled funds agreed to acquire all outstanding shares of rue21 through a leveraged buy-out (the "LBO").[4]  The LBO was successfully completed, and it is undisputed that Apax

---

[3]    *Declaration of Todd M. Lenhart, Acting Chief Financial Officer and Senior Vice President of Accounting of rue21, inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "Lenhart Decl."),  Dkt. No. 8 at ¶ 5.

[4]    Id. at ¶ 23.

controlled at least the majority of shares of rue21 at the time the current bankruptcy petition was filed.  Apax is the sponsoring agency in this bankruptcy.[5]

### Prepetition Debt Obligations[6]

Following the LBO, rue21 undertook several debt obligations.  On October 10, 2013, rue21 entered into a $150 million [Prepetition] ABL Credit Agreement with Bank of America, N.A. ("BOA").  As of the petition date, approximately $72 million was owed under the Prepetition ABL Facility.

rue21 and JPMorgan Chase Bank, N.A. (succeeded by Wilmington Savings Fund, FSB) executed a [Prepetition] Term Loan Credit Agreement on October 10, 2013.  This senior secured term loan facility was in an initial aggregate principal amount of $538.5 million, maturing in October of 2020.  On the petition date, approximately $521 million was outstanding on the Prepetition Term Loan Credit Agreement.

Indenture Trustee Wilmington Trust, N.A. (successor to Wells Fargo Bank, N.A.) and rue21, inc. (successor to Rhodes Merger Sub, Inc.) signed the Unsecured Notes Indenture also on October 10, 2013.  Under the Unsecured Notes Indenture, rue21 issued $250 million of its 9% senior unsecured notes due October of 2020.  As of the petition date, the debtors owed approximately $239 million on the Unsecured Notes.

Also as of the petition date, rue21 owed approximately $132 million in general unsecured claims.

---

[5]     The precise relationship among Apax, its controlled funds, and the Debtors is not clear in the record.

[6]     The factual descriptions here are taken from the *First Amended Debtors' Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"), Dkt. No. 697 at IV.D.1; see also Tr. Hrg. 17 (June 12, 2017) at Dkt. No. 639. There were no objections filed regarding the factual descriptions.

The parties do not dispute that retail businesses are facing difficult financial times.

As the Debtors concede (without objection by the other parties):

> The Debtors, like many other apparel and retail companies, have faced a challenging commercial environment over the past several years. This environment has been exacerbated by increased competition and a shift of customer preferences away from physical retail stores.  Given the Debtors' substantial brick-and-mortar presence, their business has been heavily dependent on physical in-store traffic, which has declined in recent years. In addition to the challenging retail environment, the Debtors were historically slow to adapt to consumer trends. The Debtors' core demographics' interests in fashion are constantly evolving. . . . The Debtors also rely on their online presence and e-commerce platform for sales, which has historically underperformed.[7]

In fiscal year 2015, rue21 had gross sales of $1.130 billion, with earnings before interest, tax, depreciation, and amortization ("EBITDA") of approximately $105 million. However, in just one year, sales increased modestly to $1.137 billion, but EBITDA collapsed by almost 50% to $54 million.[8]

The Debtors faced deteriorating liquidity, and on March 31, 2017, they failed to make a required payment of principal and interest due under the Prepetition Term Loan Credit Agreement.  The same day, rue21 and the lenders entered into a Term Loan Forbearance Agreement.  On April 4, 2017, the Debtors, ABL Credit Agreement lenders, and others executed the ABL Forbearance Agreement (together with the Term Loan Forbearance Agreement, the "Forbearance Agreements").[9]

Pursuant to the Forbearance Agreements, rue21 agreed to prepare for a chapter 11 bankruptcy proceeding in an expeditious manner.[10]

---

[7]      Lenhart Decl., *supra* note 3, at ¶¶ 38–39.

[8]      Id. at ¶ 11.

[9]      Id.

[10]     Id. at ¶ 44.

4

Before the petition was filed, the ABL Credit Agreement Lenders agreed to provide a $125 million DIP ABL Credit Facility to replace the Prepetition ABL Credit Agreement, and the term-loan lenders approved a DIP Term Loan DIP Facility of $150 million, which provided up to $50 million in new-money loans and conversion of up to $100 million of the Prepetition Term Loans.[11]

Finally, on May 15, 2017, the Debtors, ABL Lenders, Term Lenders, and Apax (through debtor Rhodes Holdings, LP) executed a Restructuring Support Agreement.[12]  The Restructuring Support Agreement provided a continuing agreement among those parties as to their duties and relationships during the chapter 11 proceedings.[13]

## The Petition and the Plan

The Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the U.S. Code on May 15, 2017, and their cases are jointly administered for procedural purposes. On May 23, 2017, the Committee was appointed.

The bankruptcy cases moved swiftly with relatively few disputes.  Just two weeks into the proceeding, the Debtors filed their initial plan of reorganization.[14]  The financial distribution scheme under the plan generally provided for:  (a) payment in full of the DIP ABL Facility as well as most other postpetition obligations; (b) converting the $50 million new-money DIP Term Loan Facility into a $50 million exit facility; (c) converting the $100 million "roll-up" DIP Term Loan Facility into 33% of new equity; (d) converting the Prepetition Term Loan

---

[11]    Id. at ¶ 49; *Declaration of Jonathan Brownstein*, Dkt. No. 21 at ¶ 27.

[12]    Lenhart Decl., *supra* note 3, at ¶ 52; id. at Ex. E, Dkt. No. 8-5 ("Restructuring Support Agreement").

[13]    Id. at Ex. E.  Among the principles underlying the Restructuring Support Agreement is the understanding that lender support for the bankruptcy proceeding is conditioned on adherence to a strict time schedule.

[14]    *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, Dkt. No. 314.

Lenders' Claims into 63% of new equity; and (e) a distribution to general unsecured creditors of a pro rata share of 4% of the new equity, plus a share of the proceeds of certain avoidance actions under certain conditions.[15]

The Committee initially objected to the Disclosure Statement and raised issues concerning the confirmability of the plan.  Intense negotiations soon followed, culminating in the filing of the Debtors' first amended plan on July 12, 2017,[16] which earned the unanimous support of the Committee members after the Committee won several concessions from the Debtors.[17]  The Court thereafter approved the Disclosure Statement and authorized the Committee to insert a letter of support into the packet of solicitation materials sent to creditors.[18]

After all the qualified ballots were tallied, it became clear that the Plan obtained support from all levels of the Debtors' capital structure.  The impaired classes who were entitled to vote on the Plan overwhelmingly accepted its terms.  In Class 4 (Prepetition Term Loan Secured Claims), 100% of the creditors voted to accept the plan.[19]  The Plan was also accepted in significant margins by more than 98% in amount and 93% in number of general unsecured creditors in Class 5.[20]

The Court received a smattering of Plan objections.  Importantly, no one comprehensively challenged the Plan's compliance with each of the elements required under 11

---

[15]     This is a significantly simplified statement of a complex distribution scheme, with each distribution subject to conditions and alternatives.  However, the distribution scheme in total has not been challenged.

[16]     See Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, Dkt. No. 695 (the "Plan").

[17]     Id.  Additional objections which are not relevant here were filed by other creditors.

[18]     Dkt. No. 719 at Schedule 2.

[19]     Certification of Adam J. Gorman of KCC, Dkt. No. 957 at ¶ 16.

[20]     Id.

U.S.C. § 1129 for confirmation.  While many creditors filed limited objections seeking to clarify their rights under the executory contracts and unexpired leases assumed under the Plan (including the cure amount necessary for assumption), these objections were largely settled or withdrawn prior to the confirmation hearing.

The Committee filed the only objection of any significance.[21]  Despite its public support for the Plan and its hope for an expedient confirmation,[22] the Committee questions the propriety of a release granted to Apax and its affiliates in Article VIII.C of the Plan (the "Apax Release").[23]  The Committee believes Apax and certain affiliates (collectively, "Apax") may have

---

[21]    <u>See</u> *Limited Objection of the Official Committee of Unsecured Creditors to the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Committee Objection"), Dkt. No. 917.

[22]    Although the Committee consented to solicitation of the Plan, it reserved the right to contest the Apax Release at the confirmation hearing.

[23]    Included with the "Debtor Release" located at Article VIII.C of the Plan, the Apax Release is just one facet of a general release granted by the Debtors in favor of a numerous third parties:

Pursuant to section 1123(b) of the Bankruptcy Code on and after and subject to the occurrence of the Effective Date, the Debtors and their Estates shall release each Released Party, and each Released Party is deemed released, acquitted and discharged by the Debtors, the Estates, and the Reorganized Debtors, each on behalf of itself and its predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates or the Reorganized Debtors, as applicable) whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Estates, the Reorganized Debtors, or such other releasing party would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the DIP Facilities, the DIP ABL Documents, the DIP Term Loan Documents, the Exit Credit Facilities Documents, the Restructuring Documents, the Restructuring Transactions, the Restructuring Support Agreement, the Chapter 11 Cases, the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of any security, asset, right, or interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation of, or distribution of property under, the Plan, the Disclosure Statement, the Restructuring Documents or

received constructive fraudulent transfers as part of the LBO, and it seeks to preserve those claims for the benefit of the bankruptcy estate.[24]  One affiliate, SKM, reportedly received $300 million from the LBO as the largest shareholder at the time it occurred.[25]

The focus of the Committee's objection is quite narrow.  It does not contest any third-party release granted in Article VIII.D of the Plan, nor does it oppose the release of claims against Apax in its capacity as a lender under the senior secured term loan facility.  The Committee also confirmed it is no longer seeking to preserve claims against the Debtors' current and former directors and officers.  To the contrary, the Committee's sole concern is that the bankruptcy estate

---

related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct.  For the avoidance of doubt, Causes of Action against Excluded Parties are released as set forth in this Article VIII.C.

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration upon Class 5 voting to accept this Plan, and subject to the occurrence of the Effective Date, the Debtors and their Estates shall release any and all parties in interest in these Chapter 11 Cases, and each party in interest in these Chapter 11 Cases is deemed released, acquitted and discharged by the Debtors, the Estates, and the Reorganized Debtors each on behalf of itself and its predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, from any and all Preference Actions (including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates or the Reorganized Debtors, as applicable) whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, in law, equity, or otherwise, that the Debtors, the Estates, the Reorganized Debtors, or such other releasing party would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim or Interest or other Entity.

Plan, *supra* note 16, at 41–42 (emphasis removed).

[24]    Committee Objection, *supra* note 21, at 3.

[25]    Id. at 2.

may forfeit potentially valuable constructive fraudulent transfer claims against Apax arising out of the LBO if the release is approved in its entirety.

The Debtors ask the Court to overrule the Committee's objection and defer to their business judgment.  On June 30, 2017, a committee of independent directors was formed to investigate any potential claims against Apax that might arise out of the LBO.[26]  The independent committee retained Reed Smith LLP to assist with the examination.[27]  After reviewing documentation from the LBO (including board minutes, financial projections, and a fairness opinion from an independent financial advisor) and interviewing employees, financial advisors, accountants, and others involved with the LBO, Reed Smith issued a 79-page investigative report which determined that there were no colorable claims against Apax.[28]  The independent directors relied on the report to conclude that any potential claims against Apax would be barred as a matter of law.  The report observed that because all payments in the LBO were either made by or to a financial institution as a settlement payment, the safe harbor of 11 U.S.C. § 546(e) operated as complete defense to any state-law avoidance claim or constructive fraudulent-transfer claims.[29] The report also concluded that several other viable defenses existed which would preclude the Debtors from obtaining any recovery from Apax.  In consideration of these findings, the Debtors

---

[26]    See *Declaration of Neal Goldman in Support of Debtors' Reply to Limited Objection of the Official Committee of Unsecured Creditors to the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, Dkt. No. 987 (the "Goldman Decl.") at ¶ 6.  The independent committee consisted of Goldman and Amy Hauk. Id.

[27]    Id.

[28]    Id. at ¶¶ 8–9, 12, 14; see also *Analysis of Potential Estate Claims* (the "Investigative Committee Report"), Dkt. No. 914.

[29]    Goldman Decl., *supra* note 25, at ¶ 14.

contend that their decision to grant the Apax Release constitutes a settlement or compromise of claims as contemplated by 11 U.S.C. § 1123(b)(3)(A).

The Court conducted an evidentiary hearing on August 30, 2017 to consider confirmation of the Plan and the Committee's objection.  This matter is now ripe for adjudication.

The Court has jurisdiction in this matter under 28 U.S.C. §§ 1334 and 157(b)(2)(L). Venue is proper in this district pursuant to 28 U.S.C. § 1408.

## II.

A consensual plan of reorganization will be confirmed if it satisfies all the requirements set forth in 11 U.S.C. § 1129(a).[30]  In this case, the sole issue is whether the Plan can be confirmed when it contains a release of the Debtors' claims against Apax.  The parties agree that, in all other respects, the Plan complies with § 1129.

As the plan proponent, the Debtors bear the burden of proving that a plan containing the release is confirmable by a preponderance of the evidence.[31]  The parties differ, however, as to the standard that should be applied when the Court reviews the propriety of the release.  The absence of controlling Circuit authority on this subject has led to this conundrum.[32]  Both agree

---

[30]    In re Armstrong World Indus., Inc., 432 F.3d 507, 511 (3d Cir. 2005).

[31]    In re Wash. Mut., Inc., 442 B.R. 314, 328 (Bankr. D. Del. 2011) (citing In re Adelphia Commc'n Corp., 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007)); see also Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship), 115 F.3d 650, 653 (9th Cir. 1997); In the Matter of Briscoe Enters., Ltd., II, 994 F.2d 1160, 1165 (5th Cir. 1993).

[32]    Gillman v. Cont'l Airlines (In re Cont'l Airlines) is the closest the Circuit has come to addressing the standard for a plan release.  203 F.3d 203 (3d Cir. 2000).  Confronted with non-consensual releases of non-debtor claims against other non-debtors, the Circuit suggested that "fairness, necessity to the reorganization, and specific factual findings to support these conclusions" are the hallmarks of permissible non-consensual releases, but it declined to establish a standard by which these releases could be evaluated. Id. at 214 ("[W]e need not establish our own rule regarding the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible.").  Because non-debtor releases are subject to a much higher degree of scrutiny than debtor releases are, the Court does not find Continental applicable in this matter.

that, notwithstanding 11 U.S.C. § 524(e), a debtor can release claims against a third party in a plan.[33]

The Debtors claim the Apax Release represents a settlement and compromise of claims which may be included in the Plan pursuant to 11 U.S.C. § 1123(b)(3)(A).[34]   As a settlement, the Debtors contend that the Court should approve the release if it constitutes a valid exercise of their business judgment and is fair and reasonable.[35]   In other words, the Debtors suggest the release be viewed within the prism of a Bankruptcy Rule 9019 motion, with the Court weighing the costs and benefits of the settlement under the four-factor test established in this Circuit under Myers v. Martin (In re Martin).[36]   When evaluating the fairness of a settlement, the court need not be convinced that it is the best possible compromise, but only that it falls above the lowest range of reasonableness.[37]

The Committee counters that a more exacting standard is necessary.   Citing to a series of cases emanating from the bankruptcy court in Delaware, the Committee suggests that when evaluating the fairness of the debtor's release of non-debtors, bankruptcy courts within the Circuit consider five factors:

---

[33]    Under § 524(e), the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e).

[34]    *Debtors' Memorandum of Law in Support of Confirmation*, Dkt. No. 956 at ¶ 53. Under 11 U.S.C. § 1123(b)(3)(A), a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."

[35]    Id.

[36]    91 F.3d 369, 393 (3d Cir. 1996).  The Martin factors include: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience, and delay related to the pursuit of the action; and (4) the paramount interest of the creditors. Id.

[37]    In re Tribune Co., 464 B.R. 126, 158 (Bankr. D. Del. 2011).

(1)    an identity of interest between the debtor and released party such that a suit against the released party will deplete the estate's resources;

(2)    a substantial contribution to the plan by the released party;

(3)    the necessity of the release to the reorganization, to the extent that, without the release, there is little likelihood of success;

(4)    the overwhelming acceptance of the plan and release by creditors and interest holders; and

(5)    the payment of all or substantially all of the claims of the creditors and interest holders under the plan.[38]

Known as the <u>Master Mortgage</u> factors after the case which first articulated the standard,[39] these elements were later adopted by Judge Walrath as a useful tool to bring focus to an otherwise fact-intensive inquiry.[40]  Other courts have since relied on its reasoning when assessing the fairness of a debtor's release.[41]

To determine the applicable standard, the Court must first discern whether the release represents the compromise of a claim or an integrated component of the plan.  This requires an examination into the essence of the transaction.  A release shown to be part of a discernable settlement agreement should be evaluated under the <u>Martin</u> standard, notwithstanding its inclusion within a plan of reorganization.[42]  Conversely, if the release is so intertwined within the plan terms

---

[38]    Committee's Objection, *supra* note 21 at ¶ 14.

[39]    <u>In re Master Mortgage Inv. Fund, Inc.</u>, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).

    <u>See</u> <u>In re Zenith Electronics Corp.</u>, 241 B.R. 92, 110 (Bankr. D. Del. 1999).  Some courts refer to these factors as <u>Zenith</u> factors.

[41]    <u>See</u>, <u>e.g.</u>, <u>In re Genesis Health Ventures, Inc.</u>, 266 B.R. 591, 606 (Bankr. D. Del. 2001); <u>In re Exide Techs.</u>, 303 B.R. 48, 72 (Bankr. D. Del. 2003); <u>In re Wash. Mut.</u>, 442 B.R. at 346; <u>In re Indianapolis Downs, LLC</u>, 486 B.R. 286, 303 (Bankr. D. Del. 2013); <u>In re Hercules Offshore, Inc.</u>, 565 B.R. 732, 755–56 (Bankr. D. Del. 2016).

[42]    <u>See</u> <u>In re Spansion, Inc.</u>, 426 B.R. 114, 142–43 (Bankr. D. Del. 2010) (citing the <u>Master Mortgage</u> factors as relevant considerations in determining whether a plan release should be approved, notwithstanding his

that it is not easy to distinguish where the settlement ends and the plan begins, it should be evaluated under the <u>Master Mortgage</u> factors.

For this Court, the determinative test is whether the settlement and its corresponding release are severable from the plan and are capable of existing as a free-standing agreement. A compromise which arises out of negotiations on a discrete claim or involves a limited number of parties may satisfy this standard. The Court reaches this conclusion because a bona fide settlement should not be analyzed differently simply because it was, as a matter of expediency or efficiency, incorporated within the terms of a comprehensive plan.[43] On the other hand, a release which is broadly granted in favor of an entire category of unrelated creditors, professionals, or parties in interest would appear to be a general plan term that is unaffiliated with a specific claim or compromise.

Here, the record lacks sufficient proof to demonstrate that the Apax Release was intended to be a settlement of a claim. The Debtors appear to have done nothing more than a cursory assessment of their potential claims against Apax prior to the bankruptcy filing. In the flurry of pre-bankruptcy activity, the Debtors were justifiably consumed with stabilizing the business and obtaining the liquidity necessary to reorganize. With their funding tied to an aggressive timetable for emergence, the Debtors danced to the tune of the lenders' barrel organ and appear to have given little thought to the Apax Release when the Restructuring Support Agreement was signed. It was not until after the Committee was formed and began its own inquiry

---

holding that a debtor's plan release was a valid exercise of the debtor's business judgment and was fair, reasonable, and in the best interests of the estate); <u>In re Aleris Int'l, Inc.</u>, 2010 WL 3492664 (Bankr. D. Del. May 13, 2010); <u>see</u> <u>also</u> <u>In re Sabine Oil & Gas Corp.</u>, 555 B.R. 180, 188 (Bankr. S.D.N.Y. 2016) (noting that the settlement forms the basis of the plan).

[43]     <u>See</u> <u>In re TCI 2 Holdings, LLC</u>, 428 B.R. 117, 135 (Bankr. D.N.J. 2010) ("[T]he standard for approving settlements as part of a plan of reorganization are the same as the standards for approving settlements under Fed.R.Bankr.P. 9019.") citing <u>In re Nutritional Sourcing Corp.</u>, 398 B.R. 816, 832 (Bankr. D.Del. 2008).

that the Debtors marshaled the resources necessary to form the independent committee, retain professionals, and fully investigate the universe of claims that could arise out of the LBO.

Having found insufficient proof that the Apax Release is part of a settlement or compromise, the Court will consult the <u>Master Mortgage</u> factors, which merely serve as guidelines to frame the Court's fact-specific inquiry.  They are not binding.[44]  Because these factors are neither exclusive nor conjunctive requirements,[45] they are helpful in weighing the equities of a particular case—but the Court can chart its own course by adding additional factors, if necessary.[46]

The Court finds that augmentation of the <u>Master Mortgage</u> factors is warranted because they miss a critical concept in this case.  To adequately test the fairness of the Apax Release, the Court must also consider whether the released claims are colorable.  In many ways, this is one of the most prominent considerations because, if the released claims have no value, the other factors are largely irrelevant.

The Debtors have already indicated they will not pursue claims against Apax if the release is denied, thereby requiring derivative standing for any party who intends to commence the claim in their place.[47]  Derivative standing is unavailable, however, unless the party can establish the existence of a colorable claim.[48]  Just as there is no point in expending limited resources to pursue a meritless claim, the Court finds no utility in preserving a claim when there are no viable means to prosecute it.  By combining the test for a colorable claim with the <u>Master Mortgage</u>

---

[44]     <u>In re One2One Commc'ns, LLC</u>, 2016 WL 3398580 at *6 (D.N.J. June 14, 2016).

[45]     <u>See</u> <u>Wash. Mut.</u>, 442 B.R. at 346.

[46]     <u>See</u> <u>Indianapolis Downs</u>, 486 B.R. at 303.

[47]     <u>Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics v. Chinery</u>, 330 F.3d 548, 573 (3d Cir. 2003).

[48]     <u>In re Nat'l Forge Co.</u>, 326 B.R. 532, 543 (W.D. Pa. 2005).

factors, the Court can accurately assess whether the Debtors are forfeiting significant claims whose value exceeds any benefit obtained through the release.[49]    Accordingly, the Court will consider each of the <u>Master Mortgage</u> factors before addressing whether the claims are colorable.

As to the initial factor, the Court finds insufficient proof of an identity of interest between the Debtors and Apax.  A constructive fraudulent-transfer action against Apax could no doubt cause the Debtors to incur time and expense responding to discovery or providing testimony. But the Court finds that such actions would not substantially drain assets from the estate nor distract management's focus on a successful emergence from bankruptcy.  Assuming the claim is brought derivatively, the Debtors would not be a party to the action, and the level of executive involvement should be modest because virtually all the Debtors' board members and key executives at the time of the LBO no longer serve in those capacities.[50]  Unlike an action against directors and officers which might trigger their indemnification obligations, the Debtors cannot be compelled to finance a costly defense because they do not owe similar duties to Apax.

The second factor requires the Court to determine whether a substantial contribution was made in exchange for the release.  It is within the Court's discretion to determine whether the nature and size of the consideration rises to the level of a "substantial" contribution.

---

[49]    The Court's inquiry is aided by the fact that the claims at issue are discernable and considerably narrow.  The Committee seeks only to preserve constructive fraudulent transfer claims against Apax arising out of the LBO.

[50]    When the Apax stock purchase offer was first received in September of 2012, the board of directors consisted of Alex Pellegrini, John Megrue, Robert Fisch, Arnold Barron, Macon Brock, Bruce Hartman, Harlan Kent, and Laura Sen. <u>See</u> Investigative Committee Report, *supra* note 7, at 7.  At the time of the LBO, Fisch served as chief executive officer, Stacy Siegal was general counsel, and Keith McDonough served as chief financial officer.  <u>Id.</u> at 5, 36.  The other executives in upper management were Kim Reynolds (senior vice president and general merchandise manager), Michael Holland (senior vice president and chief information officer), and Mark Chrystal (senior vice president, eCommerce and Planning & Allocation).  <u>Id.</u> at Ex. 1, 55. According to the documents filed in this case, none of these individuals currently serve as officers or directors of the Debtors, nor are they slated for similar positions within the reorganized debtors.  <u>See</u> Disclosure Statement, *supra* note 6, at 1–13; *Plan Supplement to the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, Dkt. No. 870 at Ex. C.

This can lead to varied and seemingly inconsistent results.  In some cases, courts demand a "critical financial contribution . . . necessary to make the plan feasible,"[51]  while others suggest a contribution of "tangible assets" may be unnecessary.[52]  The picture is equally murky when courts consider whether a party's postpetition conduct can, on its own, justify a release.[53]  If nothing else, these variations demonstrate that the fact-intensive inquiry of one case prevents it from serving as a template for others.

Apax provided no monetary contribution to the plan.  The Debtors instead suggest value was provided through its participation in the Restructuring Support Agreement.  As a signatory to the agreement, Apax agreed to relinquish its equity without a fight.  Armed with Apax's consent (and those of other stakeholders), the Debtors gained the ability to emerge from bankruptcy in a matter of months—something they could not do without a consensual plan.  The Debtors consider this to be a substantial contribution because their business could not survive in bankruptcy during a prolonged fight over plan terms.[54]

The Debtors also suggest Apax provided indirect financial value in the Restructuring Support Agreement because it agreed not to sell or transfer any interest in the Debtors' stock.  In doing so, Apax agreed to forego the benefit of claiming a worthless stock

---

[51]    Genesis, 266 B.R. at 607.

[52]    See Exide, 303 B.R. at 74 n.37.

[53]    Compare Wash. Mut., 442 B.R. at 348–49 (denying a release to parties who merely fulfilled their fiduciary duties and did not provide an "extraordinary service"), and  Genesis, 266 B.R. at 606–07 (holding that restructuring efforts of directors and officers were not contributions to the reorganization when they were otherwise compensated), and Exide, 303 B.R. at 74 (holding that contributions of directors and officers, while meaningful, are insufficient to justify a release of prepetition claims), with Indianapolis Downs, 486 B.R. at 304 (permitting a release when postpetition work is performed without compensation); Hercules Offshore, 565 B.R. at 757 (holding that a release of the debtors' officers, directors, and professionals is appropriate).

[54]    Transcript of Confirmation Hearing on the Debtors' First Amended Joint Plan of Reorganization Dated July 12th, 2017 ("Transcript"), Dkt. No. 1059, p. 65.

16

deduction on account of its equity,[55] thereby potentially preserving approximately $80 million of net operating losses ("NOLs") for the Debtors' use in future years.[56]

The Committee discounts the role Apax played in the restructuring. It notes that any postpetition conduct of Apax was guided by a need to fulfill fiduciary obligations and would have been performed irrespective of whether the Restructuring Support Agreement existed. It suggests that in the absence of a monetary contribution, Apax is not entitled to a release from the Debtors.[57]

The Court concludes that the Apax contributions to the estate were indeed "substantial." Apax provided a valuable benefit to the reorganized debtors when it agreed to retain its stock holdings through the effective date of the Plan and forego the use of the worthless stock deductions. The result is a potential savings for the reorganized debtors through the preservation of tax attributes that could offset millions of dollars in taxable income.[58] Concurrently, Apax bears a material opportunity cost by forfeiting access to deductions that might otherwise reduce its own

---

[55]   Restructuring Support Agreement, *supra* note 12, at ¶ 7(e).

[56]   Transcript at 132–33.

[57]   The Court can't help but note a tinge of hypocrisy in the Committee's position. Taking an aggressive stand on principle, the Committee contends that Apax should not benefit from a release without first providing substantial consideration to the bankruptcy estate. Yet the Committee fails to apply the same standard to parties who may have received a preferential transfer. Under Article VIII.C of the Plan, the Debtors agreed to release all avoidance actions arising under 11 U.S.C. § 547 in the event Class 5 voted to accept it. The release applies to "all parties in interest in these Chapter 11 Cases" irrespective of whether they provide ongoing value or consideration (as Continuing Trade Parties or otherwise) to the estate. The Committee bargained for the release of Preference Actions because its constituency of unsecured creditors stood to benefit most from its inclusion in the Plan. The question of whether a specific release is fair or appropriate is, apparently, a matter of perspective.

[58]   The Debtors contend that if the reorganized debtors utilize a taxable sale transaction (identified as Alternative 2 on the Plan Supplement (as amended)), it will result in a significant step-up in taxable basis (estimated to be as much as $200 million) for which the tax attributes will be beneficial to the reorganized debtors. They also suggest that if Apax had taken the worthless stock deduction at the beginning of the bankruptcy case, it would have resulted in a "change of control" for tax purposes and limited the Debtors' ability to use their tax attributes thereafter.

tax liabilities in future years.  The success of the Plan may not have been contingent upon the

preservation of the NOLs, but that does not diminish the value or materiality of the contribution to

the estate.

The third factor requires the Court to consider whether the release is essential to the

reorganization such that, without it, there is little likelihood of success.  Here, the Court finds the

Apax Release to be a critical component of the multi-party agreement by which Debtors were able

to achieve consensus to support a plan of reorganization on an expedited track.  It is foreseeable

that unraveling one aspect of that agreement could lead to an unwinding of the entire enterprise.

A default may occur under § 3(b) of the Restructuring Support Agreement if the Plan "adversely

affects . . . the economic rights, waivers, or releases proposed to be granted to, or received by

[Apax]."[59]  Any litigation on the default would invariably lead to added delay, causing the Debtors

to miss certain benchmarks in their credit agreements, thereby jeopardizing their financing, and

impairing their ability to continue as a going concern.

The remaining two factors in the <u>Master Mortgage</u> analysis can be easily addressed.

The Plan received overwhelming support from all the Debtors' stakeholders, including an

acceptance rate of at least 93% from the impaired classes of creditors.  Even with its objection, the

Committee remains "extremely supportive of the plan."[60]  By the same token, the Plan does not

provide for substantial distributions for all creditors.  While the distributions exceed the amounts

that would be available in a liquidation, any value unsecured creditors can expect to receive is

dependent on the Debtors' future performance and will be nowhere close to a full payment.

---

[59]     Restructuring Support Agreement, *supra* note 12, at ¶ 3(b).

[60]     Transcript at p. 26.

The Court's final determination turns on whether the released claims are colorable. As bankruptcy is a value-maximizing exercise, claims which have intrinsic value should be preserved for the benefit of the estate, while those lacking merit can be abandoned.   The standard for determining whether a claim is colorable is the same used to evaluate a motion to dismiss for failure to state a claim.[61]  A claim that is not plausible on its face cannot survive.[62]

After reviewing the record, the Court concludes that the constructive fraudulent-transfer claim against Apax has no merit and is barred as a matter of law.  Section 546(e) of the Bankruptcy Code prohibits the avoidance of transfers by or to a financial institution that are made in connection with a securities contract or that constitute settlement payments.[63] Courts in this Circuit have extended this "safe-harbor" defense to transfers made in connection with a leveraged buy-out such as this LBO.[64]  The distributions received by Apax constitute settlement payments by a financial institution under section 546(e) and are protected from the constructive fraud claim alleged by the Committee.

The Committee nonetheless challenges the application of the section 546(e) safe harbor on the basis that the financial institution handling the transfers of stock and money in the

---

[61]     America's Hobby Ctr., Inc. v. Official Comm. of Unsecured Creditors (In re America's Hobby Ctr., Inc.), 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998)

[62]     Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

[63]     11 U.S.C. § 546(e) provides:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

[64]     In re Nat'l Forge Co., 344 B.R. at 370; In re Hechinger Inv. Co. of Del., 274 B.R. 71, 81 (D. Del. 2002).

LBO was merely acting as a conduit in the transaction.  Under binding Third Circuit precedent, however, the section 546(e) safe harbor defense is not vitiated simply because the financial institution serves as a conduit for the transfer.[65]  The Committee suggests that the better view was expressed by the Seventh Circuit in FTI Consulting, Inc. v. Merit Mgmt. Grp., LP,[66] which held that the financial institution under section 546(e) must have a beneficial interest in the transactions. With the circuits split between the two approaches,[67] the Supreme Court decided to grant certiorari in Merit Management. [68]  It will take up the case on November 6, 2017.

During the confirmation hearing, the Committee conceded that, at present, no viable claims exist against Apax.  It acknowledged that, under prevailing Third Circuit law, the safe harbor of 11 U.S.C. § 546(e) bars recovery against parties who received settlement payments from financial institutions during the LBO, including Apax.  Nevertheless, the Committee suggests that the Court not follow a binding precedent of our Court of Appeals, Resorts International,[69] but rather devise a "creative solution" that would preserve the Apax claims pending a possible reversal of that precedent by the Supreme Court:

---

[65]     In re Resorts Int'l, Inc., 181 F.3d 505, 517 (3d Cir.1999).

[66]     830 F.3d 690 (7th Cir. 2016).

[68]     The Merit Management court summarized the holdings of the seven circuits.  Id. at 697.  The Second, Sixth, Eighth, and Tenth Circuits rendered decisions consistent with the Third Circuit analysis.  See In re Quebecor World (USA) Inc., 719 F.3d 94 (2d Cir. 2013); Contemporary Indus. Corp. v. Frost, 564 F.3d 981, 987 (8th Cir. 2009); In re QSI Holdings, Inc., 571 F.3d 545, 551 (6th Cir. 2009); In re Kaiser Steel Corp., 952 F.2d 1230, 1240 (10th Cir. 1991).  The Eleventh Circuit joins the Seventh Circuit by finding section 546(e) inapplicable to payments made through financial institutions acting as mere conduits.  In Matter of Munford, Inc., 98 F.3d 604, 610 (11th Cir. 1996).

[68]     Merit Mgmt. Grp. v. FTI Consulting, Inc. 137 S. Ct. 2092 (Certiorari grant. May 1, 2017) ("The question presented is thus:  Whether the safe harbor of 11 U.S.C. § 546(e) prohibits avoidance of a transfer made by or to a financial institution, without regard to whether the institution has a beneficial interest in the property transferred, consistent with decisions from the Second, Third, Sixth, Eighth, and Tenth Circuits, but contrary to decisions from the Eleventh Circuit and now the Seventh Circuit.").

[69]     In re Resorts Int'l, Inc., 181 F.3d 505, 517 (3d Cir.1999).

> COUNSEL:  … we understand what the law is in this circuit under <u>Resorts</u>, but we note the <u>Merit Management</u> case that is currently – that the Supreme Court took on cert based upon the conflict of the circuits.  So the court, the Supreme Court, could change the law in the Third Circuit. . . .   We understand that if the Supreme Court decides to uphold <u>Resorts</u>, there is probably no case here that can be brought . . .  If the Supreme Court rules in favor of <u>Resorts,</u> then they're [Apax] completely protected.[70]

There is a fundamental legal error in the Committee's position.  It conflicts with

one of the central principles of American jurisprudence: *stare decisis*.

> The rule of adherence to judicial precedents finds its expression in the doctrine of stare decisis.  This doctrine is simply that, when a point or principle of the law has been once officially decided or settled by the ruling of a competent court in a case in which it is directly and necessarily involved, it will no longer be considered as open to examination or to a new ruling by the same tribunal, <u>or by those which are bound to follow its adjudications</u>, unless it be for urgent reasons and in exceptional cases.[71]

As the Court warned Committee counsel, it "takes its marching orders" from the Third Circuit.

Simply stated, this Court has no authority to ignore binding precedent from its Court of Appeals.

>  (Precedents) set by the higher courts . . . are conclusive on the lower courts, and leave to the latter no scope for independent judgment or discretion. . . .   A decision by this court, not overruled by the United States Supreme Court, is a decision of the court of last resort in this federal judicial circuit.  Thus our judgments . . . are binding on all inferior courts and litigants in the Third Judicial Circuit.[72]

---

[70]    Transcript at pp. 147 - 149.

[71]    William M. Lile et al., <u>Brief Making and the Use of Law Books</u> 321 (quoted in BLACK'S LAW DICTIONARY 1626 (10th ed. 2014)).

[72]    <u>Allegheny General Hospital v. NLRB</u>, 608 F.2d 965,970 (3d Cir. 1979).  The Court understands that there are circumstances when it may evaluate the continuing vitality of a precedent.  As discussed here, the U.S. Supreme Court might overturn the circuit decision.  Also, there may be a change in the underlying statutory law.  Or even when the precedent is so dated that a reasonable court might question it.  However, none of these exceptional circumstances occur here.

It is unquestioned that this Court is a lower court under the U.S. Court of Appeals for the Third Circuit.[73]

Thus, the precedential decision of the Third Circuit in <u>Resorts International</u> is binding on this Court.  It will remain so unless and until the Supreme Court overturns it.  The law in this matter is not ambiguous.  By the Committee's own admission, <u>Resorts International</u> is the law of the Circuit.  The Committee's "creative solution" is simply prohibited.

The Court concludes that the safe harbor provision of section 546(e), as applied in this Circuit, operates as a complete defense to state-law avoidance claims and constructive claims as alleged by the Committee against Apax.  Thus, it does not reach the question of the applicable statutes of limitations.

In summary, this Court must apply the law as it exists today.  It will not speculate on the outcome of future rulings, nor is it required to do so.  Because the Committee's objection is rooted in a fundamental error of law, the Court cannot conclude that any colorable constructive fraudulent transfer claims exist against Apax.  Having reviewed all of the factors necessary to assess the fairness of the Apax Release, the Court finds no compelling reason to exclude Apax from the release provisions of Article VIII.C of the Plan.

---

[73] <u>In re Taras</u>, 136 B.R. 941, 948 (Bankr. E.D. Pa. 1992) ("Principles of stare decisis command this court to follow the law of the circuit, as set forth by the [Court of Appeals], unless and until the Supreme Court [of the United States] directs to the contrary.").

**IV.**

For the reasons expressed above, the Court overrules the Committee's objection and will authorize confirmation of the Plan, inclusive of the Apax Release. A separate Order will issue.

Dated:  September 8, 2017

GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE